# TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................................... 2

ARGUMENT ................................................................................................................... 2

  STANDARD OF REVIEW ............................................................................................. 2

  THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT WITH
  RESPECT TO THE APPROPRIATENESS OF DOJ'S GLOMAR RESPONSES AS A
  MATTER OF LAW ....................................................................................................... 3

    The Information That Has Been Disclosed ............................................................... 5

      Disclosures made by President Trump and the White House ................................. 5

      Disclosures made by Director Comey and Admiral Rogers ................................. 13

      Other disclosures made ......................................................................................... 14

    There Is More Than Sufficient Evidence Of Public, Official Disclosures Of
    Information To Conclude That A Glomar Response Is Not Permissible As A Matter
    Of Law ...................................................................................................................... 18

  CONCLUSION ............................................................................................................ 22

# TABLE OF AUTHORITIES

## Cases

ACLU v. CIA, 710 F.3d 422 (D.C. Cir. 2013) ............................................................. 4, 19

Afshar v. Dep't of State, 702 F.2d 1125 (D.C. Cir. 1983)................................................. 17

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................................. 2, 3

Fitzgibbon v. CIA, 911 F.2d 755 (D.C. Cir. 1990)............................................................ 3

Frugone v. CIA, 169 F.3d 772 (D.C. Cir. 1999)................................................................ 17

Holcomb v. Powell, 433 F.3d 889 (D.C. Cir. 2006)....................................................... 2, 3

Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d 414 (2d. Cir. 1989) ... 17

Marino v. DEA, 685 F.3d 1076 (D.C. Cir. 2012)......................................................... 4, 19

Pub. Citizen Health Research Group v. FDA, 185 F.3d 898 (D.C. Cir. 1999).................. 3

Public Citizen v. Dep't of State, 11 F.3d 198 (D.C. Cir. 1993)....................................... 17

Roth v. Dep't of Justice, 642 F.3d 1161 (D.C. Cir. 2011)................................................. 3

Smith v. CIA, 2017 U.S. Dist. LEXIS 47230 (D.D.C. Mar. 30, 2017) ........................... 19

Wilson v. CIA, 586 F.3d 171 (2d Cir. 2009) .................................................................... 17

Wolf v. CIA, 473 F.3d 370 (D.C. Cir. 2007)........................................................... 3, 4, 19

## Other Authorities

http://www.ajc.com/news/national/read-transcripts-rep-devin-nunes-news-conferences-
about-trump-surveillance/NdZ4qQv7uBnjcH9E3HSRPJ/ (last accessed August 15,
2017) ............................................................................................................................. 16

http://www.foxnews.com/politics/2017/03/15/trump-calls-tax-return-leak-illegal-thinks-
msnbc-report-is-disgrace.html (last accessed August 15, 2017).................................... 8

http://www.nbcnews.com/meet-the-press/meet-press-03-05-17-n729271 (last accessed
August 15, 2017)........................................................................................................... 16

http://www.nbcnews.com/news/us-news/trump-reveals-he-asked-comey-whether-he-was-
under-investigation-n757821 (last accessed August 2, 2017) ........................................ 6

*https://factba.se/transcript/donald-trump-interview-fox-march-15-2017* (last accessed August 15, 2017)............................................................................................... 8

*https://www.nytimes.com/2017/01/19/us/politics/trump-russia-associates-investigation.html* (last accessed August 16, 2017) ...................................................... 12

*https://www.nytimes.com/2017/07/19/us/politics/trump-interview-sessions-russia.html?action=Click&contentCollection=BreakingNews &contentID=65596145 &pgtype=article&_r=0* (last accessed July 27, 2017) ................................................... 6

*https://www.usatoday.com/story/news/politics/onpolitics/2017/05/09/full-text-trump-letter-comey-firing/101491982/* (last accessed August 2, 2017) .................................. 6

*https://www.washingtonpost.com/news/fact-checker/wp/2017/03/05/trumps-evidence-for-obama-wiretap-claims-relies-on-sketchy-anonymously-sourced-reports/?utm_term= .22e347c0e0c0* (last accessed August 16, 2017).......................................................... 12

*https://www.washingtonpost.com/news/post-politics /wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.77a224733add* (last accessed August 15, 2017) ................ 13, 14

*https://www.whitehouse.gov/the-press-office/2017/03/06/press-gaggle-press-secretary-sean-spicer* (last accessed August 15, 2017) ............................................................... 7

*https://www.whitehouse.gov/the-press-office/2017/03/13/press-briefing-press-secretary-sean-spicer-3132017-22* (last accessed August 14, 2017)............................................ 7

*https://www.whitehouse.gov/the-press-office/2017/03/16/press-briefing-press-secretary-sean-spicer-3162017-25* (last accessed August 15, 2017)...................................... 11, 12

*https://www.youtube.com/watch?v=WpyidroM9XA* (last accessed August 16, 2017)..... 12

Rules

FRCP 56.................................................................................................................... 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| THE JAMES MADISON PROJECT, | * | |
| et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 17-597 (CKK) |
| | * | |
| DEPARTMENT OF JUSTICE, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs, The James Madison Project ("JMP") and Brad Heath ("Heath") (hereinafter referred to jointly as "Plaintiffs"), brought this action under the Freedom of Information Act ("FOIA") to secure the lawful disclosure of records held by the defendant Department of Justice ("DOJ"). The underlying FOIA requests specifically sought copies of any orders issued by the Foreign Intelligence Surveillance Court ("FISC") authorizing surveillance of President Donald J. Trump ("President Trump"), his presidential campaign, his private company, or his associates, as well as any relevant applications for orders submitted to the FISC and minimization procedures issued by the FISC.

Presently before this Court for consideration is a Motion for Summary Judgment ("Motion") filed by the DOJ, as well as the Plaintiffs' Cross-Motion for Summary Judgment ("Cross-Motion").

For the reasons set forth in detail below, this Court should grant the Plaintiffs' Cross-Motion and deny the DOJ's Motion in its entirety.

## **FACTUAL BACKGROUND**

The factual and procedural background of this proceeding was largely set forth in two documents: the First Amended Complaint, see Dkt. #5 at ¶¶7-32 (filed April 15, 2017), and the Statement of Material Facts in Support of Defendant's Motion for Summary Judgment, see Dkt. #13 (filed July 14, 2017)("Statement of Material Facts").

In the interest of not repeating information already set forth before this Court in DOJ's Statement of Material Facts, the Plaintiffs incorporate that document herein by reference. However, the Plaintiffs are only incorporating the factual statements in relation to paragraphs 1-4, and only to the extent that they do not constitute legal characterizations and conclusions regarding the appropriateness of DOJ's invocations of particular FOIA exemptions.

## **ARGUMENT**

### **I. STANDARD OF REVIEW**

Summary judgment pursuant to FRCP 56 should be awarded to a movant if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the appropriateness of summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006), accepting the non-moving party's evidence as true and drawing "all justifiable inferences" in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

However, the Court need not rely on any "conclusory allegations unsupported by factual data," Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation marks and citations omitted), and should only find that "there is a genuine issue for trial" where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249 (citation omitted).

The mere existence of some alleged factual dispute between the parties will not defeat summary judgment; the requirement is that there is no genuine issue of material fact. See Holcomb, 433 F.3d at 895 (internal quotation marks and citations omitted). A fact is "material" if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment determination. Anderson, 477 U.S. at 248. An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## II. THE PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO THE APPROPRIATENESS OF DOJ'S GLOMAR RESPONSES AS A MATTER OF LAW

Agencies can, in limited circumstances, refuse to confirm or deny the existence or non-existence of records, better known as a "Glomar response". See Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007); see also Roth v. Dep't of Justice, 642 F.3d 1161, 1178 (D.C. Cir. 2011)(Glomar response permitted only when confirming or denying would itself cause harm cognizable under a FOIA exemption). When an agency has officially acknowledged otherwise exempt information through prior disclosure, the disclosure of the information may be compelled notwithstanding the agency's otherwise valid exemption claim. See Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990).

In the context of a Glomar response, the evidentiary burden that falls upon a plaintiff to establish official acknowledgment is merely to demonstrate that agency has already disclosed the fact of the existence or non-existence of responsive records. See Wolf, 473 F.3d at 379-380. It is not required, at least in terms of countering a Glomar response, for the plaintiff to demonstrate that the contents of particular records have actually been officially disclosed. See Marino v. DEA, 685 F.3d 1076, 1082 (D.C. Cir. 2012).

The D.C. Circuit's analysis and reasoning in ACLU v. CIA, 710 F.3d 422 (D.C. Cir. 2013), is particularly instructive and informative. In ACLU, the Circuit rejected a Glomar response invoked by CIA with respect to whether it had any records reflecting involvement or interest in drone strikes. Id. at 432. In explaining its' reasoning, the Circuit stated the following:

> Although these statements do not acknowledge that the CIA itself operates drones, they leave no doubt that some U.S. agency does. The CIA does not dispute that these statements qualify as official acknowledgments of at least that much. To the contrary, it concedes that 'Mr. Brennan officially acknowledged that the United States conducts drone strikes,' albeit without 'reveal[ing] whether the CIA (as opposed to another federal entity such as the Department of Defense) is involved in these drone strikes.'
>
> Given these official acknowledgments that the United States has participated in drone strikes, *it is neither logical nor plausible for the CIA to maintain that it would reveal anything not already in the public domain to say that the Agency at least has an intelligence interest in such strikes.* The defendant is, after all, the Central Intelligence Agency. And it strains credulity to suggest that an agency charged with gathering intelligence affecting the national security does not have an 'intelligence interest' in drone strikes, even if that agency does not operate the drones itself.

Id. at 429-30 (emphasis added)(internal citations omitted).

In its Motion, DOJ devoted ten pages to outlining the various arguments why Glomar responses relying upon FOIA Exemptions 1, 3, 7(A) and 7(E) were appropriate. See Memorandum of Points and Authorities in Support of Defendant's Motion for

Summary Judgment at *7-*16 (Dkt. #13)(filed July 14, 2017)("Def's Memo"). The crux of the present dispute, however, concerns whether there have been public, official disclosures of information that render those Glomar responses inappropriate as a matter of law. DOJ's Motion spent only four pages addressing this issue, two of which involved merely citing the relevant case law. See id. at *17-*20. DOJ's Motion too cavalierly glosses over the public, official disclosures of information that are relevant to the present case. Indeed, absent those public, official disclosures of information, it borders on axiomatic that the Plaintiffs would not have brought this lawsuit.

In this Cross-Motion, the Plaintiffs outline in extensive, clarifying detail the factual bases upon which this Court can rely in concluding there is no genuine issue of material fact in dispute that public, official disclosures of information have rendered DOJ's invocation of Glomar responses improper as a matter of law. This Court should further order DOJ to conduct searches for records responsive to the Plaintiffs' requests. Whether applicable FOIA exemptions will apply to justify DOJ's substantive withholdings is an issue to be addressed later.

**A.  The Information That Has Been Disclosed**

   *1.  Disclosures made by President Trump and the White House*

President Trump, as well as former White House Press Secretary Sean Spicer ("Mr. Spicer"), made several official disclosures of information that are relevant to this Court's analysis. The President, in particular, has publicly and officially disclosed on several occasions that he is not under investigation, including that he has been officially informed he is not under investigation:

(1) In a letter, dated May 9, 2017, terminating the employment of Director Comey, President Trump stated that former FBI Director James Comey ("Director Comey") had informed him on three separate occasions that he (President Trump) was not under investigation, see *https://www.usatoday.com/story/ news/politics/onpolitics/2017/ 05/09/full-text-trump-letter-comey-firing/101491982/* (last accessed August 2, 2017);

(2) On May 11, 2017, in an interview with NBC News, President Trump disclosed that he spoke with Director Comey once over dinner, and twice by phone, and that Director Comey informed President Trump that he (President Trump) was not under investigation, see *http://www.nbcnews.com/news/us-news/trump-reveals-he-asked-comey-whether-he-was-under-investigation-n757821* (last accessed August 2, 2017); and,

(3) On July 19, 2017, in an interview with The New York Times, President Trump denied that he is under investigation, see *https://www.nytimes.com/2017/07/19/us/politics/trump-interview-sessions-russia.html?action=Click&contentCollection=BreakingNews &contentID=65596145 &pgtype=article&_r=0* (last accessed July 27, 2017).

More specific to the possibility of the existence of orders issued by the FISC, President Trump made public, official disclosures on March 4, 2017, in which he claimed that former President Barack Obama ("President Obama") had President Trump's "wires tapped" in Trump Tower, that President Obama's "wire tapping" of President Trump had been "turned down by court earlier", and particularly that President Obama had been "tapping" President Trump's phones in October 2016. See Def's Memo at *19-*20.

On March 6, 2017, Mr. Spicer answered the initial set of questions that understandably arose in the aftermath of President Trump's March 4, 2017, tweets.

Q:   And does he believe it's a FISA warrant. Is it some other -- of surveillance?

MR. SPICER:  *It could be FISA. It could be surveillance.* There's no cameras, slow it down.

Q:   So he doesn't know?

6

MR. SPICER:  Look, I think he has made it clear that there are continued reports that have been out there. I'm not going to continue to -- I think the President made it clear yesterday that he wants Congress to go in and look at this. I think there is substantial reporting out there from individuals and from sources.

Q:   But what sources --

MR. SPICER:  Okay. Sara, you're not on camera. You don't need to jump in. We'll get to your question in turn. Hold on.

The answer is, is that the President has made it clear he wants Congress to look into this. And we're encouraging the House and Senate intelligence committees to use their oversight capabilities and look into this.

John Gizzi.

Q:   Sean, does he not know whether -- what kind of surveillance it was?

MR. SPICER:  *Well, I think that there's no question that something happened. The question is, is it surveillance, is it a wiretap, or whatever. But there's been enough reporting that strongly suggests that something occurred.* And I think that that's why what he has said yesterday is that he wants Congress to look into this. And I think that there is enough out there now that makes one wonder how some of this happened without the existence of surveillance

*https://www.whitehouse.gov/the-press-office/2017/03/06/press-gaggle-press-secretary-sean-spicer* (last accessed August 15, 2017)(emphasis added).

On March 13, 2017, Mr. Spicer clarified that President Trump's comments were made in the context of media reports circulating at the time concerning possible surveillance authorized by the Obama Administration that implicated President Trump and/or his associates. *https://www.whitehouse.gov/the-press-office/2017/03/13/press-briefing-press-secretary-sean-spicer-3132017-22* (last accessed August 14, 2017) ("He said they were in quotes, [President Trump] was referring to surveillance overall. It's something that had been referred to in other reports.").

On March 15, 2017, in an interview with Fox News' Tucker Carlson, President Trump specifically explained that he wrote the March 4, 2017, tweets in the context of having read an article in *The New York Times* and watching a Fox News segment concerning allegations of "wiretapping" and surveillance. *http://www.foxnews. com/politics/2017/03/15/trump-calls-tax-return-leak-illegal-thinks-msnbc-report-is-disgrace.html* (last accessed August 15, 2017); *https://factba.se/transcript/donald-trump-interview-fox-march-15-2017* (last accessed August 15, 2017).

On March 16, 2017, Mr. Spicer elaborated in detail on the various media reports that had addressed the alleged surveillance regarding which President Trump had referenced in his March 15, 2017, interview, and that provided context for President Trump's original claims in the March 4, 2017, tweets. The Plaintiffs beg this Court's indulgence in providing such a lengthy quote, but it is necessary in order to provide a comprehensive description of the information regarding which Mr. Spicer stated was being considered by President Trump.

> If you look at what The New York Times reported on January 12th, 2017, they said, "In its final days, the Obama administration has expanded the power of the National Security Agency to share globally intercepted personal communications with the government's 16 other intelligence agencies before applying privacy protections.  The new rules significantly relax longstanding limits on what the NSA may do with the information gathered by its most powerful surveillance operation, which are largely unregulated by wiretapping laws."

> When Sara Carter reported that "by the start of the new year, it brought with it unexpected politicizing of the intelligence gathered in secret. Separately, the Obama administration amended a longstanding executive order, allowing information intercepted through FISA warrants or by the National Security Agency to be shared by a wider audience and 16 government agencies as Obama was leave office, intelligence normally reserved for just a handful of intelligence leaders was spread throughout briefings to scores of workers, and soon leaks began appearing in news

media office organizations, often in stories lacking context of how national security investigations are actually concluded."

On March 3rd, Fox News chief anchor Bret Baier said that the following: "There was a report in June 2016 -- a FISA request by the Obama administration -- Foreign Intelligence Surveillance Court -- to monitor communications involving Donald Trump and several other campaign officials.  Then they got turned down.  Then in October, then they renewed it and did a startup wiretap at Trump Tower with some computer and Russian banks."  Baier continues, "A June FISA request that foreign intelligence surveillance courts gets shot down.  A judge says" -- hold -- Jonathan, I'm going to -- you can ask -- you can follow up -- "A judge says no-go to monitoring Trump Tower.  They go back in October.  They do get a FISA granted.  This is wiretap going on and a monitoring of computers that have some ties, they believe, to Russian accounts.  By all accounts, they don't come up with anything in the investigation, but the investigation continues and we don't know it.

On November 11th, 2016, days after the election, Heat Street reported, "Two separate sources with links to the counter-intelligence community had confirmed to Heat Street that the FBI sought and was granted a FISA warrant in October, giving counter-surveillance intelligence permission to examine the activities of U.S. persons in Donald Trump's campaign with ties to Russia. The first request, which sources say named Trump, was denied back in June.  But the second was drawn more narrowly and granted in October after evidence was presented of a server, possibly related to the Trump campaign and its alleged links to two banks -- SVB bank and Russia's Alfa-Bank.  Sources suggest that a FISA warrant was granted to look at the full context of related documents that concern U.S. persons.  Two separate sources with links to the counter-intelligence community have confirmed that the FBI sought and was granted a FISA warrant in October giving counter-intelligence permission to examine the activity of U.S. persons in Donald Trump's campaign with ties to Russia."

They go on: "The FISA warrant was granted in connection with investigation of suspected activities between the server and two banks. However, it is thought that the intelligence community that the warrant covers any U.S. person connected to this U.N. investigation, and thus covers Donald Trump and at least three further men who have either formed part of his campaign or acted as media surrogates."

On January 19th, the New York Times reported the following: "American law enforcement and intelligence agencies are examining intercepted communication and financial transactions as part of a broad investigation of possible links between Russian officials and associates of President-elect Donald J. Trump.  One official said intelligence reports based on

9

some of the wiretapped communications have been provided to the White House.  It is unclear which Russian officials under investigation or what particular conversations caught the attention of American eavesdroppers. The legal standard for opening these investigations is low.

Andy McCarthy, writing in National Review, suggested: "From three reports, from the Guardian, Heat Street and the New York Times, it appears the FBI has concerns about a private server in Trump Tower that was connected to one or two Russian banks.  Heat Street describes these concerns as centering on "possible financial and banking offenses."  This is his quote -- "I italicized the word "offenses" because it denotes crimes. Ordinarily, when crimes are suspected, there is a criminal investigation, not a national security investigation."

We go on.  Sara Carter from Circa, reporting, "Intelligence professionals tell Circa News they were concerned that some of the Russian intelligence was spread through group briefings to a much-larger-than-usual audience back in January.  This would have happened during the final days of the Obama administration when it expanded executive order 12333, which allows employees with a "need to know" have further unfettered access to raw data stowed by the NSA.  The new rules allowed the NSA to share "raw signals intelligence information, including the names of those involved in phone conversations and emails.  The expansion of the order makes it difficult to narrow in on the leaks and, frankly, it allows too many people access to the raw data, which only used to be available to a select few, said a U.S. official who spoke on the condition of anonymity and was not granted to speak on the authority.  Numerous outlets, including the New York Times, have reported on the FBI investigation into Mr. Trump's advisors; BBC, and then McClatchy revealed the existence of a multi-agency working group to coordinate investigations across the thing.

On February 14th, the New York Times again refers to phone record and intercepted calls -- let me quote them -- "American law enforcement intelligence agency intercepted the communications around the same times they were discovering the evidence that Russia was trying to disrupt the presidential election by hacking into the Democratic National Committee, three officials said.

The intelligence agencies then thought to learn whether the Trump campaign was colluding with the Russians on hacking or other efforts to influence the election.  The officials interviewed in recent weeks said that so far they have seen no evidence of such cooperation.  The official said that the intercepted communications are not limited to Trump campaign officials and other associates of Mr. Trump.  The call logs and intercepted communications are part of a larger trove of information that the FBI is sifting through.

10

Days later, the New York Times then reports, "In the Obama administration's last days, some White House officials scrambled to spread information about Russian efforts to undermine the presidential election of Donald Trump, connections between the President-elect and Russians across the government.  But the increasingly hard-to-escape conclusion that in our government -- that individuals in our government were instead trying to undermine the new President by saying, quote -- this is the New York Times again -- "At intelligence agencies, there was a push to process as much raw intelligence in a possible analysis to keep the report at relatively low classification levels to ensure a widespread readership across the government.  And in some cases, "among them, European allies."  This allowed the upload of as much information -- intelligence as possible to Intellipedia, a secret Wiki used by American analysts to share information.

Sean Hannity went on Fox to say, "But protections which are known as minimization procedures have been put in place to protect Americans that are not under warrant, American citizens that are caught up in their surveillance."  And, "By the way, their identities are protected.  Their constitutional rights are protected.  Now, of course, this was not the case with Lieutenant General Flynn, because a transcript of his call was created and then given to intelligence officials who then leaked this information, which is a felony, to the press that printed it."

Last, on Fox News on March 14th, Judge Andrew Napolitano made the following statement.  "Three intelligence sources have informed Fox News that President Obama went outside the chain of command.  He didn't use the NSA, he didn't use the CIA, he didn't use the FBI, and he didn't use the Department of Justice.  He used GCHQ, what is that?  It's the initials for the British Intelligence Spying Agency.  So simply, by having two people saying to them, 'the President needs transcripts of conversations involved in candidate Trump's conversations involving President-elect Trump,' he was able to get it and there's no American fingerprints on this."

Putting the published accounts and common sense together, this leads to a lot.

*https://www.whitehouse.gov/the-press-office/2017/03/16/press-briefing-press-secretary-*

*sean-spicer-3162017-25* (last accessed August 15, 2017); see also id. ("I think that there

has been a vast amount of reporting, which I just detailed, about activity that was going

on in the 2016 election.  There's no question that there was surveillance techniques used

throughout this I think by a variety of outlets that have reported this activity concluded.")

In this lengthy recitation provided by Mr. Spicer, he references media reports in

which the following claims were made and upon which Mr. Spicer was relying to justify

the evidentiary basis for President Trump's March 4, 2017, and March 15, 2017,

statements:

(a) The Obama Administration submitted an application to the FISC for an order authorizing surveillance of President Trump and some of his campaign associates, but the FISC denied the application in June 2016, see *https://www.youtube.com /watch?v=WpyidroM9XA* (last accessed August 16, 2017)(Bret Baier interview); *https://www.washingtonpost.com/news/ fact-checker/wp/2017/03/05/trumps-evidence-for-obama-wiretap-claims- relies-on-sketchy-anonymously-sourced-reports/?utm_term= .22e347c0e0c0* (last accessed August 16, 2017)(referencing the details of the original Heat Street article, which is no longer publicly accessible);

(b) The FISC later approved in October 2016, a separate application submitted by the Obama Administration and authorized surveillance of information between Russian bank servers and a server at Trump Tower, including communications involving associates of President Trump, see *https://www.youtube.com/watch ?v=WpyidroM9XA* (last accessed August 16, 2017)(Bret Baier interview); *https://www.washingtonpost.com/news /fact-checker/wp/2017/03/05/trumps-evidence-for-obama-wiretap-claims- relies-on-sketchy-anonymously-sourced-reports/?utm_term= .22e347c0e0c0* (last accessed August 16, 2017)(referencing the details of the original Heat Street article, which is no longer publicly accessible); and,

(c) The intercepted communications authorized by the FISC in October 2016 concern financial transactions of investigative interest in the broader inquiry into possible collusion between the Trump campaign and Russian officials, and the intelligence reports drafted in reliance upon those intercepted communications were provided to the White House, see *https://www.nytimes.com/2017/01/19/us/politics/trump-russia-associates- investigation.html* (last accessed August 16, 2017).

Although these media reports ordinarily would not, on their own, qualify as official

disclosures of information, President Trump and Mr. Spicer's specific reliance upon the

information in the media reports – particularly in terms of forming the basis for President

Trump's specific claims in his March 4, 2017, tweets – constitute "official

acknowledgement" of at least those portions of the media reports that overlap with

President Trump's claims.

2. *Disclosures made by Director Comey and Admiral Rogers*

In the aftermath of President Trump's March 4, 2017, tweets, there was

understandable interest in securing answers from relevant U.S. Government agencies

regarding the truth or falsity of the claims. On March 20, 2017, in a hearing before the

House Permanent Select Committee on Intelligence, then-Director of the Federal Bureau

of Investigation, James Comey ("Director Comey") and Director of the National Security

Agency, Admiral Mike Rogers ("Admiral Rogers") were specifically asked about the

President's claims. *https://www.washingtonpost.com/news/post-politics*

*/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-*

*interference-in-2016-election/?utm_term=.77a224733add* (last accessed

August 15, 2017).

Director Comey stated the following:

> With respect to the president's tweets about alleged wiretapping directed at
> him by the prior administration, I have no information that supports those
> tweets and we have looked carefully inside the FBI. The Department of
> Justice has asked me to share with you that the answer is the same for the
> Department of Justice and all its components. The department has no
> information that supports those tweets.

Id.

Admiral Rogers was asked to specifically address Mr. Spicer's reference to the media

report that President Obama had relied upon the GCHQ to "tapp" President Trump and/or

Trump Tower. Admiral Rogers categorically denied that he had ever requested GCHQ

wiretap President Trump, and stated that he had not seen any evidence that anyone at the NSA had engaged in any such activity. Id.

3. *Other disclosures made*

There have been separate, non-official disclosures of information that we believe not only are informative but that sufficiently overlap with official disclosures of information so as to render them relevant as a matter of law.

On March 5, 2017, former Director of National Intelligence James Clapper ("Director Clapper") spoke on the matter of President Trump's March 4, 2017, tweets with NBC News' Chuck Todd.

> CHUCK TODD:
>
> Let me start with the President's tweets yesterday, this idea that maybe President Obama ordered an illegal wiretap of his offices. If something like that happened, would this be something you would be aware of?
>
> JAMES CLAPPER:
>
> I would certainly hope so. I can't say-- obviously, I'm not, I can't speak officially anymore. But I will say that, for the part of the national security apparatus that I oversaw as DNI, *there was no such wiretap activity mounted against-- the president elect at the time, or as a candidate, or against his campaign.* I can't speak for other Title Three authorized entities in the government or a state or local entity.
>
> CHUCK TODD:
>
> Yeah, I was just going to say, if the F.B.I., for instance, had a FISA court order of some sort for a surveillance, would that be information you would know or not know?
>
> JAMES CLAPPER:
>
> Yes.
>
> CHUCK TODD:
>
> You would be told this?

14

JAMES CLAPPER:

I would know that.

CHUCK TODD:

If there was a FISA court order--

JAMES CLAPPER:

Yes.

CHUCK TODD:

--on something like this.

JAMES CLAPPER:

Something like this, absolutely.

CHUCK TODD:

And at this point, you can't confirm or deny whether that exists?

JAMES CLAPPER:

I can deny it.

CHUCK TODD:

There is no FISA court order?

JAMES CLAPPER:

Not-- not to know my knowledge.

CHUCK TODD:

Of anything at Trump Tower?

JAMES CLAPPER:

No.

*http://www.nbcnews.com/meet-the-press/meet-press-03-05-17-n729271* (last accessed August 15, 2017).

On March 23, 2017, Congressman Devon Nunes ("Congressman Nunes"), the Chairman of the HPSCI, held two press conferences to discuss intelligence information that had been shared with him regarding the collection of information implicating President Trump and/or his associates. In the first press conference, held prior to Congressman Nunes briefing President Trump at the White House, Congressman Nunes stated that he had confirmed "that on numerous occasions, the intelligence community incidentally collected information about U.S. citizens involves in the Trump transition." *http://www.ajc.com/news/national/read-transcripts-rep-devin-nunes-news-conferences-about-trump-surveillance/NdZ4qQv7uBnjcH9E3HSRPJ/* (last accessed August 15, 2017).

In a second press conference, held in front of the White House, Congressman Nunes elaborated further on the context of the information collection:

> Nunes: Because what I saw has nothing to do with Russia and nothing to do with the Russia investigation. It has everything to do with surveillance activities, and the President needs to know that these intelligence reports are out there, and I have a duty to tell him that.
>
> Reporter: Is it appropriate to be drawing conclusions before it was completed?
>
> Nunes: I'm not drawing any conclusions, I'm just telling the President what exists in intelligence reports.
>
> Reporter: *Are the subjects of surveillance under FISA orders?*
>
> Nunes: *It appears so.*

Id. (emphasis added).

16

The legal question of whether these disclosures by Director Clapper and Congressman Nunes qualify as "official disclosures" is a murky one. The D.C. Circuit has concluded that, for example, disclosures in books written by former government officials do not qualify as "official disclosures" for purposes of FOIA. See Public Citizen v. Dep't of State, 11 F.3d 198, 201-02 (D.C. Cir. 1993); see also Afshar v. Dep't of State, 702 F.2d 1125, 1133-34 (D.C. Cir. 1983)(books published by former CIA officials were not tantamount to official executive acknowledgments). The Plaintiffs further concede that statements by former officials, even in Congressional testimony, do not, on their own, constitute an official disclosure of information. See Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999); see also Wilson v. CIA, 586 F.3d 171, 186-86 (2d. Cir. 2009) ("[T]he law will not infer official disclosure of information classified by the CIA from … [s]tatements made by a person not authorized to speak for the Agency."); Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d 414, 421-22 (2d. Cir. 1989)(sworn affidavit submitted by former Navy Admiral did not qualify as official disclosure).

Absent official corroborating disclosures of information, the existing case law with respect to "official disclosures" arguably might be viewed as precluding consideration of the disclosures by Director Clapper and Congressman Nunes. However, separate but related official disclosures of information constitute sufficient corroboration and warrant the conclusion that the remarks by Director Clapper and Congressman Nunes can be considered by this Court in the context of evaluating the propriety of DOJ's Glomar responses.

Director Comey and Admiral Rogers both publicly and officially denied knowledge of any information that indicated President Trump's claim that his "wires" had been tapped was accurate. Supra at 13-14. Those official, public statements directly overlap with the public disclosure by Director Clapper during his March 5, 2017, interview, in which he denied knowledge of any wiretap or surveillance activity mounted against President Trump and/or his associates, including with respect to a possible FISA warrant(s). The overlap is more than sufficient for the purpose of rendering Director Clapper's comments relevant as a matter of law in the context of countering a Glomar response.

Those same public, official disclosures of information by Director Comey and Admiral Rogers are separately but similarly relevant in evaluating Congressman Nunes' remarks during his March 23, 2017, press conferences. Although Congressman Nunes' statements contradict Director Comey and Admiral Rogers on substance – Congressman Nunes stated that the information he saw indicated the existence of a possible FISA warrant in particular, and surveillance of the Trump transition team in general – it nonetheless sufficiently overlaps for the purpose of addressing the appropriateness of a Glomar response.

**B. There Is More Than Sufficient Evidence Of Public, Official Disclosures Of Information To Conclude That A Glomar Response Is Not Permissible As A Matter Of Law**

With due respect to the essence of DOJ's argument that a Glomar response is appropriate, see Def's Memo at *17-*20, the Government relies upon a misapplication of existing case law. DOJ claims that the Plaintiffs are required to demonstrate the existence of public, official disclosures of information that is as specific as the information sought.

See id. at *17-*18.

In taking that position, however, DOJ has erroneously applied to a challenge to a Glomar response the standard of specificity required only in the context of substantive withholdings and/or redactions of actual responsive records. The D.C. Circuit clarified in rulings such as ACLU and Marino that the more exacting standard set forth in Wolf for demonstrating an "official acknowledgment" of specific information within documents need not be met when countering a Glomar response. The Circuit explained in ACLU and Marino that it is not necessary for a plaintiff to demonstrate that the specific content of the records have been officially disclosed, but rather only that the existence or non-existence of the records has been officially acknowledged. See supra at 4; see also Smith v. CIA, 2017 U.S. Dist. LEXIS 47230, *10 (D.D.C. Mar. 30, 2017)("The match between Plaintiff's request and President Obama's statement, although the statement did not consist of the specific words 'CIA' of 'budget line items', is as close as the match in ACLU v. CIA.").

The following from ACLU is prescient:

> The Glomar doctrine is in large measure a judicial construct, an interpretation of FOIA exemptions that flows from their purpose rather than their express language. *In this case, the CIA asked the courts to stretch that doctrine too far -- to give their imprimatur to a fiction of deniability that no reasonable person would regard as plausible.* "There comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men" and women. Watts v. Indiana, 338 U.S. 49, 52, 69 S. Ct. 1347, 93 L. Ed. 1801 (1949)(opinion of Frankfurter, J.).

ACLU, 710 F.3d at 431.

As in ACLU, permitting the fiction of deniability with respect to the existence or non-existence of records responsive to Plaintiffs' requests simply stretches the feasibility of a Glomar response beyond acceptable limits. It is neither logical nor plausible that

disclosure of the existence or non-existence of FISA orders, applications for FISA orders, and/or applicable minimization procedures would reveal anything not already placed in the public domain by way of official disclosures (due in no small part to the calculated disclosures of President Trump and Mr. Spicer).

To summarize, the following points have been officially disclosed:

a) President Trump is not and has not been personally under investigation, supra at 5-6;

b) President Trump stated on March 4, 2017, that he "just found out" President Obama had his "wires tapped", that President Obama specifically was tapping his phones in October 2016, and that President Obama had been "turned down by court earlier" in getting authorization to "tapp" President Trump's "wires" or phones, supra at 6;

c) Mr. Spicer later incorporated by reference during press briefings on March 6, 2017, March 13, 2017, and March 16, 2017, , and President Trump incorporated by reference during his March 15, 2017, interview, media reports indicating that an application for a FISA warrant had been denied in June 2016, that a separate application had been approved in October 2016, and that intelligence reports derived from the information intercepted as part of the latter FISA warrant had been provided to the White House, supra at 6-12;

d) Director Comey and Admiral Rogers denied any knowledge of any authorization to "wiretap" Trump Tower or President Trump's phones, and those denials overlap with Director Clapper's unofficial disclosure of the fact that he was not aware of the issuance of any FISA warrants targeting President Trump or his associates, supra at 13-16; and

e) The denials by Director Comey and Admiral Rogers appear to conflict with the unofficial disclosure by Congressman Nunes that he had been shown classified documentation indicating that at least one FISA warrant had been issued that, at a minimum, had permitted incidental collection of information implicating President Trump's associates, supra at 16.

The conflicting official disclosures candidly make a mockery of DOJ's Glomar response invocation. The denials made by Director Comey and Admiral Rogers have been contradicted by none other than the President of the United States and the

White House Press Secretary, both of whom made official statements incorporating media reports as the evidentiary bases for their claims. Coupled with the overlapping (albeit contradictory) public disclosures by Director Clapper and Congressman Nunes, it simply defies credulity to conclude that there have been insufficient official disclosures of the existence or non-existence of responsive records.

If anything, the conflicting official claims that underlie this matter render a substantive response by DOJ as a practical necessity as a matter of policy, to say nothing of law. The President of the United States has made allegations that at least one FISA warrant seeking authorization to surveil him and/or his associates was denied, and both he and the White House Press Secretary incorporated media claims that a separate warrant was issued that did authorize surveillance implicating the president's associates. Those claims have been at least partially (if not entirely) contradicted by the NSA and FBI. This is exactly the type of scenario that FOIA alone can resolve to the benefit of the public, as it would clarify a public dispute between portions of the Executive Branch regarding what the "government was up to" (or, as it may be, what it was *not* up to).

It bears noting that denying DOJ's Motion and granting the Plaintiffs' Cross-Motion does not necessarily mandate that documents will ultimately be produced to the Plaintiffs. It is certainly plausible (although the Plaintiffs are not conceding anything) that this Court would ultimately conclude in later briefing that any actual responsive records are exempt from production, likely for many of the same substantive reasons outlined by DOJ in its current Motion. However, that legal issue is not currently before this Court and it cannot be addressed one way or the other until this Court first adjudicates the appropriateness of DOJ's Glomar response.

## **CONCLUSION**

For the foregoing reasons, DOJ's Motion for Summary Judgment should be denied and the Plaintiffs' Cross-Motion for Summary Judgment should be granted.

Date: August 18, 2017

Respectfully submitted,

/s/
_____
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, Esq.
D.C. Bar #440532
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Brad@MarkZaid.com
Mark@MarkZaid.com

Attorneys for the Plaintiffs