## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES MADISON PROJECT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 17-597-APM |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant United States Department of Justice ("DOJ") hereby moves for summary

judgment pursuant to Fed. R. Civ. P. 56(b) and Local Rule 7(h) for the reasons stated in the

attached memorandum of points and authorities, statement of material facts, and supporting

declarations and exhibits, and in the *ex parte*, *in camera* submission.

Dated:  October 19, 2018

Respectfully Submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/Amy E. Powell*
AMY E. POWELL
Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov
*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAMES MADISON PROJECT, et al.,    )
    )
  Plaintiffs,    )
    )
v.    )
    )   Case No. 17-597-APM
UNITED STATES DEPARTMENT OF JUSTICE,  )
    )
  Defendant.    )
    )

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

As required by Local Civil Rule 7(h)(1), and in support of the Motion for Summary

Judgment, Defendants hereby make the following statement of material facts as to which there is

no genuine issue.

**Administrative Background**

1.    This action arises from FOIA requests submitted by the Plaintiffs to the Federal

Bureau of Investigation ("FBI") and DOJ's National Security Division ("NSD"). By letter dated

March 6, 2017, Plaintiffs sought:

> 1)    Any orders by the FISC authorizing surveillance of and/or
> collection of information concerning the Trump Organization,
> President Trump, President Trump's campaign for presidency, or
> people associated with President Trump.
> 2)    Any applications to the FISC seeking authorization for
> surveillance of and/or collection of information concerning the
> Trump Organization, President Trump, President Trump's
> campaign for presidency, or people associated with President
> Trump.
> 3)    Any minimization procedures issued by the FISC and that
> applied to any orders issued that fall within the scope of #1 or #2.

*See* Third Declaration of David Hardy, dated October 19, 2018, ¶ 6 (citing 1st Hardy Decl., Dkt. 13-3, ¶ 5 & Exhibit A (FOIA Request));[1] Declaration of Patrick N. Findlay, dated October 19, 2018, ¶ 4 & Exhibit A (FOIA Request).

2.     By email dated March 17, 2017, NSD refused to confirm or deny the existence of responsive records pursuant to Exemption 1, explaining that to confirm or deny the existence of responsive records would reveal information that is properly classified under Executive Order 13526.  *See* Findlay Decl. ¶ 5 & Ex. B (NSD Response).

3.     On the same day, Plaintiffs appealed the determination to the DOJ Office of Information Policy ("OIP").  On April 12, 2017, OIP affirmed the determination of NSD – that the existence or non-existence of responsive records is a properly classified fact.  *See* Findlay Decl. ¶ 6 & Ex. C (OIP Determination).

4.     By letter dated March 16, 2017, the FBI acknowledged receipt of Plaintiffs' request, and on April 4, 2017, the FBI also issued a Glomar response.   The FBI's Glomar response was based on FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).  *See* 3rd Hardy Decl. ¶ 7 (citing 1st Hardy Decl., Dkt. 13-3, ¶ 11 & Ex. D).

**Factual Background.**

5.     DOJ has acknowledged a national security investigation of "the Russian government's efforts to interfere in the 2016 presidential election[, including] the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts [and] an assessment of whether any crimes were committed."  *See* The Washington Post, Full transcript:

_____

[1] A redacted version of the Third Hardy Declaration is filed herewith on the public record.  A classified version of the declaration is being concurrently lodged with the Court *ex parte* and *in camera*, in order to more fully explain the basis for the withholding of exempt information.

FBI Director James Comey testifies on Russian interference in 2016 election (Mar. 20, 2017),

https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-

james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9f19a0cf9cf; 3rd

Hardy Decl. ¶ 14 & n.3.  The investigation of Russian election interference is now under the

direction of Special Counsel Robert Mueller.  *See* Office of the Dep. Att'y General, Order No.

3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016

Presidential Election and Related Matters (May 17, 2017), https://www.justice.gov/opa/press-

release/file/967231/download; 3rd Hardy Decl. ¶ 16.

     6.     On March 4, 2017, President Trump's Twitter account made a four-part post,

complaining that President Obama had Mr. Trump's "wires tapped in Trump Tower just before

the victory."  *See* https://twitter.com/realDonaldTrump.  During sworn testimony before the

House Permanent Selection Committee on Intelligence ("HPSCI") on March 20, 2017, then-FBI

Director James B. Comey was asked about this by Congressman Schiff and responded to address

this specific statement:

> With respect to the President's tweets about alleged wiretapping directed at
> him by the prior administration, I have no information that supports those
> tweets and we have looked carefully inside the FBI. The Department of
> Justice has asked me to share with you that the answer is the same for the
> Department of Justice and all its components. The Department has no
> information that supports those tweets.

*See* Full transcript: FBI Director James Comey testifies on Russian interference in 2016 election

(Mar. 20, 2017); 3rd Hardy Decl. ¶ 26.

     7.     In March 2017, the House Permanent Select Committee on Intelligence

("HPSCI") announced an investigation into "the Russian active measures campaign targeting the

2016 U.S. election" and later added additional areas of inquiry, including allegations regarding

the purported "FISA abuse."  *See* 3rd Hardy Decl. ¶ 15.  HPSCI's review led to competing

memoranda authored by the Majority and the Minority members – often referred to by the names

of the Chairman and the Ranking Member, i.e., as the "Nunes Memo" and the "Schiff Memo."

Both memoranda were initially classified because, at a minimum, they revealed FISA coverage

on an identified target – Carter Page – which was a properly classified fact. *Id.* ¶ 17.

8.    In February 2018, President Trump authorized the declassification of the Nunes

Memo, dated January 18, 2018. *See* 3rd Hardy Decl. ¶ 19; Findlay Decl. ¶ 9;

http://intelligence.house.gov/uploadedfiles/memo_and_white_house_letter.pdf. As set forth in a

February 2, 2018, letter from the White House Counsel, the Nunes Memo was declassified "in

light of the significant public interest in the memorandum," and "reflects the judgments of its

congressional authors." *Id.*

9.    Approximately three weeks after the public disclosure of the Nunes Memo, an

unclassified, redacted version of the Schiff Memo, dated January 29, 2018, addressed to All

Members of the House of Representatives, and entitled "Correcting the Record – The Russia

Investigations" ("Minority Memo"), was released. *See*

https://intelligence.house.gov/uploadedfiles/ hpsci_redacted_minority_memo.pdf (last visited

Sept. 13, 2018). Prior to its release, the FBI reviewed the Schiff Memo and redacted classified

information unaffected by the President's declassification of the Nunes Memo. The FBI did not

declassify additional information as part of this review. *See* 3rd Hardy Decl. ¶¶ 20-22.

10.    Neither the Majority nor the Minority asked the FBI or the Department to opine

on their judgment or conclusions, and neither the FBI nor the Department did so; rather, both

memoranda reflect the judgments of their congressional authors. *See* 3rd Hardy Decl. ¶¶ 20-22.

**FOIA Determination**

11.     Because the declassification of the Majority Memo and the subsequent release of the redacted Minority Memo both revealed the existence of certain FISA applications and orders to conduct surveillance of Carter Page, the Department reviewed the FISA applications and orders for potential release of segregable information in response to Plaintiffs' FOIA request. *See* 3rd Hardy Decl. ¶¶ 24, 31-34, 134; Findlay Decl. ¶ 12.  On July 20, 2018, DOJ and the FBI released all responsive, non-exempt and reasonably segregable information subject to FOIA – releasing 412 pages with redactions and withholding 186 pages in full.  3rd Hardy Decl. ¶¶ 4, 134-35; Findlay Decl. ¶¶ 11-12; *see also* https://vault.fbi.gov/d1-release/d1-release.  DOJ is thus no longer asserting a Glomar response with respect to the fact that Page was the subject of these FISA applications and orders.  *Id.* ¶ 4; Findlay Decl. ¶ 13.  This FOIA release was unprecedented—prior to the release, there had never been any public disclosure of an application to the FISC or an order from the FISC pertaining to a specific individual surveillance target.  3rd Hardy Decl. ¶ 13.

12.     Other than the above-described disclosures, no authorized Government official has confirmed or denied the existence of responsive FISA-related records.  3rd Hardy Decl. ¶¶ 27, 143; Findlay Decl. ¶ 23.  Accordingly, DOJ maintains its Glomar response with respect to the remainder of Plaintiffs' request and refuses to confirm or deny the existence of other responsive records.

**Search for Documents Related to Acknowledged Carter Page Surveillance**

13.     NSD and the FBI conducted a reasonable search for records responsive to Plaintiffs' FOIA request insofar as it relates to the acknowledged Carter Page FISA applications. The official acknowledgement at issue here was limited to four specific FISA applications, submitted for surveillance on Carter Page, starting in October 2016 and continuing through three

renewals, with accompanying FISA orders.  3rd Hardy Decl. ¶ 28.  Given the information

pinpointing the specific responsive records, FBI and NSD FOIA personnel consulted with

knowledgeable officials in both components familiar with the investigation to locate the four

responsive FISA packages, encompassing the acknowledged applications and orders related to

Carter Page.  *Id.* ¶¶ 28-30; Findlay Decl. ¶¶ 10-11.   As set forth in the Hardy Declaration, the

request for minimization procedures did not require a separate search because those procedures

are set forth in the packages.  3rd Hardy Decl. ¶ 30.  The FBI and NSD compared records and

confirmed that they had complete copies of each of the four FISA packages whose existence had

been officially acknowledged.  *Id.* ¶ 28.

14.     The FBI coordinated the review of these documents, and NSD participated in the

process.  Accordingly, the FBI is asserting all applicable exemptions over these materials.

Findlay Decl. ¶ 12 & n.6; 3rd Hardy Decl. ¶ 31.

**Exemption One and Carter Page Documents**

15.     David M. Hardy is an original classification authority.  3rd Hardy Decl. ¶ 2.

16.     Mr. Hardy determined that information withheld from the Carter Page documents

pursuant to Exemption 1 is under control of the United States Government, and contains

information pertaining to intelligence activities, sources or methods.  *See* Executive Order 13526

§§ 1.4(c).  3rd Hardy Decl. ¶¶ 43, 46-63.

17.     In particular, Mr. Hardy has determined that the information pertaining to

intelligence activities, sources and methods includes the FBI's intelligence interests, priorities,

activities and methods; undisclosed intelligence sources or methods upon which the FBI relied in

support of its application for FISA coverage on Carter Page, as well as undisclosed portions of

intelligence information provided by Source #1; and information about the use and implementation of various intelligence methods.  3rd Hardy Decl. ¶ 49.

18.     Mr. Hardy has determined that disclosure of this information pertaining to intelligence sources and methods in these documents would cause harm to national security, and has articulated the harm that could be expected to occur.  3rd Hardy Decl. ¶¶ 49-63.

19.     Mr. Hardy has further determined that information in the Carter Page documents pertains to foreign relations, and determined that disclosure of such information would cause harm to national security.  Mr. Hardy has articulated the harm that could be expected to occur. 3rd Hardy Decl. ¶¶ 49, 64-67.

**Exemption Three and Carter Page Documents**

20.     DOJ also withheld information in the Carter Page documents to protect intelligence sources and methods from disclosure under Exemption 3 and the National Security Act.  Mr. Hardy articulated the risk of disclosure of intelligence sources and methods.  3rd Hardy Decl. ¶¶ 68-72.

21.     DOJ also redacted information pursuant to another Exemption 3 statute, which cannot be publicly identified without revealing the very information to be protected.  *Id*. ¶ 73.

**Exemption 7 and the Carter Page Documents**

22.     The FISA applications and orders are compiled in part for law enforcement purposes.  3rd Hardy Decl. ¶¶ 74-79.

23.     DOJ withheld information from these documents pursuant to Exemption 7(A). Mr. Hardy has determined that disclosure of redacted information in the Carter Page FISA documents could reasonably be expected to interfere with the pending investigation into Russian election interference if publicly disclosed at this time, and has articulated the harms that would

occur.  The types of information that could reasonably be expected to harm the investigation if disclosed include:  aspects of the investigation not previously made public, what information or activities are or are not of interest to the investigators, areas in which there may be gaps in investigators' knowledge that could be exploited, and the identities of potential witnesses and the information they provided.  3rd  Hardy Decl. ¶¶ 80-91.

24.    DOJ withheld information under Exemption 7(D) because certain investigatory information would reveal the identity or information of confidential sources.  This includes nonpublic information about and provided by Christopher Steele, as well as information about and provided by other confidential sources, all of whom were provided express assurances of confidentiality.  3rd Hardy Decl. ¶¶ 112-18.

25.    DOJ withheld eight categories of information in the Carter Page documents pursuant to Exemption 7(E):  information about the investigative focus of these applications; information about collection and analysis of information; information about specific techniques used in the national security investigations; information about specific databases used for law enforcement purposes; information about payments to confidential sources; detailed information about targets, dates and scope of surveillance; information about dates and types of investigations; and investigative strategies for particular evidence.  Mr. Hardy determined each of the nine categories encompasses nonpublic information about law enforcement techniques and has articulated how its disclosure risks circumvention of the law.  3rd Hardy Decl. ¶¶ 119-33.

**Private Information in the Carter Page Documents**

26.    DOJ withheld four categories of private information in the Carter Page documents pursuant to Exemption 6 and Exemption 7(E):  identifying information for FBI agents; personal information about Carter Page; identifying information about a FISC deputy clerk and an NSD

attorney; and identifying information about a third party source.  For each category, the FBI articulated and balanced the person's substantial privacy interest in nondisclosure and the public interest in the withheld information.  3rd Hardy Decl. ¶¶ 92-111.

**Withheld in Full Pages from FISA Packages**

27.    DOJ withheld 186 pages in full from the Carter Page FISA packages pursuant to Exemptions 1, 3, 7(A), and 7(E).  Mr. Hardy determined that disclosure would reveal classified intelligence methods and law enforcement techniques.  There is no additional information that can be provided on the public record but the justification for withholding is similar to the justification for other redactions under these exemptions.  3rd Hardy Decl. ¶¶ 135-41.

**Segregability Analysis**

28.    DOJ released all reasonably segregable, non-exempt information from the Carter Page documents.  DOJ conducted a document- by-document and line-by-line review to ensure that all reasonably segregable, non-exempt information was released, taking into account the public disclosures related to this matter.  3rd Hardy Decl. ¶ 134.

**Partial Glomar**

29.    DOJ has refused to confirm or deny the existence of FISA applications and orders beyond the four previously acknowledged Carter Page packages.  Accordingly, DOJ has refused to confirm or deny whether there are responsive record beyond the limited disclosures outlined above, pursuant to Exemptions 1, 3, 7(A) and 7(E).  3rd Hardy Decl. ¶¶ 142-46; Findlay Decl. ¶¶ 14-15 (asserting Exemption 1).

30.    Patrick Findlay is an original classification authority.  He determined that the information withheld by NSD – the existence or nonexistence of other responsive records – is protected by Exemption 1.  Findlay Decl. ¶¶ 2, 14-22.

31.     David M. Hardy is an original classification authority.  3rd Hardy Decl. ¶ 2.  He determined that the information withheld by FBI – the existence or nonexistence of other responsive records – is protected by Exemption 1.  *Id*. ¶¶ 143-44, 152-60.

32.     Mr. Hardy has determined that the existence or nonexistence of other responsive records pertains to intelligence activities, sources and methods, and Mr. Hardy has articulated the harm to national security that would result from disclosure of the existence or nonexistence of other responsive records.  3rd Hardy Decl. ¶¶ 147-55.

33.     Mr. Findlay has determined that the existence or nonexistence of other responsive records is currently and properly classified and is therefore properly withheld pursuant to Exemption 1.   That information pertains to intelligence activities, sources and methods, and Mr. Findlay has articulated the harm to national security that would result from disclosure of the existence or nonexistence of other responsive records.  Findlay Decl. ¶¶ 14-22.

34.     The information withheld pursuant to Exemption 1 also pertains to foreign relations, and Mr. Hardy has articulated the harm to national security that would result from disclosure of the existence or nonexistence of other responsive records.  3rd Hardy Decl. ¶¶ 156-60.

35.     Mr. Hardy further determined that disclosure of the existence or non-existence of responsive records risks disclosure of intelligence sources and methods and is therefore protected by the National Security Act and Exemption 3.   *See* 3rd Hardy Decl. at ¶¶ 161-64.

36.     Mr. Hardy further determined that FISA applications and FISC orders – when they exist – are records compiled for law enforcement purposes within the meaning of Exemption 7.  *See* 3rd Hardy Decl. ¶¶ 164-65.

37.     Mr. Hardy further determined that disclosure of the existence or non-existence of other responsive records could reasonably be expected to interfere with enforcement proceedings that are pending or reasonably anticipated, and that the information is therefore properly withheld under Exemption 7(A).   The withheld information pertains to the pending Russia investigation and that its disclosure could reasonably be expected to interfere with enforcement proceedings.  Mr. Hardy has articulated the anticipated harm.  3rd Hardy Decl. ¶¶ 166-69.

38.     Mr. Hardy further determined that disclosure of the existence or non-existence of other responsive records would disclose techniques and procedures for law enforcement investigations and that such disclosure could reasonably be expected to risk circumvention of the law, and that the information is therefore properly withheld under Exemption 7(E).  Disclosure would reveal nonpublic information about whether the FBI is employing specific investigative techniques against specific targets and would reveal nonpublic information when and under what circumstances the FBI relies upon FISA-authorized techniques.  Mr. Hardy has articulated how such disclosure risks circumvention of the law.   3rd Hardy Decl. ¶¶ 170-72.

**Official Acknowledgement**

39.     No authorized government official has disclosed the precise information withheld. *See* 3rd Hardy Decl. ¶¶ 13, 25, 27, 44, 134, 143; Findlay Decl. ¶ 23.


Dated:  October 19, 2018                                    Respectfully Submitted,

                                                           CHAD READLER
                                                           Principal Deputy Assistant Attorney General

                                                           MARCIA BERMAN
                                                           Assistant Director, Federal Programs Branch

                                                           */s/Amy E. Powell*
                                                           AMY E. POWELL

11

Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov
*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAMES MADISON PROJECT, et al., )
)
  Plaintiffs, )
)
v. )
)   Case No. 17-597-APM
UNITED STATES DEPARTMENT OF JUSTICE, )
)
  Defendant. )
)

**<u>DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

CHAD A. READLER
Principal Deputy Assistant Attorney General
Civil Division

MARCIA BERMAN
Assistant Director, Federal Programs Branch

AMY E. POWELL
Trial Attorney, Federal Programs Branch
Civil Division, United States Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC  27601-1461
Phone: (919) 856-4013
Email:  amy.powell@usdoj.gov

*Counsel for Defendant*

## Table of Contents

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    Administrative and Procedural Background............................................................. 3

    Factual Background ................................................................................................. 5

ARGUMENT ...................................................................................................................... 9

    I.    Statutory Standards. .................................................................................... 9

        A.    The Freedom of Information Act ........................................................ 9

        B.    Special Considerations in National Security Cases .................................. 10

        C.    The Glomar Response. ....................................................................... 11

    II.    DOJ Conducted a Reasonable Search for Responsive Records Related to Acknowledged Surveillance of Carter Page and Properly Released Redacted Records. ......................... 13

        A.    DOJ Conducted a Reasonable Search. ....................................................... 13

        B.    DOJ Properly Redacted Classified Information in the Carter Page Documents Pursuant to Exemption 1 ........................................................ 15

            (1)    Exemption One Standards. ............................................................... 15

            (2)    DOJ Properly Withheld Information Pertaining to Intelligence Activities, Sources and Methods ........................................................ 16

            (3)    DOJ Properly Redacted Information Pertaining to Foreign Relations. ......... 18

        C.    DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 3, Including Information Protected By the National Security Act. ......... 18

        D.    DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 7(A). ................................................................... 20

            (1)    Exemption 7 Threshold. .................................................................. 20

            (2)    Exemption 7(A) Standards. ............................................................. 20

            (3)    Disclosure of the Withheld Information Could Reasonably Be Expected to Interfere with the Russia Investigation. ........................................... 21

        E.    DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 7(D). ................................................................... 22

            (1)    7(D) Standards. ................................................................................. 22

            (2)    DOJ Properly Withheld Information Regarding Confidential Sources ......... 23

        F.    DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 7(E). ................................................................... 24

       (1)   7(E) Standards. ........................................................................................ 24

       (2)   DOJ Properly Withheld Information About Law Enforcement Techniques that Risks Circumvention of the Law. ........................................................ 25

G.   DOJ Properly Withheld Private Information in the Carter Page Documents Pursuant to Exemptions 6 and/or 7(C). .................................................................................. 28

       (1)   Applicable Exemptions. ............................................................................ 28

       (2)   DOJ Properly Withheld Private Information. ............................................. 29

H.   DOJ Properly Withheld in Full Certain Portions of the Carter Page Documents Pursuant to Exemptions 1, 3, 7(A), and 7(E). ............................................................ 30

I.   DOJ Released All Reasonably Segregable Information. ............................................ 31

III.  DOJ Properly Refused to Confirm or Deny the Existence of Other Responsive Records. .............................................................................................................................. 32

A.   The Partial Glomar is Proper Pursuant to Exemption One Because the Existence or Non-Existence of Responsive Records is Properly Classified. ................................... 33

B.   The FBI Established that the Partial Glomar is Proper Pursuant to Exemption 3 and the National Security Act. ........................................................................................... 35

C.   The FBI Established that the Partial Glomar is Proper Pursuant to Exemption 7(A). 35

D.   The FBI Established that the Partial Glomar Response is Proper Pursuant to Exemption 7(E). ......................................................................................................... 37

IV.  The Withheld Information Has Not Been Officially Acknowledged. ............................. 38

CONCLUSION .............................................................................................................................. 41

# Table of Authorities

## Cases

*ACLU v. CIA,*
  710 F.3d 422 (D.C. Cir. 2013)................................................................................. 38

*ACLU v. Dep't of Def.,*
  628 F.3d 612 (D.C. Cir. 2011)................................................................ 11, 19, 39

*ACLU v. DOJ,*
  655 F.3d 1 (D.C. Cir. 2011)...................................................................................... 29

*Afshar v. Dep't of State,*
  702 F.2d 1125 (D.C. Cir. 1983)......................................................................... 11, 38

*\*Agility Pub. Warehousing Co. K.S.C. v. NSA,*
  113 F. Supp. 3d 313 (D.D.C. 2015)................................................................ 19, 33, 39

*\*Ancient Coin Collectors Guild v. Dep't of State,*
  641 F.3d 504 (D.C. Cir. 2011).................................................................................. 13

*Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.,*
  830 F.2d 331 (D.C. Cir. 1987).................................................................................. 10

*Baker & Hostetler LLP v. Dep't of Commerce,*
  473 F.3d 312 (D.C. Cir. 2006).................................................................................. 13

*Bigwood v. Dep't of Defense,*
  132 F. Supp. 3d 124 (D.D.C. 2015).......................................................................... 24

*Blackwell v. FBI,*
  646 F.3d 37 (D.C. Cir. 2011).................................................................................... 24

*Campbell v. DOJ,*
  164 F.3d 20 (D.C. Cir. 1998).................................................................................... 23

*Canning v. DOJ,*
  567 F. Supp. 2d 104 (D.D.C. 2008).......................................................................... 22

*Carter v. NSA,*
  2014 WL 2178708 (D.C. Cir. Apr. 23, 2014) .......................................................... 33

*Chambers v. Dep't of Interior,*
  568 F.3d 998 (D.C. Cir. 2009).................................................................................. 13

*CIA v. Sims,
   471 U.S. 159 (1985) ........................................................................... 9, 18, 19

*Citizens for Responsibility and Ethics in Wash. v. DOJ,
   746 F.3d 1082 (D.C. Cir. 2014)...................................................... 20, 21, 37

Clemente v. FBI,
   867 F.3d 111 (D.C. Cir. 2017)..................................................................... 13

*Competitive Enter. Inst. v. NSA,
   78 F. Supp. 3d 45 (D.D.C. 2015)...................................................... 33, 38, 39

Cozen O'Connor v. Dep't of Treasury,
   570 F. Supp. 2d 749 (E.D. Pa. 2008)........................................................... 36

*Ctr. for Nat'l Sec. Studies v. DOJ,
   331 F.3d 918 (D.C. Cir. 2003)....................................................... 9, 10, 11, 24

DOJ v. Landano,
   508 U.S. 165 (1993) ..................................................................................... 22

Dep't of State v. Wash. Post Co.,
   456 U.S. 595 (1982) ..................................................................................... 28

DiBacco v. Army,
   795 F.3d 178 (D.C. Cir. 2015)............................................................... 10, 13

DOJ v. Reporters Comm. For Freedom of Press,
   489 U.S. 749 (1989) ............................................................................... 28, 29

Dow Jones & Co. v. DOJ,
   917 F.2d 571 (D.C. Cir. 1990)..................................................................... 22

Fitzgibbon v. CIA,
   911 F.2d 755 (D.C. Cir. 1990)....................................................... 11, 38, 39

Frugone v. CIA,
   169 F.3d 772 (D.C. Cir. 1999)............................................................... 11, 12

Gardels v. CIA,
   689 F.2d 1100 (D.C. Cir. 1982)........................................................... 11, 18

Gov't Accountability Project v. Food & Drug Admin.,
   206 F. Supp. 3d 420 (D.D.C. 2016)............................................................ 10

Halperin v. CIA,
   629 F.2d 144 (D.C. Cir. 1980)..................................................................... 19

*Hodge v. FBI*,
   703 F.3d 575 (D.C. Cir. 2013)..................................................................23

*Iturralde v. Comptroller of Currency*,
   315 F.3d 311 (D.C. Cir. 2003)..................................................................13

*James Madison Project v. DOJ*,
   208 F. Supp. 3d 265 (D.D.C. 2016)..........................................................12

*James Madison Project v. DOJ*,
   267 F. Supp. 3d 154 (D.D.C. 2017)..........................................................14

*\*James Madison Project v. DOJ*,
   2018 WL 4283562 (D.D.C. Sept. 7, 2018)..........................................38, 39

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) ..............................................................................9, 10

*Johnson v. Exec. Office for U.S. Attorneys*,
   310 F.3d 771 (D.C. Cir. 2002)..................................................................31

*Juarez v. DOJ*,
   518 F.3d 54 (D.C. Cir. 2008)..............................................................20, 31

*Judicial Watch, Inc. v. Dep't of the Navy*,
   25 F. Supp. 3d 131 (D.D.C. 2014)............................................................10

*Judicial Watch, Inc. v. Dep't of Defense*,
   715 F.3d 937 (D.C. Cir. 2013)..................................................................15

*King v. DOJ*,
   830 F.2d 210 (D.C. Cir. 1987)............................................................10, 11

*Kissinger v. Reporters Comm. for Freedom of the Press*,
   445 U.S. 136 (1980) ..................................................................................9

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009)......................................................11, 12, 15

*\*Marrera v. DOJ*,
   622 F. Supp. 51 (D.D.C. 1985)................................................................32

*Mayer Brown, LLP v. Internal Revenue Serv.*,
   562 F.3d 1190 (D.C. Cir. 2009)................................................................24

*McCready v. Nicholson*,
   465 F.3d 1 (D.C. Cir. 2006)......................................................................13

*Mead Data Cent., Inc. v. Dep't of Air Force,*
566 F.2d 242 (D.C. Cir. 1977) ............................................................. 31

*Military Audit Project v. Casey,*
656 F.2d 724 (D.C. Cir. 1981) .......................................................... 10, 39

*Milner v. Dep't of the Navy,*
562 U.S. 562 (2011) ............................................................................ 24

*Minier v. CIA,*
88 F.3d 796 (9th Cir. 1996) ................................................................... 9

*Moore v. CIA,*
666 F.3d 1330 (D.C. Cir. 2011) ......................................................... 39

*Moore v. Obama,*
2009 WL 2762827 (D.C. Cir. Aug. 24, 2009) .................................... 33

*Morley v. CIA,*
508 F.3d 1108 (D.C. Cir. 2007) ......................................................... 19

*Multi Ag Media LLC v. Dep't of Agric.,*
515 F.3d 1224 (D.C. Cir. 2008) ......................................................... 28

*Nat'l Sec. Archive Fund, Inc. v. CIA,*
402 F. Supp. 2d 211 (D.D.C. 2005) .................................................... 31

*Neufeld v. IRS,*
646 F.2d 661 (D.C. Cir. 1981) ........................................................... 31

*NLRB v. Robbins Tire & Rubber Co.,*
437 U.S. 214 (1978) ...................................................................... 20, 37

*\*Oglesby v. Dep't of the Army,*
920 F.2d 57 (D.C. Cir. 1990) .......................................................... 13, 14

*Parker v. EOUSA,*
852 F. Supp. 2d 1 (D.D.C. 2012) ....................................................... 12

*\*People for the Ethical Treatment of Animals v. NIH,*
745 F.3d 535 (D.C. Cir. 2014) ........................................................... 36

*Perry v. Block,*
684 F.2d 121 (D.C. Cir. 1982) ........................................................... 13

*Phillippi v. CIA,*
546 F.2d 1009 (D.C. Cir. 1976) .................................................. 4, 7, 12

*Prison Legal News v. Samuels*,
   787 F.3d 1142 (D.C. Cir. 2015) ............................................................... 28

*Pub. Citizen v. Dep't of State*,
   11 F.3d 198 (D.C. Cir. 1993) ................................................................... 38

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*,
   740 F.3d 195 (D.C. Cir. 2014) ................................................................. 20

*Ray v. Turner*,
   587 F.2d 1187 (D.C. Cir. 1978) ............................................................... 10

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ........................................................ 10, 14

*Schwarz v. Dep't of Treasury*,
   131 F. Supp. 2d 142 (D.D.C. 2000) .......................................................... 32

*Shannahan v. IRS.*,
   672 F.3d 1142 (9th Cir. 2012) ................................................................. 20

*Stern v. FBI*,
   737 F.2d 84 (D.C. Cir. 1984) ................................................................... 29

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ............................................................... 31

*Unrow Human Rights Impact Litig. Clinic v. Dep't of State*,
   134 F. Supp. 3d 263 (D.D.C. 2015) .......................................................... 11

*Wash. Post Co. v. Dep't of Health & Human Servs.*,
   690 F.2d 252 (D.C. Cir. 1982) ................................................................. 28

*Weisberg v. DOJ*,
   745 F.2d 1476 (D.C. Cir. 1984) ............................................................... 13

*Wheeler v. CIA*,
   271 F. Supp. 2d 132 (D.D.C. 2003) .......................................................... 12

*Williams v. FBI*,
   69 F.3d 1155 (D.C. Cir. 1995) ................................................................. 23

*Wilner v. NSA*,
   592 F.3d 60 (2d Cir. 2009) ................................................................. 12, 33

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ...................................................... 11, 38, 39

## Statutes

5 U.S.C. § 552(a)(4)(B) .................................................................................................. 9, 10

*5 U.S.C. § 552(b)(1) ......................................................................................................15

*5 U.S.C. § 552(b)(3)(A) ................................................................................................ 18

5 U.S.C. § 552(b)(6) ....................................................................................................... 28

5 U.S.C. § 552(b)(7) ....................................................................................................... 20

*5 U.S.C. § 552(b)(7)(A) ................................................................................................20

5 U.S.C. § 552(b)(7)(C) .................................................................................................. 29

5 U.S.C. § 552(b)(7)(D) .................................................................................................. 22

*5 U.S.C. § 552(b)(7)(E) ................................................................................................ 24

50 U.S.C. § 3024(i)(1) .................................................................................................... 19

## Executive Order

Exec. Order 13,526,
    75 Fed. Reg. 707 (Dec. 29, 2009) ........................................................................ *passim*

## Other

Correcting the Record—The Russia Investigations, https://intelligence.house.gov/uploadedfiles/
    hpsci_redacted_minority_memo.pdf ...........................................................................7

https://twitter.com/realDonaldTrump ........................................................................6, 40

Office of the Dep. Att'y General, Order No. 3915-2017, Appointment of Special Counsel to
    Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May
    17, 2017), https://www.justice.gov/opa/press-release/file/967231/download ............................5

The Washington Post, *Full transcript: FBI Director James Comey testifies on Russian
    interference in 2016 election* (Mar. 20, 2017), https://www.washingtonpost.com/news/post-
    politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-
    interference-in-2016-election/?utm_term=.b9f19a0cf9cf ....................................................5, 6

https://vault.fbi.gov/d1-release/d1-release ......................................................................8

## INTRODUCTION

Using the Freedom of Information Act, Plaintiffs James Madison Project and Brad Heath seek detailed, highly sensitive information about a specific type of surveillance activity, allegedly related to an ongoing national security investigation, and allegedly directed at a specific group of individuals during a specific timeframe.  More specifically, Plaintiffs seek to compel production of FISA applications and orders dating from mid-2016, "concerning the Trump Organization, President Trump, President Trump's campaign for presidency, or people associated with President Trump."

The Government has made two acknowledgments arguably relevant to this request.  First, the Department of Justice acknowledged, based upon the Congressional testimony of then-FBI Director James B. Comey, that it has no records of alleged wiretapping of then-candidate Trump in Trump Tower by the Obama administration prior to the 2016 presidential election, as referenced in President Trump's Twitter post on March 4, 2017.  In addition, following the President's declassification of a memorandum prepared by staff of the House Permanent Select Committee on Intelligence ("HPSCI"), and the subsequent release of a different memorandum prepared by certain HPSCI members, the Department has acknowledged responsive Foreign Intelligence Surveillance Act ("FISA") applications and orders to conduct surveillance of Carter Page, and produced redacted versions of those documents.  With these limited exceptions, DOJ has otherwise provided a "Glomar" response, declining to confirm or deny the existence of records for any other FISA surveillance responsive to Plaintiffs' FOIA request.

The applications and orders related to Carter Page were properly located, processed, redacted and produced, with some pages being withheld in full.  These documents, at issue in several pending FOIA matters, are the first FISA applications ever processed for public release, and the FBI and DOJ devoted considerable resources to ensure that they were carefully

1

processed, releasing information that matched prior public disclosures as well as other information that is not currently exempt.  The FBI declaration establishes that some withheld information is properly classified and exempt from disclosure because it pertains to intelligence activities, sources, and methods, and/or foreign relations or foreign activities of the United States, and its disclosure would cause harm to national security; it is therefore properly withheld under Exemption 1.  The FBI's declaration further establishes that disclosure of the withheld information would reveal intelligence sources and methods protected by Exemption 3 and the National Security Act, as well as law enforcement information protected by Exemptions 7(A), 7(D) and 7(E), and private information protected by Exemptions 6 and 7(C).  These records relate to an ongoing national security investigation, and full disclosure would undermine and obstruct that investigation, compromise sources, and reveal nonpublic information about important law enforcement methods, disclosure of which risks circumvention of the law.

The partial Glomar response to the remainder of Plaintiffs' FOIA request is proper.  The declarations establish that confirming or denying the existence of other responsive records would reveal classified information pertaining to intelligence sources and methods.  DOJ and the FBI determined that disclosure of the existence or non-existence of records for any other FISA surveillance responsive to Plaintiffs' FOIA request could reasonably be expected to cause harm to national security, and is exempt from disclosure pursuant to FOIA Exemption 1.  FBI has further determined that this information is exempt from disclosure under Exemptions 3, 7(A) and 7(E).  This determination is entitled to substantial deference from this Court under well-settled law.

There has been no official acknowledgement of the existence or non-existence of FISA applications or orders as to a range of potential surveillance targets.  The limited official acknowledgements relevant to Plaintiffs' FOIA request—then-Director Comey's Congressional

testimony regarding the non-existence of records of alleged wiretapping of then-candidate

Trump in Trump Tower by the Obama Administration prior to the 2016 presidential election, and

the extraordinary and unprecedented acknowledgement of the existence of FISA applications and

orders to conduct surveillance of Carter Page—satisfy the exacting criteria for official disclosure

of classified information responsive to Plaintiffs' FOIA request, and the Department's response

is consistent with those disclosures.  But there have been no other official disclosures that

specifically reveal the existence or non-existence of the particular alleged FISA surveillance that

Plaintiffs seek to discover.  Accordingly, the Glomar response as to the remaining portions of

Plaintiffs' request is proper.  The Court should defer to Defendant's determination in this regard

and grant the Government summary judgment.

## **BACKGROUND**

Administrative and Procedural Background

This matter arises from nearly identical FOIA requests submitted to the Federal Bureau

of Investigation ("FBI") and DOJ's National Security Division ("NSD") on March 6, 2017, in

which Plaintiffs sought records related to specific individuals and organizations allegedly subject

to surveillance under the Foreign Intelligence Surveillance Act ("FISA").  Specifically, Plaintiffs

sought:

> 1)      Any orders by the FISC authorizing surveillance of and/or
> collection of information concerning the Trump Organization,
> President Trump, President Trump's campaign for presidency, or
> people associated with President Trump.
> 2)      Any applications to the FISC seeking authorization for
> surveillance of and/or collection of information concerning the
> Trump Organization, President Trump, President Trump's
> campaign for presidency, or people associated with President
> Trump.
> 3)      Any minimization procedures issued by the FISC and that
> applied to any orders issued that fall within the scope of #1 or #2.

*See* Third Declaration of David Hardy, dated October 19, 2018, ¶ 6 (citing 1st Hardy Decl., Dkt. 13-3, ¶ 5 & Exhibit A (FOIA Request));[1] Declaration of Patrick N. Findlay, dated October 19, 2018, ¶ 4 & Exhibit A (FOIA Request).  The requests limited the search to June 2016 to the date of the request.  *Id*.  JMP quoted certain public statements by President Trump and asserted that the requesters "are pre-emptively asserting that President Trump's public comments constitute prior official disclosure of the existence of at least one, if not more, FISA warrants."  *Id*.

By email dated March 17, 2017, NSD refused to confirm or deny the existence of responsive records pursuant to Exemption 1, explaining that to confirm or deny the existence of responsive records would reveal information that is properly classified under Executive Order 13526.  *See* Findlay Decl. ¶ 5 & Ex. B (NSD Response).  This is known as a "Glomar" response, and is proper if the fact of the existence or non-existence of agency records is protected by a FOIA exemption.  *See Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976) (acknowledging CIA refusal to confirm or deny existence of records regarding activities of a ship named Hughes Glomar Explorer).   On the same day, Plaintiffs appealed the determination to the DOJ Office of Information Policy ("OIP").  On April 12, 2017, OIP affirmed the determination of NSD – that the existence or non-existence of responsive records is a properly classified fact.  *See* Findlay Decl. ¶ 6 & Ex. C (OIP Determination).

By letter dated March 16, 2017, the FBI acknowledged receipt of Plaintiffs' request, and on April 4, 2017, the FBI also issued a Glomar response.  The FBI's Glomar response was based on FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).  *See* 3rd Hardy Decl. ¶ 7 (citing 1st Hardy Decl., Dkt. 13-3, ¶ 11 & Ex. D).

---

[1] A redacted version of the Hardy Declaration is filed herewith on the public record.  A classified version of the declaration is being concurrently lodged with the Court *ex parte* and *in camera*, in order to more fully explain the basis for the withholding of exempt information.

Plaintiffs filed a Complaint on April 4, 2017 and an Amended Complaint was filed on

April 15, 2017.  *See* Compl., ECF No. 1; Am. Compl. ECF No. 5.

The parties briefed cross-motions for summary judgment in summer and fall of 2017, and

Defendant defended the Glomar response.  In light of subsequent disclosures, DOJ sought to

withdraw its motion for summary judgment and set a schedule for processing the acknowledged

Carter Page materials.  After the Carter Page materials were processed and released, the Court

set a schedule for further briefing.  Dkt. No. 38.

Factual Background

Plaintiffs' FOIA request arises in a factual context in which there is an ongoing,

acknowledged official investigation related to the Russian government's efforts to interfere in the

2016 presidential election.  Specifically, the Department has acknowledged a national security

investigation of "the Russian government's efforts to interfere in the 2016 presidential election[,

including] the nature of any links between individuals associated with the Trump campaign and

the Russian government and whether there was any coordination between the campaign and

Russia's efforts [and] an assessment of whether any crimes were committed."  *See* The

Washington Post, *Full transcript: FBI Director James Comey testifies on Russian interference in

2016 election* (Mar. 20, 2017), https://www.washingtonpost.com/news/post-

politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-

in-2016-election/?utm_term=.b9f19a0cf9cf; 3rd Hardy Decl. ¶ 14 & n.3.  The investigation into

Russian election interference is now under the direction of Special Counsel Robert Mueller.  *See*

Office of the Dep. Att'y General, Order No. 3915-2017, Appointment of Special Counsel to

Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May

17, 2017), https://www.justice.gov/opa/press-release/file/967231 /download; 3rd Hardy Decl. ¶

16.

On March 4, 2017, President Trump's Twitter account made a four-part post, complaining that President Obama had Mr. Trump's "wires tapped in Trump Tower just before the victory." *See* https://twitter.com/realDonaldTrump.  During sworn testimony before the House Permanent Selection Committee on Intelligence ("HPSCI") on March 20, 2017, then-FBI Director James B. Comey was asked about this by Congressman Schiff and responded to address this specific statement:

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components. The Department has no information that supports those tweets.

*See Full transcript: FBI Director James Comey testifies on Russian interference in 2016 election* (Mar. 20, 2017); 3rd Hardy Decl. ¶ 26; Findlay Decl. ¶ 8.[2]

In March 2017, the House Permanent Select Committee on Intelligence ("HPSCI") announced an investigation into "the Russian active measures campaign targeting the 2016 U.S. election" and later added additional areas of inquiry, including allegations regarding the purported "FISA abuse." *See* 3rd Hardy Decl. ¶ 15.  HPSCI's review led to competing memoranda authored by the Majority and the Minority members – often referred to by the names of the Chairman and the Ranking Member, *i.e.*, as the "Nunes Memo" and the "Schiff Memo." Both memoranda were initially classified because, at a minimum, they revealed FISA-authorized surveillance on an identified target – Carter Page – which was a properly classified fact.  *Id.* ¶ 17.

---

[2] The Department has subsequently confirmed Director Comey's conclusion in several FOIA matters.  In the first round of summary judgment briefing in this case, Defendant specifically acknowledged this statement and noted that "Had plaintiff more specifically tied his FOIA request to the information in the tweets, he likely would have received a no-records response from the FBI and DOJ."  Dkt. No. 13, at 20.

In February 2018, President Trump authorized the declassification of the Nunes Memo, dated

January 18, 2018.  *See* 3rd Hardy Decl. ¶ 19; Findlay Decl. ¶ 9;

http://intelligence.house.gov/uploadedfiles/memo_and_white_house_letter.pdf.

    As set forth in a February 2, 2018, letter from the White House Counsel, the Nunes

Memo was declassified "in light of the significant public interest in the memorandum," and

"reflects the judgments of its congressional authors."  *Id.*  Approximately three weeks after the

public disclosure of the Nunes Memo, an unclassified, redacted version of the Schiff Memo,

dated January 29, 2018, addressed to All Members of the House of Representatives, and entitled

"Correcting the Record – The Russia Investigations" ("Minority Memo"), was released.  *See* 3rd

Hardy Decl. ¶¶ 20-22, also available at https://intelligence.house.gov/uploadedfiles/

hpsci_redacted_minority_memo.pdf (last visited Sept. 13, 2018).  Prior to its release, the FBI

reviewed the Schiff Memo and redacted classified information unaffected by the President's

declassification of the Nunes Memo.  3rd Hardy Decl. ¶ 21.  The FBI did not declassify additional

information as part of this review.  *Id.*  Neither the Majority nor the Minority asked the FBI or

the Department to opine on their judgment or conclusions, and neither the FBI nor the

Department did so; rather, both memoranda reflect the judgments of their congressional authors.

*Id.* ¶ 22.[3]

    Because the declassification of the Majority Memo and the subsequent release of the

redacted Minority Memo both revealed the existence of certain FISA applications and orders to

conduct surveillance of Carter Page, the Department reviewed the FISA applications and orders

---

[3] One other Congressional memorandum references the Page FISA applications.  After the declassification of the Nunes Memo, the FBI conducted a classification review of a January 4, 2018 memorandum from Senators Grassley and Graham as well.  As with the other memoranda, this memorandum reflects the judgments of its Congressional authors.  3rd Hardy Decl. ¶ 22 & n. 6.

for potential release of segregable information in response to Plaintiffs' FOIA request.[4]  *See* 3rd Hardy Decl. ¶¶ 24, 31-34, 134; Findlay Decl. ¶ 9.  On July 20, 2018, DOJ and the FBI released all responsive, non-exempt and reasonably segregable information subject to FOIA – releasing 412 pages with redactions and withholding 186 pages in full.  3rd Hardy Decl. ¶¶ 4, 134-35; Findlay Decl. ¶¶ 9-12; *see also* https://vault.fbi.gov/d1-release/d1-release.   The redactions are coded by application exemption and certain categories within exemptions.  3rd Hardy Decl.  ¶¶ 31-34.  DOJ is thus no longer asserting a Glomar response with respect to the fact that Page was the subject of these FISA applications and orders.  *Id.* ¶ 4; Findlay Decl. ¶ 13.  This FOIA release was unprecedented—prior to the release, there had never been any public disclosure of an application to the FISC or an order from the FISC pertaining to a specific individual surveillance target.  3rd Hardy Decl. ¶ 13; Findlay Decl. ¶ 12.

Other than the above-described disclosures, no authorized Government official has confirmed or denied the existence of responsive FISA-related records.  3rd Hardy Decl. ¶¶ 27, 143; Findlay Decl. ¶ 23.[5]  Accordingly, DOJ maintains its Glomar response with respect to the remainder of Plaintiffs' request and refuses to confirm or deny the existence of other responsive records.

---

[4] Although Page was not associated with the Trump campaign when the initial FISA order was obtained, the Page FISA applications and orders were deemed to be responsive at least to that portion of Plaintiffs' FOIA request that seeks FISA applications and orders "concerning . . . people associated with President Trump."

[5] On September 17, 2018, the White House Press Secretary announced that President Trump was directing DOJ and ODNI to "provide for immediate declassification of" certain documents, including additional pages of the Page documents.  *See* Statement from the Press Secretary, https://www.whitehouse.gov/briefings-statements/statement-press-secretary-34/.   The President later indicated that he was no longer requiring immediate declassification of these documents at this time.

## ARGUMENT

### I.     Statutory Standards.

### A.  The Freedom of Information Act

The "basic purpose" of FOIA reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted).  "Congress recognized, however, that public disclosure is not always in the public interest . . . ." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985).  Accordingly, in passing FOIA, "Congress sought 'to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy.'"  *John Doe Agency*, 493 U.S. at 152 (quoting H.R. Rep. No. 89-1497, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423).  As the D.C. Circuit has recognized, "FOIA represents a balance struck by Congress between the public's right to know and the [G]overnment's legitimate interest in keeping certain information confidential."  *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing *John Doe Agency*, 493 U.S. at 152).

FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exemptions.  *See* 5 U.S.C. § 552(b).  "A district court only has jurisdiction to compel an agency to disclose improperly withheld agency records," *i.e.* records that do "not fall within an exemption."  *Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996); *see also* 5 U.S.C. § 552(a)(4)(B) (providing the district court with jurisdiction only "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant"); *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 150 (1980) ("Under 5 U.S.C. § 552(a)(4)(B)[,] federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'").  While

narrowly construed, FOIA's statutory exemptions "are intended to have meaningful reach and application." *John Doe Agency*, 493 U.S. at 152; *accord DiBacco v.U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015).

The courts resolve most FOIA actions on summary judgment. *See Judicial Watch, Inc. v. Dep't of the Navy*, 25 F. Supp. 3d 131, 136 (D.D.C. 2014). The Government bears the burden of proving that the withheld information falls within the exemptions it invokes. *See* 5 U.S.C. § 552(a)(4)(B); *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987). A court may grant summary judgment to the Government based entirely on an agency's declarations, provided they articulate "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *accord Gov't Accountability Project v. Food & Drug Admin.*, 206 F. Supp. 3d 420, 430 (D.D.C. 2016). Such declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims[.]" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).

**B. Special Considerations in National Security Cases**

The issues presented in this case directly "implicat[e] national security, a uniquely executive purview." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926–27. While courts review *de novo* an agency's withholding of information pursuant to a FOIA request, "*de novo* review in FOIA cases is not everywhere alike . . . ." *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). Indeed, the courts have specifically recognized the "propriety of deference to the executive in the context of FOIA claims which implicate national security." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *see Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) ("[T]he executive ha[s] unique insights into what adverse [e]ffects might occur

as a result of public disclosure of a particular classified record."). "[A]ccordingly, the government's 'arguments needs only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context.'" *Unrow Human Rights Impact Litig. Clinic v. Dep't of State*, 134 F. Supp. 3d 263, 272 (D.D.C. 2015) (quoting *ACLU v. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011)).

For these reasons, the courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *see Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (citation omitted) ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security."); *accord Unrow Human Rights Impact Litig. Clinic*, 134 F. Supp. 3d at 272. Consequently, a reviewing court must afford "substantial weight" to agency declarations "in the national security context." *King*, 830 F.2d at 217; *see Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure . . . ."); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security). FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

### C. The Glomar Response.

A Glomar response allows the Government to "refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA

exception." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)); *accord Wilner v. NSA*, 592 F.3d 60, 68 (2d Cir. 2009) ("The Glomar doctrine is well settled as a proper response to a FOIA request because it is the only way in which an agency may assert that a particular FOIA statutory exemption covers the 'existence or non-existence of the requested records[.]'" (quoting *Phillippi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976)). In support of a Glomar response, the asserting agency "must explain why it can neither confirm nor deny the existence of responsive records." *James Madison Project v. DOJ,* 208 F. Supp. 3d 265, 283 (D.D.C. 2016) (quoting *Parker v. EOUSA*, 852 F. Supp. 2d 1, 10 (D.D.C. 2012)). The agency can satisfy this obligation by providing "public affidavit[s] explaining in as much detail as is possible the basis for its claim that it can be required neither to confirm nor to deny the existence of the requested records." *Phillippi*, 546 F.2d at 1013. The courts in this Circuit have consistently upheld Glomar responses where, as here, confirming or denying the existence of records would reveal classified information protected by FOIA Exemption 1. *See, e.g.*, *Frugone*, 169 F.3d at 774–75 (finding that CIA properly refused to confirm or deny the existence of records concerning the plaintiff's alleged employment relationship with CIA pursuant to Exemptions 1 and 3); *Larson*, 565 F.3d at 861–62 (upholding the National Security Agency's use of the Glomar response to the plaintiffs' FOIA requests regarding past violence in Guatemala pursuant to Exemptions 1 and 3); *Wheeler v. CIA*, 271 F. Supp. 2d 132, 140 (D.D.C. 2003) (ruling that CIA properly invoked a Glomar response to a request for records concerning the plaintiff's activities as a journalist in Cuba during the 1960s pursuant to Exemption 1).

## II.    DOJ Conducted a Reasonable Search for Responsive Records Related to Acknowledged Surveillance of Carter Page and Properly Released Redacted Records.

NSD and the FBI searched for the acknowledged FISA applications and orders related to

Carter Page.  The 412 released pages reflect information properly redacted under Exemptions 1,

3, 6, 7(A), 7(C), 7(D), 7(E).   The withheld in full pages from the FISA applications and orders

were properly withheld pursuant to Exemptions 1, 3, 7(A) and 7(E).

### A.   DOJ Conducted a Reasonable Search.

An agency is entitled to summary judgment in a FOIA case with respect to the adequacy

of its search if it shows "'that it made a good faith effort to conduct a search for the requested

records, using methods which can be reasonably expected to produce the information

requested.'" *Clemente v. FBI*, 867 F.3d 111, 117 (D.C. Cir. 2017) (quoting *Oglesby v. Dep't of

the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)); *DiBacco*, 795 F.3d at 188.   "[T]he issue to be

resolved is not whether there might exist any other documents possibly responsive to the request,

but rather whether the *search* for those documents was *adequate*."   *Weisberg v. DOJ*, 745 F.2d

1476, 1485 (D.C. Cir. 1984) (emphasis in original).   The search is thus gauged "not by the fruits

of the search, but by the appropriateness of the methods used to carry out the search." *Ancient

Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (quoting *Iturralde v.

Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).   An agency can establish the

reasonableness of its search by "reasonably detailed, nonconclusory affidavits describing its

efforts."   *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006).

Such affidavits are sufficient if they "set[] forth the search terms and the type of search

performed, and aver[] that all files likely to contain responsive materials (if such records exist)

were searched."   *Chambers v. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (quoting

*McCready v. Nicholson*, 465 F.3d 1, 14 (D.C. Cir. 2006)).   This standard is not demanding.   "[I]n

the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice . . . . " *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).  "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc.*, 926 F.2d at 1200 (citation omitted).

The declarations demonstrate that NSD and the FBI conducted a reasonable search for records responsive to Plaintiffs' FOIA request insofar as it relates to the acknowledged Carter Page FISA applications.  The official acknowledgement at issue here was limited to four specific FISA applications, submitted for surveillance on Carter Page, starting in October 2016 and continuing through three renewals, with accompanying FISA orders.  3rd Hardy Decl. ¶ 28. Given the information pinpointing the specific responsive records, FBI and NSD FOIA personnel consulted with knowledgeable officials in both components familiar with the investigation to locate the four responsive FISA packages, encompassing the acknowledged applications and orders related to Carter Page.  *Id*. ¶¶ 28-30; Findlay Decl. ¶¶ 10-11.   As set forth in the Hardy Declaration, the request for minimization procedures did not require a separate search because those procedures are set forth in the packages.  3rd Hardy Decl. ¶ 30.  The FBI and the National Security Division compared records and confirmed that they had complete copies of each of the four FISA packages whose existence had been officially acknowledged.  *Id*. ¶ 28.  FBI then coordinated the processing of the documents, in consultation with interested components.  *Id*. ¶ 31; Findlay Decl. ¶¶ 11-12 & n. 6.

This strategy – identifying the personnel responsible for the requested FISC information, and asking them to search their records – is a "method[] which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68; *see also James Madison Project v.*

14

*DOJ*, 267 F. Supp. 3d 154, 160-61 (D.D.C. 2017). Therefore, DOJ is entitled to summary judgment on this issue.

### B. DOJ Properly Redacted Classified Information in the Carter Page Documents Pursuant to Exemption 1.[6]

#### (1) Exemption One Standards.

FOIA Exemption 1 exempts from disclosure information that is "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1). Under Executive Order No. 13,526, an agency may withhold information that an official with original classification authority has determined to be classified because its "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security[.]" Exec. Order No. 13,526 § 1.4, 75 Fed. Reg. 707, 709 (Dec. 29, 2009). The information must also "pertain[] to" one of the categories of information specified in the Executive Order, including "intelligence activities (including covert action), intelligence sources or methods," Exec. Order No. 13,526 §§ 1.4(c); or "foreign relations or foreign activities of the United States, including confidential sources," *id.* §1.4(d). *See also Judicial Watch, Inc. v. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (citation omitted) ("'[P]ertains' is 'not a very demanding verb.'"). As discussed above, a court "accord[s] substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects might occur as a result of a particular classified record." *Larson*, 565 F.3d at 864 (citation omitted).

---

[6] The FBI coordinated the review of these documents, and NSD participated in the process. Accordingly, the FBI is asserting all applicable exemptions over these materials. Findlay Decl. ¶ 12 & n.6; 3rd Hardy Decl. ¶ 31.

### (2) DOJ Properly Withheld Information Pertaining to Intelligence Activities, Sources and Methods.

Defendant redacted portions of the Carter Page FISA applications and orders to safeguard currently and properly classified information involving categories of information set forth in Section 1.4 of Executive Order 13,526. *See* 3rd Hardy Decl. at ¶¶ 35-67. *Id*. First, the redacted information pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Exec. Order 13,526 §1.4(c). FISA surveillance is an intelligence method, and the request on its face seeks information pertaining to FISA surveillance. The supporting declaration establishes that information redacted from these FISA packages encompasses "the FBI's intelligence interests, priorities, activities and methods; undisclosed intelligence sources or methods upon which the FBI relied in support of its application for FISA authorized surveillance of Carter Page, as well as undisclosed portions of intelligence information provided by Source #1; and information about the use and implementation of various intelligence methods." 3rd Hardy Decl. ¶ 49.

The Third Hardy Declaration identifies two general categories of information withheld on this basis and describes the specific harm to national security that would result from disclosure: activities and methods; and intelligence sources. First, the redacted information includes details about the FISA surveillance sought and obtained through the FISA applications and orders – such as dates, locations, intended purposes, and specific methods -- as well as detailed, undisclosed information about other intelligence activities and methods forming part of the underlying basis for the applications. 3rd Hardy Decl. ¶ 50. The withheld information includes, for example, detailed information about investigation of individuals other than Page, undisclosed methods used to gather information about Page, detailed undisclosed information about a source's activities, and information about the specific amounts and timeframes for payments to

16

human sources.  *Id.* ¶¶ 56-59.  Additionally, the FBI redacted information that would reveal the exact timeframes of authorized surveillance and descriptions of exactly what was authorized, including minimization procedures.  *Id.* ¶¶ 51-53.  None of that information has been previously disclosed and all of it would be valuable to adversaries seeking to analyze, undermine, and evade our counterintelligence apparatus.  This type of information reveals actual intelligence activities undertaken regarding specific targets during a specific timeframe, discloses intelligence-gathering capabilities of those methods, and provides an assessment of the level of FBI penetration of specific targets during a specific time frame.  *Id.* ¶ 58.  "Armed with such information, adversaries, including hostile foreign governments, could implement actions to thwart the FBI's intelligence activities and weaken or negate the particular intelligence methods, which would severely disrupt the FBI's intelligence-gathering capabilities."  *Id.*

Second, DOJ has redacted information that tends to identify particular intelligence sources.  As explained in the Third Hardy Declaration, "an intelligence source who requires continued classification is one that provided or is currently providing information that pertains to national security matters, the disclosure of which could reasonably be expected to result in serious damage to FBI's intelligence-gathering capabilities."  3rd Hardy Decl. ¶ 60.  Although the identity of one source has been disclosed, the Page applications include identifying information for other sources as well.  *Id.* ¶¶ 61-63.  Disclosure of intelligence sources "could reasonably be expected to jeopardize their livelihoods, their families and other relationships, and even their lives" and disclosure of one source can cause other current and potential sources to fear disclosure.  *Id.* ¶¶ 62-63.  Thus, disclosure of source-identifying information could reasonably be expected to damage national security by endangering current and past sources and by discouraging current and potential sources from reporting.  *Id.*  Accordingly, such information is properly redacted pursuant to Exemption 1.

### (3) DOJ Properly Redacted Information Pertaining to Foreign Relations.

The Hardy Declaration establishes that DOJ also redacted certain information pertaining to foreign relations or foreign activities of the United States, and that disclosure of this information would cause harm to national security.  3rd Hardy Decl. ¶¶ 64-67.  Although Mr. Hardy explains that further details cannot be provided on the public record, the redacted information relates to the United States' interactions with foreign countries.  *Id*.  If disclosed, such information "can reasonably be expected to lead to diplomatic or economic retaliation, the loss of cooperation, or the compromise of cooperative foreign sources."  *Id*.  The disclosure of specific relationships could reasonably be expected to cause serious damage to national security. *Id*.  Accordingly, such information is properly redacted pursuant to Exemption 1. [7]

### C. DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 3, Including Information Protected By the National Security Act.

Exemption 3 exempts from disclosure records that are "specifically exempted from disclosure by [another] statute" if the relevant statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A).  The Government's mandate to withhold information under FOIA Exemption 3 is broader than its authority under FOIA Exemption 1, as it does not have to demonstrate that the disclosure will harm national security.  *See Sims*, 471 U.S. at 167; *Gardels*, 689 F.2d at 1106–07.  Instead, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.  It is particularly important to protect intelligence sources and methods from public disclosure."  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir.

---

[7] The classified Hardy Declaration provides additional information about the redaction of classified information and the harm to national security that would result from disclosure.

2007).  In analyzing the propriety of a withholding made pursuant to FOIA Exemption 3, the

Court need not examine "the detailed factual contents of specific documents[.]" *Id.*

DOJ has invoked Section 102A(i)(1) of the National Security Act of 1947, as amended

(now codified at 50 U.S.C. § 3024(i)(1)), which requires the Director of National Intelligence to

"protect intelligence sources and methods from unauthorized disclosure."  It is well-established

that Section 102A qualifies as a withholding statute for the purposes of FOIA Exemption 3.  *See,*

*e.g.*, *ACLU v. Dep't of Defense*, 628 F.3d at 619.   In fact, the Supreme Court has recognized the

"wide-ranging authority" provided by the National Security Act to protect intelligence sources

and methods.  *See Sims*, 471 U.S. at 169–70, 177, 180; *see Halperin v. CIA*, 629 F.2d 144, 147

(D.C. Cir. 1980) (explaining that the only question for the court is whether the agency has shown

that responding to a FOIA request "could reasonably be expected to lead to unauthorized

disclosure of intelligence sources and methods").  The Act has been properly invoked to

withhold information about FISA and other surveillance techniques.  *See, e.g., Agility Pub.*

*Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 329 (D.D.C. 2015).

As explained above, information redacted from the Page FISA applications and orders

includes information that would disclose intelligence sources and methods.   *See* Part II.B.2,

*supra*.  Accordingly, DOJ properly concluded that it is also prohibited from disclosing such

information under the National Security Act.  3rd Hardy Decl. ¶¶ 68-72.

DOJ also redacted information pursuant to another Exemption 3 statute, which cannot be

publicly identified without revealing the very information to be protected.  *Id.* ¶ 73.  The Court is

referred to the *ex parte, in camera* declaration for additional explanation.

### D. DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 7(A).

#### (1) Exemption 7 Threshold.

Exemption 7 protects from disclosure all "records or information compiled for law enforcement purposes" that could reasonably be expected to cause one of the six harms outlined in the Exemption's subparts. 5 U.S.C. § 552(b)(7). "To fall within any of the exemptions under the umbrella of Exemption 7, a record must have been 'compiled for law enforcement purposes.'" *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 202 (D.C. Cir. 2014) (quoting 5 U.S.C. § 552(b)(7)). Here, DOJ records regarding FISA applications and orders are compiled in part for law enforcement purposes.  3rd Hardy Decl. ¶¶ 74-79.

#### (2) Exemption 7(A) Standards.

Exemption 7(A) "exempts from FOIA disclosure records or information compiled for 'law enforcement purposes . . . to the extent that the production . . . could reasonably be expected to interfere with enforcement proceedings.'" *Shannahan v. IRS*., 672 F.3d 1142, 1145 (9th Cir. 2012) (quoting 5 U.S.C. § 552(b)(7)(A)).  "Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *Citizens for Responsibility & Ethics in Wash. v. DOJ,* 746 F.3d 1082, 1096 (D.C. Cir. 2014) (hereinafter "*CREW*") (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)).

An ongoing investigation typically triggers Exemption 7(A).  *See CREW*, 746 F.3d at 1098 (quoting *Juarez v. DOJ*, 518 F.3d 54, 59 (D.C. Cir. 2008)).  "In the typical case," therefore,

"the requested records relate to a specific individual or entity that is the subject of the ongoing investigation, making the likelihood of interference readily apparent." *Id.*

> **(3) Disclosure of the Withheld Information Could Reasonably Be Expected to Interfere with the Russia Investigation.**

Here, the FBI sought and received authority under FISA to surveil Carter Page as part of and in furtherance of a pending proceeding – the ongoing Russian interference investigation. *See* 3rd Hardy Decl. ¶¶ 82-83. The redacted information reflects details relevant to the ongoing investigation, "making the likelihood of interference readily apparent." *See CREW*, 746 F.3d at 1098.

The Third Hardy Declaration explains that disclosure of redacted information in the Carter Page FISA documents "could reasonably be expected to interfere with the pending Russian election interference investigation if publicly disclosed at this time." 3rd Hardy Decl. ¶ 83. The Third Hardy Declaration explains that the types of information that could reasonably be expected to harm the investigation if disclosed include: aspects of the investigation not previously made public, what information or activities are or are not of interest to the investigators, areas in which there may be gaps in investigators' knowledge that could be exploited, and the identities of potential witnesses and the information they provided. Hardy Decl. ¶ 85. Moreover, disclosure of confidential or classified sources risks curtailing their cooperation. *Id.* ¶ 87. Disclosure of the evidence relied upon risks influencing, compromising or tainting these or other witnesses, and risks revealing gaps in investigative information that can be exploited. *Id.* ¶ 88. Disclosure of specific investigative techniques used during specific time periods and regarding specific subject matters creates similar risks, including efforts by adversaries or targets to undermine the techniques. *Id.* ¶ 89.

The FBI carefully considered whether information would match public information and whether its disclosure would reasonably be expected to harm the investigation. *Id.* ¶ 90. Additionally, although there has been widespread media coverage of the Russia investigation, official disclosures would cause greater harm to the investigation, regardless of whether it confirmed or refuted media reporting. *Id.* ¶ 84. Accordingly, such information is properly withheld pursuant to Exemption 7(A).

### E.  DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 7(D).

DOJ properly withheld information under Exemption 7(D) because certain investigatory information would reveal the identity or information of confidential sources.

#### (1)  7(D) Standards.

Exemption 7(D) permits the withholding or redacting of law enforcement records, the release of which "could reasonably be expected to disclose the identity of a confidential source . . . and, . . . [in the case of] an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). Exemption 7(D) requires no balancing of public and private interests.  *See Dow Jones & Co.* v. *DOJ*, 917 F.2d 571, 575–76 (D.C. Cir. 1990).  The agency is entitled to withhold any information that could disclose a confidential source's identity and, in the context of an agency conducting a lawful national security intelligence investigation, to withhold the substance of the information furnished by such source.  *See* 5 U.S.C. § 552(b)(7)(D); *Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993); *Canning v. DOJ,* 567 F. Supp. 2d 104, 111 (D.D.C. 2008).

A confidential source is one who "provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Landano*, 508 U.S. at 172.  Thus, Exemption 7(D) applies to protect the identity of a source if an

agency establishes that a source has provided information under either an express or implied promise of confidentiality.  *See Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995).  In cases, such as this one, where the Government provides an express promise of confidentiality, "the issue is simple enough: The agency must present 'probative evidence that the source . . . receive[d] an express grant of confidentiality.'" *Hodge v. FBI*, 703 F.3d 575, 581 (D.C. Cir. 2013) (quoting *Campbell v. DOJ,* 164 F.3d 20, 34 (D.C. Cir. 1998).

### (2) DOJ Properly Withheld Information Regarding Confidential Sources.

Here, the FBI redacted certain non-public information regarding Christopher Steele (identified as "Source #1" in the documents), and all information about and from other confidential human sources.  3rd Hardy Decl. ¶¶ 112-17.  First, the Hardy Declaration establishes that the FBI provided an express promise of confidentiality to Steele as part of the FBI's protocols for confidential human sources, and Steele in fact provided information in furtherance of a national security investigation.  *Id.* ¶¶ 115-16.  His information is therefore categorically exempt from disclosure under 7(D).  Nonetheless, Steele's identity and some of his reporting has been publicly disclosed, and the FBI therefore has not redacted information that matches his information as disclosed in the Nunes and Schiff memoranda.  *Id.*

Second, the FISA applications contain information from and about other sources who provided information to the FBI and did so pursuant to express assurances of confidentiality.  *Id.* ¶ 117.  Thus, the requirements of Exemption 7(D) are satisfied.  Confidential human sources providing information to the FBI pursuant to assurances of confidentiality should be secure in the knowledge that their assistance will be held in confidence.  *Id.* ¶¶ 113-14.  Release of such information may eliminate a source and have a chilling effect on other current and potential sources, who need to know they can trust the FBI's assurances of confidentiality.  *Id.* Accordingly, the FBI properly redacted information pursuant to Exemption 7(D).

**F. DOJ Properly Withheld Information in the Carter Page Documents Pursuant to Exemption 7(E).**

**(1) 7(E) Standards.**

Exemption 7(E) authorizes withholding of information compiled for law enforcement purposes if release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Congress intended that Exemption 7(E) protect law enforcement techniques and procedures from disclosure, as well as techniques and procedures used in all manner of investigations after crimes or other incidents have occurred.

Exemption 7(E) is written in broad and general terms to cover not only information that will definitively lead to the circumvention of the law, but also information that risks circumvention of the law. *Mayer Brown, LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1193 (D.C. Cir. 2009); *Bigwood v. Dep't of Defense*, 132 F. Supp. 3d 124, 152–53 (D.D.C. 2015). Satisfying the exemption is a "relatively low bar". *See Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). The agency need not make a "highly specific ... showing" of risk of circumvention of the law, but only "demonstrate logically how the release of the requested information might create" such a risk. *Id.* (quoting *Mayer Brown*, 562 F.3d at 1194). Nor must the agency demonstrate "an actual or certain risk of circumvention" of the law; rather the agency need only show "the chance of a reasonably expected risk." *Mayer Brown*, 562 F.3d at 1193.

Importantly, the range of "law enforcement purposes" covered by Exemption 7(E) includes not only traditional criminal law enforcement duties, but also proactive steps taken by the government designed to prevent terrorism and to maintain national security. *See Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926; *Bigwood*, 132 F. Supp. 3d at 152; *see also Milner v. Dep't of*

*the Navy*, 562 U.S. 562, 582 (2011) ("Particularly in recent years, terrorism prevention and national security measures have been recognized as vital to effective law enforcement efforts in our Nation.") (Alito, J., concurring).

### (2) DOJ Properly Withheld Information About Law Enforcement Techniques that Risks Circumvention of the Law.

The withholdings easily satisfy the "relatively low" Exemption 7(E) standard here. The entirety of the FISA packages are a law enforcement technique, whose details were not previously known to the public, and such FISA applications have never previously been processed for public release. Accordingly, the applications and orders contain a substantial amount of still nonpublic information about this law enforcement technique and how it is used in particular contexts. The Third Hardy Declaration describes eight categories of information withheld under 7(E).[8]  3rd Hardy Decl. ¶¶ 119-33.

First, DOJ withheld information about the investigative focus of these particular FISA applications and orders. 3rd Hardy Decl. ¶ 120. Together, the information in these applications reveals how the FBI conducted certain aspects of the investigation to that date and a road-map of certain contemplated investigative steps. *Id*. Although the general techniques authorized by the FISA are publicly known, this detailed information about how, when, where and why such authorities are employed in this particular investigation is not publicly known. *Id*. Such details would be useful to criminals and other adversaries as a guide to adjust their own behavior and develop effective countermeasures. *Id*.

Second, DOJ withheld information about the collection and analysis of information it

---

[8] Each category is separately coded on the redacted documents. *See* 3rd Hardy Decl. ¶ 34. These categories often overlap, and redactions may be coded to more than one category. For example, specific techniques described to the Court are protected under category three, but also tend to show the focus of the investigation under category one based on which investigative activities were ongoing when and where.

obtains for investigative purposes, including how and where the FBI collects particular types of information and the methodologies employed to analyze it.  *Id.* ¶¶ 121-23. Such disclosures would enable subjects of investigations to identify when these or similar techniques are or might be used and take countermeasures.  *Id.*

Third, DOJ withheld specific techniques authorized for and used in national security investigations.  Hardy Decl. ¶¶ 124-26.  This category includes:  techniques that have not been publicly disclosed in this specific context, details about other techniques that have been disclosed generally, and those techniques specifically considered or authorized by the FISC here.  *Id.* ¶ 124.  The disclosure of techniques in this particular context would have important ramifications on the use of such techniques in other national security cases.  *Id.*  Although the techniques authorized by FISA are publicly known, detailed information about how, when, where and why such authorities are employed in a particular investigation is not publicly known.  *Id.*  Aggregated, such information provides a roadmap to counterintelligence investigations and would give sophisticated adversaries the information necessary to take countermeasures.  *Id.*

Fourth, DOJ redacted specific databases used by the FBI for investigative purposes.  It is not publicly known under what circumstances the FBI utilizes these particular databases, particularly in the context of a national security investigation.  *Id.* ¶ 127.  And their disclosure would provide another useful data point useful to spies, criminals and others intent on avoiding FBI attention and developing countermeasures.  *Id.*

Fifth, DOJ withheld specific information about payments to confidential human sources.  While it is publicly known that FBI pays such sources, the details of when, for what, and how much sources are paid are aspects of this technique that are not made public in order to protect the viability of this technique.  *Id.* ¶ 128.  Moreover, the amount paid to a particular confidential human source could suggest the relative volume or importance of information provided by a

source, leading people who believe they are subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention. *Id.* ¶¶ 128-29.  And it could reveal important non-public information about the level of resources devoted to particular investigations or subjects.  *Id.*

Sixth, DOJ withheld detailed information about the targets, dates and scope of surveillance.  While it is known that the FBI conducts FISA surveillance and specifically conducted surveillance directed at Page, the details about how such surveillance was investigatively or technically implemented, the locations targeted by the surveillance, and the specific time periods under which the surveillance was conducted are not public.  *Id.* ¶ 130.  Disclosure of such details about how and when the FBI conducts surveillance would create a mosaic that criminals and other adversaries could use to predict when and where such surveillance may occur, detect it, and to develop and utilize countermeasures.  *Id.*

Seventh, DOJ redacted information regarding dates and types of FBI investigations.  In particular, the FBI protected information that identifies the type of a particular investigation, whether it is a "preliminary" or "full" investigation, and the time period of the particular investigation.  *Id.* ¶ 131.  Disclosure would allow individuals to know what types of activities would trigger which type of investigation and allow them to deduce applicable time periods.  *Id.*  Disclosure that a particular activity warrants investigation could cause individuals to adjust conduct to avoid detection.  *Id.*

Eighth, DOJ redacted investigative strategies for particular evidence.  The FBI redacted information that describes a specific purpose for which it might use information gathered as a result of its FISA authorized surveillance of Page.  *Id.* ¶¶ 132-33.  Publicly disclosing this information would permit targets of FBI investigative activities to anticipate such activities and take effective countermeasures.  *Id.*

### G. DOJ Properly Withheld Private Information in the Carter Page Documents Pursuant to Exemptions 6 and/or 7(C).

**(1) Applicable Exemptions**.

Two FOIA exemptions cover different types of private information redacted in these documents.  First, Exemption 6 allows agencies to withhold "personnel and medical files and similar files" whenever "disclosure . . . would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  To determine whether a file qualifies as "similar" to "personnel or medical files," courts examine whether information in that file "applies to a particular individual." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 601-02 (1982).  Therefore, not only does the exemption protect files, "but also bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (citation omitted).  If the threshold requirement is met, a court must next ask whether disclosure would compromise a "substantial" privacy interest, since FOIA requires the release of information "[i]f no significant privacy interest is implicated . . . ." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (citation omitted).  "Anything greater than a de minimis privacy interest" is generally sufficient. *Id*. at 1229–30.  Finally, courts test whether release of such information would constitute a "clearly unwarranted invasion of personal privacy," *Wash. Post Co. v. Dep't of Health & Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982), by balancing "the privacy interest that would be compromised by disclosure against any public interest in the requested information," *Multi Ag Media*, 515 F.3d at 1228.  Courts examine the "public need for the information" in light of "the basic purpose of [FOIA] to open agency action to the light of public scrutiny, rather than . . . the particular purpose for which the document is being requested." *DOJ v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 772 (1989) (internal citations omitted).

"That purpose . . . is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *Id.* at 773.

Second, under Exemption 7(C), an agency is exempt from producing "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). In determining whether this exemption applies to particular information, a court must balance the privacy interests of individuals mentioned in the records against the public interest in disclosure. *See ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011). The privacy interest at stake belongs to the individual, not the government agency, *see Reporters Comm.*, 489 U.S. at 763–65, and "individuals have a strong interest in not being associated unwarrantedly with alleged criminal activity," *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984).

**(2) DOJ Properly Withheld Private Information.**

Here, the Third Hardy Declaration establishes that several categories of private or personally identifying information are properly redacted. First, DOJ withheld the names of the FBI agents who signed the Page FISA applications under Exemption 6 and 7(C). Such agents can become the target of harassing inquiries or threats, a risk that is heightened in the context of national security or counterintelligence cases. 3rd Hardy Decl. ¶¶ 96-101. They have substantial privacy interests in avoiding such harassment or threats, an interest that is heightened by the high profile nature of the investigation. *Id.* Finally, there is no legitimate public interest in these identities, which would not inform the public understanding of the Page warrants, the Russia investigation or anything else. *Id.* Accordingly, the FBI properly protected these names.

Second, DOJ withheld certain personal information about Carter Page. While FISC-

authorized surveillance of Carter Page has been officially acknowledged, there remains information not previously made public by the Government and in which he retains a privacy interest. 3rd Hardy Decl. ¶¶ 102-05. Although there is a demonstrated public interest in these applications, the particular information redacted would not substantially increase the public's understanding of this matter. *Id.*

Third, DOJ withheld identifying information about a FISC deputy clerk and the career NSD attorney who submitted the FISA applications to the FISC. *Id.* ¶¶ 106-109. Such employees could become targets of harassing inquiries or threats, and they may be targeted by foreign powers; in contrast, there is no public interest in their identities. *Id.* Accordingly, their identifying information was properly redacted.

Finally, DOJ redacted identifying information regarding a third party source. This particular source is mentioned twice in the released documents and did not provide information directly to the FBI. *Id.* ¶¶ 110-11. The individual has a substantial privacy interest in not being publicly linked to the investigation and could face harassment, retaliation, threats or physical harm if revealed publicly in connection with a sensitive national security investigation. *Id.* And the public interest in an individual mentioned in two footnotes is quite limited and would not increase the public's understanding of FBI operations or this investigation. *Id.* Accordingly, this information was properly redacted.

### H. DOJ Properly Withheld in Full Certain Portions of the Carter Page Documents Pursuant to Exemptions 1, 3, 7(A), and 7(E).

DOJ withheld 186 pages in full from the Carter Page FISA packages. Disclosure would reveal classified intelligence methods and law enforcement techniques. 3rd Hardy Decl. ¶¶ 135-41. There is no additional information that can be provided on the public record but the justification for withholding is similar to the justification for other redactions under these

exemptions.  The classified *ex parte, in camera* submission provides additional information.

**I.  DOJ Released All Reasonably Segregable Information.**

Under FOIA, "any reasonably segregable portion of a record shall be provided to any

person requesting such record after deletion of the portions which are exempt . . . ." 5 U.S.C. §

552(b).  Accordingly, "non-exempt portions of a document must be disclosed unless they are

inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. Dep't of Air Force,* 566

F.2d 242, 260 (D.C. Cir. 1977).  An agency has no obligation to segregate non-exempt material

that is so "inextricably intertwined" with exempt material that "the excision of exempt

information would impose significant costs on the agency and produce an edited document with

little informational value."  *Neufeld v. IRS*, 646 F.2d 661, 666 (D.C. Cir. 1981), abrogated on

other grounds by *Church of Scientology of Calif. v. IRS*, 792 F.2d 153 (D.C. Cir. 1986); *see also*

*Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005) (same).  A

court "may rely on government affidavits that show with reasonable specificity why documents

withheld pursuant to a valid exemption cannot be further segregated . . . ."  *Juarez*, 518 F.3d at

61 (internal citation omitted).  "Agencies are entitled to a presumption that they complied with

the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494

F.3d 1106, 1117 (D.C. Cir. 2007).

Here, DOJ has shown that it released all reasonably segregable material through the

declaration of Mr. Hardy.  3rd Hardy Decl. ¶ 134.  Mr. Hardy indicates that the agency conducted

a document-by-document and line-by-line review to ensure that all reasonably segregable, non-

exempt information was released, taking into account the public disclosures related to this

matter.  *Id.  See Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776-77 (D.C. Cir.

2002) (holding that agency had demonstrated there was no reasonably segregable non-

deliberative material when it had submitted an affidavit by an agency official confirming that "a

line-by-line review of each document withheld in full [had] determined that 'no documents contained releasable information which could be reasonably segregated from the nonreleasable portions.'").  This segregability conclusion is borne out by the released documents: redactions have been taken narrowly and only where specific information protected by exemptions is at issue.

Because the Hardy Declaration establishes that all reasonably segregable, non-exempt information has been released, Defendant is entitled to summary judgment.

### III.    DOJ Properly Refused to Confirm or Deny the Existence of Other Responsive Records.

DOJ has refused to confirm or deny the existence of FISA applications and orders beyond the four previously acknowledged Carter Page packages.  DOJ has established that this partial Glomar response is proper, pursuant to Exemptions 1, 3, 7(A) and 7(E).  3rd Hardy Decl. ¶¶ 142-46; Findlay Decl. ¶¶ 14-15.

The standards for these exemptions are outlined in Part II of this memorandum, and the application of FOIA standards to refuse to confirm or deny the use of particular surveillance techniques against particular individuals ought to be non-controversial.  The Government routinely makes Glomar responses to similar requests for information about particular surveillance subjects, *see* 3rd Hardy Decl. ¶¶ 13, 143 (confirming that with extremely limited exceptions, the FBI does not confirm or deny FISA surveillance of particular individuals or entities); Findlay Decl. ¶ 16 (same), and courts routinely uphold such responses.  *See, e.g., Marrera v. DOJ*, 622 F. Supp. 51, 53–54 (D.D.C. 1985) ("[T]his Court finds that OIPR's refusal to confirm or deny the existence of FISA records pertaining to this particular plaintiff to be justified in the interests of national security as part of an overall policy of [the Executive Order] with respect to *all* FISA FOIA requests."); *Schwarz v. Dep't of Treasury*, 131 F. Supp. 2d 142,

149 (D.D.C. 2000) ("The Office properly refused to confirm or deny that it had any responsive records maintained under the Foreign Intelligence Surveillance Act of 1978 (FISA) and in non-FISA files relating to various intelligence techniques."), *aff'd*, No. 00-5453, 2001 WL 674636 (D.C. Cir. May 10, 2001); *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 60 (D.D.C. 2015) (upholding NSA Glomar response to request for metadata records with respect to two particular individuals); *Agility Pub. Warehousing Co. K.S.C.*, 113 F. Supp. 3d at 329 (upholding NSA Glomar in response to request for particular surveillance records); s*ee also Carter v. NSA,* No. 1:12-CV-00968-CKK, 2014 WL 2178708, at *1 (D.C. Cir. Apr. 23, 2014) (upholding Glomar response to request for records related to alleged NSA surveillance of plaintiff); *Moore v. Obama*, No. 09-5072, 2009 WL 2762827, at *1 (D.C. Cir. Aug. 24, 2009) (same); *Wilner*, 592 F.3d at 65 ("Glomar responses are available, when appropriate, to agencies when responding to FOIA requests for information obtained under a 'publicly acknowledged' intelligence program, such as the [Terrorist Surveillance Program], at least when the existence of such information has not already been publicly disclosed.").

### A.   The Partial Glomar is Proper Pursuant to Exemption One Because the Existence or Non-Existence of Responsive Records is Properly Classified.

The Glomar response with respect to the existence or non-existence of other FISA surveillance applications is proper under FOIA Exemption 1.  DOJ has logically and plausibly explained why it cannot confirm or deny the existence of additional responsive records that would identify other FISA targets, if any, without revealing information that is currently and properly classified and exempt from disclosure under FOIA Exemption 1.  First, the existence or non-existence of additional responsive records "pertains to" one of the categories of information protected by Executive Order 13526, namely, "intelligence sources and methods" and "foreign relations and foreign activities of the United States."  And the disclosure of either category

33

would cause harm to national security.

The existence or non-existence of responsive records pertains to intelligence sources and methods because the request, on its face, seeks information about whether there has been additional FISA surveillance, beyond that already acknowledged.  3rd Hardy Decl. ¶¶ 152-55; Findlay Decl. ¶¶ 16-19.  Confirming or denying whether other responsive records exist "would be tantamount to confirming whether or not the FBI has relied on a particular intelligence activity or method targeted at particular individuals or organizations" and "reveal otherwise non-public information regarding the nature of the FBI's intelligence interests, priorities, activities and methods– information that is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission."  3rd Hardy Decl. ¶ 155; Findlay Decl. ¶ 17 ("To disclose the existence or non-existence of responsive documents in NSD files would disclose whether or not particular individuals or organizations were targets of FISC-authorized surveillance.").   Such activities and methods "are valuable only so long as they remain unknown and unsuspected" and that disclosure would "seriously jeopardize[]" the use of such methods.  3rd Hardy Decl. ¶¶ 153-54; Findlay Decl. ¶¶ 20-21.  Mr. Hardy further explains that hostile groups review officially released information like this; they have "the ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts."  3rd Hardy Decl. ¶ 154; Findlay Decl. ¶¶ 20-21.  Disclosure of the withheld information "would pose at least a serious risk to national security."  3rd Hardy Decl. ¶ 155; Findlay Decl. ¶ 20.

Further, the Hardy Declaration establishes that confirming the existence or non-existence of other responsive documents would reveal information about the United States Government's foreign relations, the disclosure of which could cause damage to national security.  3rd Hardy Decl. ¶¶ 156-60.  Such disclosure could "weaken, or even sever, the relationship between the

United States and its foreign partners (present and future), thus degrading the Government's ability to combat hostile threats abroad." *Id.* [9]

Accordingly, the partial Glomar response was proper under Exemption One.

### B. The FBI Established that the Partial Glomar is Proper Pursuant to Exemption 3 and the National Security Act.

As discussed in Part II, Exemption 3 and the National Security Act prohibit the disclosure of intelligence sources and methods. For the reasons discussed above with regard to Exemption 1, confirming the existence or non-existence of responsive records could divulge information about the existence or nonexistence of intelligence sources and methods protected from disclosure under the National Security Act. 3rd Hardy Decl. ¶¶ 161-63. No additional showing is necessary under the National Security Act.

### C. The FBI Established that the Partial Glomar is Proper Pursuant to Exemption 7(A).

Here, the Hardy Declaration justifies the FBI's use of Exemption 7(A) to protect the currently undisclosed fact of the existence or non-existence of any investigative records that would be responsive to Plaintiffs' requests. As an initial matter, FISA records are plainly compiled for law enforcement purposes. As the Hardy Declaration establishes, the "only circumstance under which the FBI can request a FISA order is when the FBI is conducting an authorized, predicated national security investigation within the scope of its law enforcement and foreign intelligence responsibilities." 3rd Hardy Decl. ¶ 77. Accordingly, FISA applications and FISC orders – when they exist – are records compiled for law enforcement purposes.

---

[9] The Government is not arguing that such disclosure of the existence or nonexistence of records would reveal the existence of the Russia investigation. The existence of the Russia investigation is officially acknowledged information. Additional information about the harm to foreign relations that would result from disclosure is available in the *ex parte*, *in camera* declaration.

Additionally, the information requested purportedly relates to an ongoing investigation. Plaintiffs' request explicitly mentions the investigation into the Russian government's efforts to interfere in the 2016 presidential election.  3rd Hardy Decl. ¶¶ 14 (describing opening of investigation); 168 (describing ongoing investigation).  Any sort of investigation involving such FISA records would be the sort of active investigation protected by Exemption 7(A).  *See, e.g.*, *People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 541 (D.C. Cir. 2014) (Exemption 7's threshold requirement satisfied in a *Glomar* response case because FOIA requester did not dispute that "any responsive documents," if they existed, "would constitute records or information compiled for law enforcement purposes . . .").

The Hardy Declaration further describes the harm to an investigation that may result:

> Confirming or denying the existence or non-existence of responsive records would reveal non-public information about the focus, scope, and conduct of that investigation.  Specifically, it would reveal whether or not specific investigative techniques have been used; when and to what extent they were used, if they were; their relative value or benefit if they were used; and the targets they were used against, if any.  Prematurely disclosing nonpublic information about the Russia investigation could give targets and others intent on interfering with the FBI's investigative efforts the information necessary to:  take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats.  Accordingly, confirming or denying the existence or non-existence of responsive records, beyond the four Carter Page FISA applications . . . , could reasonably be expected to adversely affect the pending investigation.

3rd Hardy Decl. ¶ 169.

Accordingly, a Glomar response is available under these circumstances to protect the integrity of confidential law-enforcement investigations, and to therefore prevent harm cognizable by FOIA Exemption 7(A).  *See, e.g.*, *Cozen O'Connor v. Dep't of Treasury*, 570 F.

Supp. 2d 749, 788 (E.D. Pa. 2008); *see also CREW*, 746 F.3d at 1096 ("Exemption 7(A) reflects

the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep

certain records confidential, lest the agencies be hindered in their investigations or placed at a

disadvantage when it [comes] time to present their case.'" (quoting *Robbins Tire*, 437 U.S. at

224)).  For these reasons, the FBI's Glomar response is justified by Exemption 7(A).

### D.   The FBI Established that the Partial Glomar Response is Proper Pursuant to Exemption 7(E).

As discussed in Part II, Exemption 7(E) protects law enforcement techniques and

procedures, where disclosure risks circumvention of the law.  Here, the Third Hardy Declaration

establishes that disclosure of existence or non-existence of responsive records would reveal a law

enforcement technique or procedure.  "How the FBI applies its investigative resources (or not)

against a particular allegation, report of criminal activity, or perceived threat is itself a law

enforcement technique or procedure that the FBI protects."  3rd Hardy Decl. ¶ 171.  Such an

acknowledgment of the existence or non-existence of responsive records "would reveal when

and under what circumstances the FBI relies upon FISA-authorized techniques in an

investigation," and "provide pieces of information that adversaries could use to ascertain at what

point, and against whom we might use particular techniques."  *Id.* ¶ 172.  "Armed with this

information, adversaries could glean significant insight into the activities likely to attract – or not

attract – the FBI's law enforcement attention.  These individuals would then be able to alter their

behavior to avoid attention by law enforcement, making it more difficult for the FBI to be

proactive in assessing threats and investigating crimes."  *Id.*  Accordingly, the FBI properly

invoked Exemption 7(E) to refuse to confirm nor deny the existence of responsive records,

beyond the Carter Page documents discussed in detail above.

**IV.     The Withheld Information Has Not Been Officially Acknowledged.**

As a general matter, under FOIA, "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013). This "official acknowledgement" principle applies to the Glomar context, so a requester "can overcome a Glomar response by showing that the agency has already disclosed the fact of the existence (or non-existence) of responsive records, since that is the purportedly exempt information that a Glomar response is designed to protect." *Id.* at 427. But the plaintiff "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id.* (quoting *Wolf*, 473 F.3d at 378).

The D.C. Circuit has narrowly construed the "official acknowledgment" doctrine, however, and to bring such a challenge plaintiff must satisfy three stringent criteria, none of which are satisfied here. "First, the information requested must be as specific as the information previously released." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765); *James Madison Project v. DOJ*, No. CV 17-1392 (ABJ), 2018 WL 4283562, at *6 (D.D.C. Sept. 7, 2018). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure. This insistence on exactitude [by the D.C. Circuit] recognizes 'the Government's vital interest in information relating to national security and foreign affairs." *Id.* (quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993)); *Competitive Enter. Inst.*, 78 F. Supp. 3d at 54 ("Plaintiffs in this case must therefore point to specific information in the public domain establishing that the NSA has [the claimed information.]"). The information already released must also be of the same level of generality as the information sought—broadly crafted disclosures, even on the same general topic, do not waive the Glomar response. *See, e.g., Afshar*,

702 F.2d at 1133 (previous disclosure that plaintiff had "'created a problem' in U.S.-Iranian relations" was too general to justify releasing documents detailing the nature of that problem).

"Second, the information requested must match the information previously disclosed." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).  If there are "substantive differences" between the two, an official-acknowledgment claim must fail.  *ACLU v. DOD*, 628 F.3d at 621.  That is true even if the previous disclosures are on the same topic.  *See, e.g.*, *Competitive Enter. Inst.*, 78 F. Supp. 3d at 57 (a Presidential statement that "the intelligence community . . . is looking at phone numbers and durations of calls," was not adequately congruent with a request seeking the companies that had provided that data to U.S. intelligence agencies); *Wolf*, 473 F.3d at 379 (holding that CIA could not claim Glomar protection when it had previously read excerpts from materials sought into the record during congressional hearing); *James Madison Project v. DOJ*, 2018 WL 4283562, at *8-*16 (various Presidential statements failed to meet matching and specificity requirements).

"Third, . . . the information requested must already have been made public through an official and documented disclosure." *Id.* at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).  Key to this element is that the source must be *official*; non-governmental releases, or anonymous leaks by government officials or former government officials do not qualify.  *See, e.g.*, *ACLU v. Dep't of Defense*, 628 F.3d at 621-22; *Agility Public Warehousing Co.  K.S.C.*, 113 F. Supp. 3d at 330 n.8; *Competitive Enter. Inst.*, 78 F. Supp. 3d at 55.  In other words, "mere public speculation, no matter how widespread," cannot undermine the agency's Glomar prerogative.  *Wolf*, 473 F.3d at 378.  And Congressional statements also cannot waive Executive Branch classification or other Exemptions.  *See Military Audit Project*, 656 F.2d at 742-745; *see also Moore v. CIA*, 666 F.3d 1330, 1333 n.4 (D.C. Cir. 2011) ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought.").

Plaintiffs cannot meet their burden of pointing to an official disclosure of the information

they seek.  The declarations establish that no authorized government official has disclosed the

precise information withheld and that the declarants carefully considered the known public

information related to this issue.  *See* 3rd Hardy Decl. ¶¶ 23-27, 31-32, 134, 143; Findlay Decl. ¶

23.

The Amended Complaint cites a number of public statements that Plaintiffs allege

constitute official acknowledgement of properly classified facts.  *See* Am. Compl. ¶ 11 ("The

comments of President Trump and Press Secretary Sean Spicer constitute prior official disclosure

of the existence of surveillance orders issued by the FISC and that authorized collection of

information that, at a minimum, incidentally implicated President Trump and/or his associates.

This lawsuit ultimately will seek to determine the circumstances in which specific

surveillance/collection orders were issued by the FISC.").  But these cited public statements

about an investigation and alleged surveillance do not come close to meeting the standard for

official acknowledgement of the information sought by Plaintiffs.

Plaintiffs appear to rely on President Trump's four-part post on Twitter on March 4,

2017, discussed *supra*.  *See* https://twitter.com/realDonaldTrump; *see also* Am. Compl. ¶ 7; 3rd

Hardy Decl. ¶ 26; Findlay Decl. ¶ 8.  As discussed above, DOJ – through the testimony of then-

FBI Director James Comey – has confirmed that it has no records that support this statement.

Hardy Decl. ¶ 26; Findlay Decl. ¶ 8 & Ex. E.[10]

---

[10] In any event, this series of tweets contains a constellation of specific opinions and allegations
regarding wiretapping, including that (1) his phones were tapped; (2) at Trump Tower; (3) in
October just prior to the election; (4) by the Obama Administration; and (5) that such actions
were comparable to "Nixon/Watergate."  Nowhere do these tweets mention FISA, the FISC, any
targets other than President Trump, or the involvement of DOJ or FBI.  Moreover, the statements
are limited to a particular time, a particular target, and a particular place, in contrast to Plaintiffs'
FOIA request.  Thus, the statements do not match the information sought in this FOIA request.
The follow-up statements to the media by the President or his Press Secretary as cited in the

Neither the Complaint nor the request point to any statements that could constitute official acknowledgment, and the agency has carefully considered the known public information on this issue.  Accordingly, Plaintiffs cannot establish official acknowledgment.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Government's motion for summary judgment.

Dated:  October 19, 2018

Respectfully Submitted,

CHAD A.  READLER
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/Amy E. Powell*
AMY E. POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

---

complaint also do not match the specific information sought by Plaintiffs here.  Am. Compl. ¶¶ 7-11.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JAMES MADISON PROJECT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 17-597-APM |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**[PROPOSED] ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Having considered the submissions of the parties, the Court hereby ORDERS that the

Defendant's Motion for Summary Judgment is GRANTED.

_____
U.S. DISTRICT COURT JUDGE

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MADISON PROJECT, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br> Defendant. | Civil Action No. 1:17-cv-0597-APM |

### (U) **THIRD DECLARATION OF DAVID M. HARDY**

(U) I, David M. Hardy, declare as follows:

(1)      (U) I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia.[1] I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)      (U) In my official capacity as Section Chief of RIDS, I supervise approximately

---

[1] (U) IMD was formerly known as the Records Management Division, or RMD.

1

Classified By: ███████████
Derived From: Multiple Sources
Declassify On: 20431231

SECRET//NOFORN

SECRET//NOFORN

242 employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters

("FBIHQ") units and two (2) field operational service center units whose collective mission is to

effectively plan, develop, direct, and manage responses to requests for access to FBI records and

information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN

FOIA Act of 2009, and FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive

Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial

decisions; and Presidential and Congressional directives. My responsibilities also include the

review of FBI information for classification purposes as mandated by Executive Order 13526,

and the preparation of declarations in support of Exemption 1 claims asserted under the FOIA. I

have been designated by the Attorney General of the United States as an original classification

authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

(3)     (U) Due to the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am

aware of the FBI's handling of plaintiffs James Madison Project ("JMP") and Brad Heath's

FOIA request for three categories of records concerning surveillance under the Foreign

Intelligence Surveillance Act of 1978 ("FISA"), which is at issue in this litigation. In response to

this request, the FBI issued a so-called Glomar response, whereby it neither confirmed nor

denied the existence or non-existence of responsive records. Due to intervening events, the FBI

pierced that Glomar response in a limited fashion, acknowledged the existence of four FISA

SECRET//NOFORN

SECRET//NOFORN

applications and resulting orders regarding Carter Page, and processed those four packages for release. The FBI retained its Glomar response as to the existence or non-existence of any other responsive records.

(4)    (U) The FBI processed 598 pages, which is the totality of the four Page FISA applications and orders; released five pages in whole and 407 in part, with information redacted pursuant to FOIA exemptions; and withheld 186 pages in full pursuant to FOIA exemptions. The FBI relied on the following FOIA exemptions in redacting information or withholding pages: FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). *See* 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(6), and (b)(7)(A), (C)-(E).

(5)    (U) This declaration is being submitted in support of DOJ's motion for summary judgment on the partial Glomar response and on the processing of plaintiffs' FOIA request. It supplements and incorporates by reference my previous two declarations in this case. *See* ECF No. 13-3, Declaration of David M. Hardy (hereafter "First Hardy Decl."), submitted in support of DOJ's withdrawn motion for summary judgment (ECF No. 13); ECF No. 34-1, Second Declaration of David M. Hardy (hereafter "Second Hardy Decl."), submitted in support of the DOJ's Joint Status Report (ECF No. 34).

## (U) <u>**ADMINISTRATIVE HISTORY**</u>

(6)    (U) Plaintiffs submitted a FOIA request to the FBI dated March 6, 2017, requesting:

1. Any orders by the FISC authorizing surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for presidency, or people associated with President Trump.

2. Any applications to the FISC seeking authorization for surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for presidency, or people associated with

3

SECRET//NOFORN

President Trump.

3. Any minimization procedures issued by the FISC and that applied to any orders issued that fall within the scope of #1 or #2.

*See* **ECF No. 13-3, First Hardy Decl., at ¶ 5; ECF No. 14, Exhibits to First Hardy Decl., Exhibit A.**

(7)     (U)   On April 4, 2017, the FBI responded to plaintiffs' request by issuing a Glomar response and refusing to confirm or deny the existence of responsive records based on FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).   *See* **ECF No. 13-3, First Hardy Decl., at ¶ 11; ECF No. 14, Exhibits to First Hardy Decl., Exhibit D.**

(8)     (U)   That same day, April 4, 2017, plaintiffs filed their complaint in this case. *See* **ECF No. 1, Complaint; ECF No. 13-3, First Hardy Decl., at ¶ 12.**

(9)     (U)   On April 15, 2017, plaintiffs filed their amended complaint. *See* **ECF No. 5, First Amended Complaint; ECF No. 13-3, First Hardy Decl., at ¶ 13.**

(10)     (U)   As described above, due to events occurring after this lawsuit was filed, the FBI pierced its Glomar response in a limited fashion and processed four FISA applications and FISC orders related to Carter Page.  On July 20, 2018, the FBI released all reasonably segregable, non-exempt portions of those FISA materials and published them on the FBI's electronic FOIA reading room at https://vault.fbi.gov/d1-release/d1-release/view. **(See also Exhibit A attached hereto.)**

## (U) **CARTER PAGE FISA APPLICATIONS AND FISC ORDERS**

### (U) **BACKGROUND**

(11)     (U)   The Foreign Intelligence Surveillance Act of 1978, or FISA, establishes procedures for the physical search, electronic surveillance, and collection of "foreign intelligence

SECRET//NOFORN

information" between "foreign powers" and "agents of foreign powers" suspected of espionage or terrorism. 50 U.S.C. § 1801(b). The statute also created the FISC to oversee requests for surveillance warrants by federal law enforcement and intelligence agencies.

(12)    (U) The FISC meets in secret, and approves or denies requests for search warrants. Proceedings before the FISC are generally *ex parte* and non-adversarial. *But see* 50 U.S.C. § 1803(i)(2)(A). The court hears evidence presented solely by DOJ, and unlike most opinions rendered by other Federal courts, there is no provision for the publication or release of FISC opinions or other information regarding FISC hearings.[2]

(13)    (U) FISA is, itself, an intelligence method and details of its use are classified, and prohibited from disclosure under the National Security Act of 1947, 50 U.S.C. § 3024(i)(1). Specifically, the identity of a target of a FISA application/warrant is a classified fact, as are the dates of FISA authorized surveillance, the types and locations of authorized surveillance methods and tools, and other details about the authorized surveillance. Accordingly, FISA applications previously have never been disclosed publicly, including under the FOIA or through IC transparency efforts. The disclosure of the four Carter Page FISA applications is unprecedented.

(14)    (U) In July 2016, the FBI opened an investigation of "the Russian government's efforts to interfere in the 2016 Presidential election[.]"[3] As part of this investigation, in October

---

[2] (U) Under some circumstances, certain FISC opinions and orders have been released in response to FOIA requests or as part of Intelligence Community ("IC") transparency efforts. *See* 50 U.S.C. § 1872.

[3] (U) On March 20, 2017, then-FBI Director James B. Comey publicly confirmed the existence of this investigation in testimony before Congress, stating "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts." Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation).

SECRET//NOFORN

2016, the FBI first sought and obtained a FISA warrant to conduct surveillance on Carter

Page. Like any other FISA application and resulting order, the existence of the Carter Page

FISA was a classified fact. The Government thereafter sought and obtained three renewals from

the FISC to continue surveilling Page. The existence of each of those applications and resulting

orders was also classified.

(15)    (U)  Separately, in March 2017, the House Permanent Select Committee on

Intelligence ("HPSCI") announced an investigation into "the Russian active measures campaign

targeting the 2016 U.S. election." *See* https://intelligence.house.gov/news/

documentsingle.aspx?DocumentID=767.  Although not originally part of the scope of that

investigation, HPSCI added additional areas of inquiry, including the purported abuse of FISA.

*See* https://intelligence.house.gov/uploadedfiles/hpsci_russia_investigation_one_page_summary.

pdf.  As part of its investigation, HPSCI sought and was ultimately provided access to the Carter

Page FISA applications and orders.

(16)    (U)  On May 17, 2017, Acting Attorney General Rod Rosenstein appointed

Robert S. Mueller as Special Counsel. *See* DOJ Order No. 2915-2017 (May 17, 2017).  Under

the terms of his appointment, Special Counsel Mueller is authorized to "conduct the investigation

confirmed by then-FBI Director James B. Comey in testimony before the House Permanent

Select Committee on Intelligence on March 20, 2017, including (i) any links and/or coordination

between the Russian government and individuals associated with the campaign of President

Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and

(iii) any other matters within the scope of 28 C.F.R. § 600.4(a)."  The FBI's FISA authorized

surveillance on Page continued after the Special Counsel was appointed.

(17)    (U)  In February 2018, the HPSCI Majority and Minority issued two memoranda

SECRET//NOFORN

SECRET//NOFORN

regarding HPSCI's Russia investigation, which are often colloquially referred to by the names of the HPSCI Chairman and Ranking Member – *i.e.*, as the "Nunes Memo" and the "Schiff Memo." As originally drafted, both memoranda were classified because they revealed FISA authorized surveillance on an identified target – Carter Page.[4]

(18)     (U)  HPSCI voted to release the Nunes Memo publicly but could not immediately do so because it was classified at the Top Secret level. Thus, pursuant to clause 11(g) of Rule X of the House of Representatives, HPSCI forwarded the Nunes Memo to President Trump with a request to declassify it. The declassification request did not ask the President to opine on the judgments and conclusions of the HPSCI Majority.

(19)     (U)  On February 2, 2018, President Trump declassified the Nunes Memo "in light of the significant public interest in the memorandum." *See* Letter from Donald F. McGahn II, Counsel to the President, to Devin Nunes, Chairman of HPSCI (Feb. 2, 2018). HPSCI thereafter publicly released the Nunes Memo with a cover letter authored by Mr. McGahn documenting the President's action (which was also noted on the Nunes Memo itself with a stamp stating "Declassified by order of the President February 2, 2018"). Mr. McGahn's cover letter made it "clear [that] the Memorandum reflects the judgments of its congressional authors." *See* https://docs.house.gov/meetings/IG/IG00/20180129/106822/HMTG-115-IG00-20180129-SD001.pdf.

(20)     (U)  Subsequently, the HPSCI Minority submitted the Schiff Memo to DOJ,

---

[4] (U) Under classification rules, an entire document is classified if any single piece of information in it is classified. So, for example, an entire document is classified as Top Secret if it contains any Top Secret information, even if it also contains Secret, Confidential, or unclassified information. Moreover, information that by itself is unclassified can become classified when combined or associated with other unclassified or classified information, if the compiled information reveals an association or relationship that meets the standards and criteria for classification (*i.e.*, when disclosure of the compiled information would, itself, reveal classified information).

SECRET//NOFORN

SECRET//NOFORN

asking for a classification review. The FBI conducted the review requested by the HPSCI

Minority and identified those portions of the Schiff Memo that contained classified information

unaffected by the President's declassification of the Nunes Memo.[5]

(21)    (U) The FBI did not declassify any additional information during the review of

the Schiff Memo, nor did the HPSCI Minority request any further declassification. Rather, the

FBI conducted a review to identify what information remained classified, in light of the

President's declassification of the Nunes Memo. The HPSCI Minority redacted those portions of

the Schiff Memo that the FBI identified as classified, and then released the redacted

memorandum. *See* https://docs.house.gov/meetings/ig/ig00/20180205/106838/hmtg-115-ig00-

20180205-sd002.pdf.

(22)    (U) As with the HPSCI Majority, the HPSCI Minority did not ask the FBI to

opine on their judgment or conclusions, and the FBI did not do so. And as with the Nunes

Memo, the Schiff Memo reflects the judgments of its congressional authors.[6]

(23)    (U) Although DOJ and the FBI had previously and properly refused to confirm or

deny the existence of any records responsive to plaintiff's request on the grounds that doing so

could reasonably be expected to reveal classified information, among other things, the

---

[5] (U) The President's declassification of the Nunes Memo resulted only in the declassification of the classified information contained in that memorandum. It did not broadly declassify all information contained in or related to the Carter Page FISA applications and orders.

[6] (U) On January 4, 2018, Senators Grassley and Graham referred to DOJ their allegations that Christopher Steele had violated 18 U.S.C. § 1001. The referral memorandum referenced the Page FISA applications/orders and identified Steele, a classified intelligence source. Thus, the memorandum was classified. After the declassification of the Nunes Memo and the release of the Nunes and Schiff Memos, the FBI was asked to conduct a classification review of the referral memorandum so that the Senate could publicly release it. The FBI conducted that classification review and identified the portions that remained classified following the declassification of the Nunes Memo. The memorandum reflects the Senators' judgments and conclusions; they did not ask the FBI to opine on them and the FBI did not do so as part of its classification review.

SECRET//NOFORN

SECRET//NOFORN

President's declassification of the existence of the Carter Page FISA applications and orders,

through his declassification of the Nunes Memo, pierced that Glomar response as to the four

FISA applications and resulting orders referenced in the Nunes Memo.[7]

(24)    (U) As a result of the President's declassification of the existence of four Carter

Page FISA applications and orders, DOJ and the FBI undertook a FOIA review of the four sets

of applications and orders to determine whether any information necessarily had to be disclosed

in light of the President's declassification order.  On July 20, 2018, the FBI produced all

reasonably segregable, non-exempt portions of those four FISA packages in response to

plaintiff's FOIA request at issue in this case, among others.[8]

(25)    (U) Substantial portions of the Page FISA materials remain classified; the

President's declassification of the Nunes Memo resulted in the declassification of a relatively

limited amount of information.  Thus, the information that remains classified was protected

pursuant to FOIA Exemption (b)(1), 5 U.S.C. § 552(b)(1).  Furthermore, as previously noted, the

materials contain investigative information relevant to the pending investigation into Russia's

interference in the 2016 Presidential election.  Disclosure of this withheld relevant information

(none of which exactly matches that disclosed in the Nunes, Schiff, or Grassley/Graham Memos)

could reasonably be expected to interfere with this active and pending investigation.[9]  *See 5*

---

[7] (U) The Nunes Memo referenced an initial FISA application and order from October 2016, and three renewals thereafter.

[8] (U) Because the FBI received more than three requests to which the Carter Page FISA packages were responsive, the records were posted to The Vault, the FBI electronic reading room, on July 21, 2018.  *See* 5 U.S.C. § 552(a)(2)(D)(ii)(II).

[9] (U) While the three Congressional memoranda each reflect statements by the Legislative Branch, not the Executive Branch, in light of the President's actions with respect to the Congressional memoranda, the FBI identified and released any information contained in the four Page FISA packages that matched information released in the Congressional memoranda.

SECRET//NOFORN

SECRET//NOFORN

U.S.C. § 552(b)(7)(A).  The FISA packages also contain information from and about intelligence

sources, and detailed information about intelligence methods, including non-public information

about FISA surveillance.  This information was also protected.  *See* 5 U.S.C. §§ 552(b)(3),

(b)(7)(D), (b)(7)(E).  Finally, these documents contain personally-identifying information about

DOJ and FBI personnel and other third parties, which was withheld pursuant to the FOIA.  *See* 5

U.S.C. §§ 552(b)(6), (b)(7)(C).

(26)   (U)  Plaintiff's request is broader than the four acknowledged applications and

resulting orders, however.  As discussed further below, the FBI's original Glomar response was

pierced only in a very limited fashion for those four acknowledged applications and resulting

orders.  It remains in place as to any other responsive applications and orders, with one other

exception.  Specifically, on March 20, 2017, then FBI Director James B. Comey specifically

addressed President Trump's four-part post on Twitter on March 4, 2017 that President Obama

had had President Trump's "'wires tapped' in Trump Tower just before the victory," stating:

> With respect to the President's tweets about alleged wiretapping
> directed at him by the prior administration, I have no information
> that supports those tweets and we have looked carefully inside the
> FBI.  The Department of Justice has asked me to share with you
> that the answer is the same for the Department of Justice and all its
> components.  The Department has no information that supports
> those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian

Interference in the 2016 U.S. Election, March 20, 2017.  https://www.washingtonpost.com/news/

post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-

interference-in-2016-election/?utm_term=.b9fl9a0cf9cf (last access 6/12/2017).

(27)   (U)  Aside from this statement and the acknowledgment of the four Page FISA

applications and accompanying FISC orders, neither the FBI nor DOJ have publicly commented

SECRET//NOFORN

SECRET//NOFORN

on or acknowledged the existence or non-existence of any other FISA records within the scope of plaintiff's FOIA request, and the FBI's Glomar response remains intact as to the existence or non-existence of any other responsive records.

### (U) SEARCH

(28)   (U)  In most instances, when searching for records to respond to a FOIA request, RIDS's first step is to conduct a search of the FBI's Central Records System ("CRS"). Such a search was not necessary here. In this case, a known universe of responsive records was revealed through the release of the Nunes and Schiff Memos. Specifically, the memoranda revealed the existence of four FISA applications submitted for surveillance on Carter Page, starting in October 2016 and continuing through three renewals, with accompanying FISA orders. FBI FOIA personnel consulted with FBI personnel familiar with the Russia investigation to locate the four Page FISA packages. Through these efforts, the FBI was able to locate each of the four packages. At the same time, the FBI also contacted DOJ's National Security Division ("NSD"), which represents the Government before the FISC, to obtain copies of all four applications that NSD had submitted to the FISC and all accompanying orders on the applications. NSD provided the FBI copies of all four packages for processing. The FBI then confirmed that between its records and the NSD records, it had complete copies of each of the four FISA packages on Carter Page that had been revealed by the Nunes and Schiff Memos.

(29)   (U)  With regard to Item 2 of plaintiffs' request, the FBI interpreted this to include the four final applications actually submitted to the FISC seeking authorization for surveillance of Carter Page, which resulted in orders from the FISC authorizing surveillance. The FBI did not interpret Item 2 to include all versions or drafts of those applications, as plaintiffs did not specifically reference other versions or drafts.

11

SECRET//NOFORN

(30)   (U)  With regard to Item 3 of plaintiffs' request, a separate search was not required because the minimization procedures that DOJ proposed and that the FISC ordered with regard to the Page surveillance are included within the four applications and resulting FISC orders.

## (U) FOIA EXEMPTIONS

(31)   (U)  The FBI carefully reviewed, processed, released to plaintiff (and others), and posted to The Vault all non-exempt portions of the four Page FISA packages (applications and orders) that were revealed in the Nunes Memo.[10]  In conjunction with DOJ, the FBI conducted a thorough review of each page and redacted information or withheld pages in full pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(32)   (U)  Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of non-exempt material.  No reasonably segregable, non-exempt portions have been withheld.  To further describe the information withheld could reveal the very material which the FBI seeks to protect.

(33)   (U)  On the pages released to plaintiff, each redaction is marked by two pieces of information:  a FOIA exemption (*e.g.*, "(b)(6)") and a code (*e.g.*, "-1").  The FOIA exemption marking shows that the redaction contains information determined to be exempt under that particular exemption.  The code corresponds to a particular category of information determined to be exempt.  For example, where "(b)(6)-1" appears on a document, it signals that the FBI relied on FOIA Exemption (b)(6), which protects against unwarranted invasions of personal

---

[10] (U) The released pages are Bates numbered "17-cv-597 (FBI)-1" through "17-cv-597 (FBI)-412." A chart identifying which exemptions were cited on which pages is attached hereto as **Exhibit B.**

SECRET//NOFORN

privacy, to protect a particular category of information – *i.e.*, the names and/or other identifying information of FBI Special Agents or Support Personnel.

(34)   (U)  A key to the coding system applied to the Carter Page FISA records follows:

| EXEMPTIONS AND CODED CATEGORIES | CATEGORY DESCRIPTION |
|---|---|
| **Exemption (b)(1)** | **Classified Information** |
| (b)(1)-1 | Information properly classified by an FBI Original Classification Authority pursuant to Executive Order 13526 |
| **Exemption (b)(3)** | **Information Protected by Statute** |
| (b)(3)-1 | Intelligence sources and methods, prohibited from disclosure by the National Security Act of 1947, 50 U.S.C. § 3024(i)(1) |
| **Exemptions (b)(6) and (b)(7)(C)** | **Unwarranted Invasions of Personal Privacy** |
| (b)(6)-1 (b)(7)(C)-1 | Names of FBI Special Agents |
| (b)(6)-2 (b)(7)(C)-2 | Personally-identifying and other non-public information about Carter Page |
| (b)(6)-3 (b)(7)(C)-3 | Names of and/or other information about one FISC employee and one NSD employee |
| (b)(6)-4 (b)(7)(C)-4 | Information sufficient to identify a third party who was a source of information relied upon in the Carter Page FISA applications |
| **Exemption (b)(7)(A)** | **Pending Enforcement Proceedings** |
| (b)(7)(A)-1 | Information which, if disclosed, could reasonably be expected to interfere with the pending Russia investigation |
| **Exemption (b)(7)(D)** | **Confidential Source Information** |
| (b)(7)(D)-1 | Names of or other identifying information about individuals who provided information under an express assurance of confidentiality, and any information that they provided |
| **Exemption (b)(7)(E)** | **Investigative Techniques and Procedures** |
| (b)(7)(E)-1 | Information revealing the investigative focus of an investigation |
| (b)(7)(E)-2 | Information about the collection and/or analysis of information |
| (b)(7)(E)-3 | Information that would reveal the specific techniques authorized for and used in national security investigations |
| (b)(7)(E)-4 | Information about specific databases utilized by the FBI for investigative and law enforcement purposes |
| (b)(7)(E)-5 | Information about monetary payments in relation to utilization of investigative techniques, such as the payment of confidential human sources |
| (b)(7)(E)-6 | Information about the targets, dates, and scope of surveillance |

SECRET//NOFORN

| EXEMPTIONS AND CODED CATEGORIES | CATEGORY DESCRIPTION |
|---|---|
| (b)(7)(E)-7 | Information that would reveal the dates and types of investigations (*i.e.*, preliminary investigations, full investigations) |
| (b)(7)(E)-8 | Information that would reveal investigative strategies for utilizing particular evidence |

### (U) *Exemption (b)(1) – Classified Information*

(35)    (U)  Given that FISA applications and orders, by their nature, contain sensitive classified intelligence information, and given that the declassification of the Nunes Memo did not impact all information in the four Page FISA packages, it should be unsurprising that the FBI protected a relatively significant amount of information under Exemption (b)(1) here.

(36)    (U)  Exemption (b)(1) protects from disclosure records that are (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and (B) in fact properly classified pursuant to such Executive Order.  5 U.S.C. § 552(b)(1).

(37)    (U)  The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency information consists of two significant steps.  The FBI must determine first whether the information contained in the records qualifies for classification under the applicable Executive Order governing classification and protection of national security information, and second whether the information actually has been classified in compliance with the various substantive and procedural criteria of the Executive Order.

(38)    (U)  E.O. 13526 presently governs the classification and protection of information that affects the national security (*i.e.*, "the national defense or foreign relations of the United States," § 6.1(cc)), and prescribes the various substantive and procedural criteria for classifying information.  I am bound by its requirements when making classification determinations.

SECRET//NOFORN

SECRET//NOFORN

(39)     (U)  For information to be properly classified, and thus properly withheld

pursuant to Exemption (b)(1), the information must meet the substantive requirements set forth

in E.O. 13526 § 1.1(a), which requires:

    (1)     an original classification authority must have classified the information;

    (2)     the information must be owned by, produced by or for, or be under the
control of the United States Government;

    (3)     the information must fall within one or more of the categories of
information listed in § 1.4 of [the] order; and

    (4)     the original classification authority must determine that the unauthorized
disclosure of the information reasonably could be expected to result in
damage to the national security, which includes defense against
transnational terrorism, and the original classification authority must be
able to identify or describe the damage.

(40)     (U)  The information covered by Exemption (b)(1) here is under the control of the

United States Government, falls within applicable categories of E.O. 13526 § 1.4, and requires a

classification marking at the TOP SECRET level because unauthorized disclosure of this

information could reasonably be expected to cause exceptionally grave damage to the national

security, or at the SECRET level because the unauthorized disclosure of this information

reasonably could be expected to cause serious damage to the national security.  *See* E.O. 13526 §

1.2(a)(1)-(2).

(41)     (U)  In addition to these substantive requirements, certain procedural and

administrative requirements set forth in E.O. 13526 must be followed before information can be

considered to be properly classified, such as proper identification and marking of documents.

Specifically, E.O. 13526 requires that:

    (a)     Each document was marked as required and stamped with the proper
classification designation.  *See* E.O. 13526 § 1.6(a)(1) – (5).

    (b)     Each document was marked to indicate clearly which portions are

SECRET//NOFORN

SECRET//NOFORN

classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b).  *See* E.O. 13526 § 1.6(a)(5)(c).

(c)     The prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were followed.

(d)     The declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed.

(e)     Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

(42)     (U)  With the above requirements in mind, I determined that the information protected pursuant to Exemption (b)(1) in the four Page FISA applications and accompanying orders is currently and properly classified at the TOP SECRET or SECRET level pursuant to E.O. 13526, and satisfies both the procedural and substantive requirements set forth in the Executive Order.

(43)     (U)  Specifically, this information is owned by, was produced by or for, and is under the control of the U.S. Government; was classified by an original classification authority; meets all of the procedural requirements of E.O. 13526; and warrants classification at the TOP SECRET or SECRET level to protect "intelligence activities (including covert action), intelligence sources or methods, or cryptology," *see* E.O. 13526 § 1.4(c), and "foreign relations or foreign activities of the United States, including confidential sources," *see* E.O. 13526 § 1.4(d), because unauthorized disclosure of this information could be expected to cause exceptionally grave damage to national security (for information classified at the TOP SECRET level) or serious damage to national security (for information classified at the SECRET level). This is discussed further below.

(44)     (U)  I examined the information protected in this case pursuant to Exemption

SECRET//NOFORN

SECRET//NOFORN

(b)(1) in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, it was evaluated with careful consideration given to the impact that its disclosure could have on other sensitive information contained elsewhere in the United States Intelligence Community's files. Equal consideration was given to the impact that other information – both in the public domain and likely known or suspected by present or potential adversaries of the United States – would have upon the information protected here.

(45)　(U) The justifications for protecting classified information here were prepared with the intent that they be read with consideration given to the context in which the classified information is found. This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to intelligence activities, sources, and methods and foreign relations/activities of the United States could reasonably be expected to harm interests that FOIA exemptions were designed to protect.

(U) ***E.O. 13526 § 1.4(c) – Intelligence Activities, Sources and Methods***

(U) **Overview**

(46)　(U) E.O. 13526 § 1.4(c) authorizes the classification of "intelligence activities (including covert action), intelligence sources or methods, or cryptology." An intelligence activity, source, or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity, source, or method has two

17

characteristics. First, the intelligence activity, source, or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the use or non-use of the activity, source, or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, source, and method are to be preserved.

(47)  (U)  Intelligence activities, sources, and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities, sources, and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(48)  (U)  Moreover, the U.S. Government must do more than prevent explicit references to intelligence activities, sources, and methods; it must also prevent indirect references to them. One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information. We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(U) **Information Protected In This Case**

(49)  (U)  As discussed below, information withheld under Exemption (b)(1) in

18

SECRET//NOFORN

conjunction with E.O. 13526 § 1.4(c) would, if disclosed, reveal otherwise non-public information regarding: the FBI's intelligence interests, priorities, activities, and methods; undisclosed intelligence sources or methods upon which the FBI relied in support of its application for FISA authorized surveillance of Carter Page, as well as undisclosed portions of intelligence information provided by Source #1; and information about the use and implementation of various intelligence methods, including the specific details of the surveillance of Carter Page authorized by the FISC via the four applications and orders publicly revealed in the HSPCI memoranda. All of this information is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.

(U) **Intelligence Activities and Methods**

(50) (U) In the four Page FISA applications and accompanying orders, the FBI protected details about intelligence activities undertaken by the FBI and the methods utilized during those intelligence activities. This information includes the details about the FISA surveillance sought and obtained through the four Page FISA applications and accompanying orders, but also includes information about other intelligence activities and methods utilized by the FBI that were included in the responsive records.

(51) (U) With regard to the FISA surveillance of Page, the withheld information reveals the specific surveillance method(s) sought and authorized by the FISC, including citations to relevant legal authorities that would reveal the specific method(s) sought or authorized with respect to a specific individual during a particular timeframe. The withheld information includes the minimization procedures, which are specifically tied to the particular surveillance methods and activities requested by DOJ and authorized by the FISC. Using the fourth application and resulting order as an example, this information was protected on Bates

19

SECRET//NOFORN

SECRET//NOFORN

pages 17-cv-597(FBI)-361-364 and 404-411.

(52)   (S//NF)



(53)   (U)  The withheld information also reveals:  descriptions of and the particulars about implementing the authorized surveillance method(s); information that would reveal the

20

SECRET//NOFORN

SECRET//NOFORN

exact periods of FISA authorized surveillance[11]; what information was being sought through the surveillance; and any information obtained as a result of the FISA-authorized surveillance of Page included in the second through fourth applications.

(54)　(S//NF)　████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

(55)　(S//NF)　████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[11] (U) This includes the FISC docket numbers and the specific dates on which coverage was sought and authorized (including as reflected in the "declassify on" dates in the classification blocks).

SECRET//NOFORN

SECRET//NOFORN

(56)   (U)  The withheld information also reflects intelligence-gathering activities,

including specific intelligence methods used and information obtained in broader contexts.

Using the fourth application and resulting orders as an example, this information was protected

on Bates pages 17-cv-597(FBI)-301-302, 304-308, 311-312, 317-319, 324-325, 353, and 386.

(57)   (U)  Finally, the withheld information includes information about Source #1's

intelligence reporting activities and the period of time he served as an intelligence source for the

FBI.  While some information about Source #1 has been declassified and disclosed, other

information remains classified and has not been publicly disclosed.  Using the fourth application

and resulting orders as an example, this information was protected on Bates pages 17-cv-

597(FBI)-308-316.

(58)   (U)  The disclosure of the above-described types of information could reasonably

be expected to cause serious damage to the national security, as it would: (a) reveal actual

intelligence activities undertaken by the FBI, and the methods used in doing so, regarding

specific targets and during specific periods of time; (b) disclose the intelligence-gathering

capabilities of the methods; and (c) provide an assessment of the level of penetration by the FBI

of specific targets during the specific time period.  Armed with such information, adversaries,

including hostile foreign governments, could implement actions to thwart the FBI's intelligence

activities and weaken or negate the particular intelligence methods, which would severely disrupt

the FBI's intelligence-gathering capabilities.  Accordingly, this information is currently and

properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly

withheld it under Exemption (b)(1).

(59)   (U)  The FBI also concluded that the specific amounts of payments made to

SECRET//NOFORN

SECRET//NOFORN

intelligence sources reflected in the records is classified intelligence method information. Without adequate context, the particular amount paid to a particular intelligence source could be viewed to suggest the relative volume of information provided by a particular source, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's intelligence activities. Moreover, disclosure would reveal non-public information about the level of resources devoted to particular targets or subject matters. The FBI has limited resources that it must allocate strategically in order to effectively pursue its intelligence gathering mission. Revealing the amount of money the FBI has paid to particular intelligence sources and over particular periods of time would reveal the FBI's level of focus on certain intelligence gathering efforts. Revealing this level of focus would reveal how the FBI has allocated and is allocating its limited resources. If aggregated over time, this information would paint a high-level picture of the resources devoted to particular threat areas, and reveal where the FBI's strengths and weaknesses lie within the spectrum of its intelligence-gathering activities. This would give sophisticated adversaries and hostile governments the information necessary to adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI's strength areas and exploit its weak ones. Accordingly, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly withheld it under Exemption (b)(1).

### (U) Intelligence Sources

(60)    (U) An intelligence source who requires continued classification is one that provided or is currently providing information that pertains to national security matters, the

SECRET//NOFORN

SECRET//NOFORN

disclosure of which could reasonably be expected to result in serious damage to the FBI's intelligence-gathering capabilities.

(61)    (U) Although some information about Source #1 and his activities has been declassified and publicly disclosed, the four Page FISA applications include information about other intelligence sources. This information, including specific information about the sources themselves as well as the information they provided, is singular in nature and, if disclosed, reasonably could be expected to identify the contributing sources.

(62)    (U) Disclosure of the identities of intelligence sources could reasonably be expected to jeopardize their livelihoods, their families and other relationships, and even their lives. Moreover, disclosure of one source can reasonably be expected to cause other current and potential intelligence sources to fear that their identities will be publicly revealed at some point. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-308-319.

(63)    (U) Thus, the release of source-identifying information can reasonably be expected to cause damage to the national security by causing current intelligence sources to cease providing information, and discouraging potential intelligence sources from cooperating with the FBI for fear their identities would be publicly revealed at some point. Such a source reaction would eliminate one of the Intelligence Community's most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's intelligence and investigative missions. Accordingly, some of the protected intelligence source information here is currently and properly classified pursuant to E.O. 13526, § 1.4(c) at the TOP SECRET level, for intelligence source information that could reasonably be expected to cause exceptionally grave damage to the national security, and some of the protected intelligence source information here is

24

currently and properly classified at the SECRET level, for intelligence source information that could reasonably be expected to cause serious damage to the national security. The FBI properly withheld this information under Exemption (b)(1).[12]

### (U) *E.O. 13526 § 1.4(d) – Foreign Relations or Foreign Activities*

(64)    (U) E.O. 13526 § 1.4 (d) authorizes the classification of information about foreign relations or foreign activities of the United States, including confidential sources. Such information includes information gathered from/with the assistance of and/or about foreign countries. It is sensitive due in part to the delicate nature of international diplomacy, and must be handled with care so as not to jeopardize the fragile relationships that exist between the United States and certain foreign governments.

(65)    (U) The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; the loss of the cooperation and assistance of friendly nations; or the compromise of cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources. Due to the nature of the information here, the FBI cannot provide any more specific details on the public record about its basis for redacting information pursuant to E.O. 13526, § 1.4(d) and Exemption (b)(1). However, as the FBI's classified portions of this declaration demonstrate, this information is currently and properly classified and was appropriately redacted by the FBI.

(66)    (S//NF) ███████████████████████████████████████████

████████████████████████████████████████

---

[12] (U) The intelligence source information protected in the FISC orders is classified at the SECRET level only. The FISA applications include information classified at both the SECRET and the TOP SECRET levels.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

(67)     (U) Thus, the FBI protected such information because, if disclosed, it could

reasonably be expected to cause serious damage to national security. Because this information

remains currently and properly classified, pursuant to E.O. 13526 § 1.4(c), the FBI properly

protected it under Exemption (b)(1).

(U) <strong><em>Exemption (b)(3) – Information Protected by Statute</em></strong>

(68)     (U) Exemption (b)(3) protects information that is specifically exempted from

public disclosure by a statute that requires that the matters be withheld from the public in such a

manner as to leave no discretion on the issue, establishes particular criteria for withholding, or

refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3)(A). If the non-

disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it

must specifically cite this paragraph in order for Exemption (b)(3) to apply. *Id.* at §

552(b)(3)(B).

(69)     (U) As explained above, the four Page FISA applications and resulting orders,

include information that is classified pursuant to E.O. 13526 § 1.4(c) to protect intelligence

sources and methods, which the FBI has protected under Exemption (b)(1). Those same

intelligence sources and methods are also exempt here under Exemption (b)(3). Specifically,

their disclosure is prohibited pursuant to the National Security Act of 1947, as amended, which

26

provides that the Director of National Intelligence (DNI) "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

(70)    (U)  As relevant to the FBI's application of Exemption (b)(3), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009, and on its face, leaves no discretion to agencies about withholding from the public information about intelligence sources and methods.

(71)    (U)  In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence.  50 U.S.C. §§ 3024(i)(1).  The FBI is one of the member agencies comprising the IC, and as such must protect intelligence sources and methods.

(72)    (U)  Accordingly, the information in the Page FISA applications and resulting FISC orders that reveals intelligence sources and methods is prohibited from disclosure pursuant to 50 U.S.C. § 3024(i)(1) and thus exempt from disclosure under Exemption (b)(3).

(73)    (S//NF)  ██████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

SECRET//NOFORN



(U) *Exemption (b)(7) – Law Enforcement Information*

(U) *Threshold*

(74)    (U) The first step in applying any of Exemption (b)(7)'s subparts is to
demonstrate that the records or information at issue were compiled for law enforcement
purposes.  5 U.S.C. § 552(b)(7).  Law enforcement agencies such as the FBI must demonstrate
that the records at issue are related to the enforcement of federal laws and that the enforcement
activity is within the law enforcement responsibility of the agency.

(75)    (U) Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as
implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-
DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal
government, with authority and responsibility to:  investigate all violations of federal law not
exclusively assigned to another agency; conduct investigations and activities to protect the
United States and its people from terrorism and threats to national security; and further the
foreign intelligence objectives of the United States.

(76)    (U) As discussed previously, and as has been publicly disclosed, in July 2016, the
FBI opened an investigation of the Russian government's efforts to interfere in the 2016 election.

SECRET//NOFORN

SECRET//NOFORN

The FBI sought and obtained a FISA warrant in October 2016 to conduct surveillance of Carter Page in the course of that investigation. The FBI thereafter sought and obtained three renewals from the FISC to continue surveilling Page. Those applications were compiled as part of the FBI's investigation of Russian election interference.

(77)    (U) The only circumstance under which the FBI can request a FISA order is when the FBI is conducting an authorized, predicated national security investigation within the scope of its law enforcement and foreign intelligence responsibilities. The Russia investigation is clearly within the law enforcement and foreign intelligence responsibilities of the FBI. Similarly, any records reflecting NSD and FBI's efforts to respond to questions from the FISC about the application(s) were compiled in furtherance of this law enforcement purpose. Thus, Exemption (b)(7)'s threshold is easily satisfied here.

(78)    (U) In May 2017, the Acting Attorney General appointed Special Counsel Robert S. Mueller, III and authorized him to conduct the investigation confirmed by then-FBI Director Comey in Congressional testimony, including "(i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)). In addition, "[i]f the Special Counsel believes it necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters." *Id.*

(79)    (U) Accordingly, the Page FISA applications and orders are records that were compiled in part for law enforcement purposes, and Exemption (b)(7)'s threshold is easily

SECRET//NOFORN

SECRET//NOFORN

satisfied here.

### (U) *Exemption (b)(7)(A) – Pending Enforcement Proceedings*

(80)   (U) Exemption (b)(7)(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(81)   (U) Thus, to apply Exemption (b)(7)(A), the FBI must establish the existence of a pending or prospective investigation or other enforcement proceeding and must show a reasonable expectation that disclosure of the withheld information could interfere with that proceeding.

(82)   (U) Here, the enforcement proceeding at risk is the Russian interference investigation. That investigation is pending as of the date of this filing.

(83)   (U) The FBI, in consultation with DOJ, concluded that disclosure of a variety of information in the Page FISA applications and orders could reasonably be expected to interfere with the pending Russian election interference investigation if publicly disclosed at this time.

(84)   (U) The FBI is limited in the amount of information it can provide publicly about how the investigation may be adversely affected by disclosure of this information without the explanation itself risking harm to the investigation or revealing information exempt under one or more other exemptions. Although there has been extensive media coverage of the investigation, that coverage often relies on speculation, assumptions, and anonymous/unnamed sources. Greater harm to the investigation would result from official disclosures, regardless of whether it confirmed or refuted widespread media reporting. That is because official disclosure directly reveals law enforcement activity or lack thereof, removing doubts or ambiguity inherently present in other reporting.

SECRET//NOFORN

SECRET//NOFORN

(85)    (U) Broadly speaking, the redacted/withheld portions of the four Page FISA applications and accompanying orders could reasonably be expected to adversely affect the pending investigation by revealing aspects of the investigation that have not previously been made public; what information or activities are or are not of interest to investigators, and areas where there may be gaps in the investigators' knowledge about such information/activities that could be exploited by targets and other adversaries; who investigators have already spoken with or interviewed and what they said (and did not say); and whether particular persons or entities are or are not of interest in the investigation.

(86)    (U) Moreover, the FBI has explained herein why particular types of information contained in the four Page FISA applications and accompanying orders are exempt under other exemptions because of the harm associated with disclosure.  While Exemption (b)(7)(A) considers the impact on a specific investigation or investigations, the big-picture risks to law enforcement, national security, and privacy interests addressed by the other exemptions are relevant here, and indeed are more immediate here.

(87)    (U) Disclosing information that would identify confidential and/or classified intelligence sources or other individuals who are or could become witnesses risks their compromise through efforts to discredit, harass, or even threaten them.  This, in turn, creates the risk of curtailing their further cooperation, which can significantly hamper an investigation.[13]

(88)    (U) Similarly, disclosing the evidence, information, or intelligence (including source reporting) already obtained by/known to the FBI risks influencing, compromising, or tainting testimony by other witnesses and/or the fabrication of other information/falsification of

---

[13] (U) The harms in disclosing information about and from confidential sources is discussed further in the Exemption (b)(7)(D) discussion below.

SECRET//NOFORN

SECRET//NOFORN

other testimony for the purpose of countering or undermining the credibility of the evidence, information, or intelligence already gathered.  It would also reveal gaps in the FBI's knowledge of information, intelligence, or source reporting/witness testimony, which risks destruction or adulteration of evidence or fabrication of false evidence, and attempts to intimidate or improperly influence potential sources/witnesses.

(89)    (U) Disclosing the investigative techniques already used in this case during specific time periods[14] and regarding specific subject matter areas creates a risk of revealing what investigators already know, what they do not or may not know yet, who is or may be of interest to investigators, and who may be cooperating in the investigation, which, for all reasons discussed above, would adversely affect the investigation.  Moreover, providing details about the use of those techniques risks efforts by targets, subjects, and other adversaries to undermine or thwart the techniques.[15]

(90)    (U) Consistent with its standard practices, the FBI and SCO have not publicly identified the specific scope/focus of, subjects of, witnesses/sources in, or evidence/information from the pending Russia investigation, beyond the information made public through criminal justice proceedings.  To the extent that information made public in those criminal proceedings

---

[14] (U) Included here would be the FISC docket numbers.  If aggregated with each other and/or other FISC docket numbers, they could be used to pinpoint the times of FISA coverage on Page, which creates the risks discussed here in the Exemption (b)(7)(A) analysis, as well as those in the analysis of Exemption (b)(7)(E), and particularly category (b)(7)(E)-6, below.

(U) Disclosing the use of specific techniques during identified timeframes would allow targets and potential targets to determine the probability that the FBI is aware of particular information likely to be obtained through such techniques during that time as well as the probability that the FBI may not be aware of the information.  Such knowledge could allow targets, potential targets, and others intent on disrupting the investigation to better target their activities toward, for example, creation or destruction of evidence, fabrication of cover stories, intimidation of witnesses, etc.

[15] (U) The risks of circumvention are discussed further in the Exemption (b)(7)(E) descriptions below.

SECRET//NOFORN

SECRET//NOFORN

exactly matched information in the four Page FISA packages processed in this case, it was not redacted. Moreover, while unclear that HSPCI's disclosures of the Nunes and Schiff Memos legally precluded the FBI's ability to assert FOIA exemptions over matching information in the four Page FISA packages processed here, the FBI nevertheless did not redact any exactly matching information. Furthermore, the FBI carefully considered whether to disclose similar information that was not an exact match to the memoranda, and asserted Exemption (b)(7)(A) only upon concluding that disclosure of the non-matching information could reasonably be expected to harm the investigation.

(91)    (U) For the reasons discussed above, combined with the justifications for protecting information under the other exemptions discussed herein, the FBI concluded that disclosure of information marked as "(b)(7)(A)-1" could reasonably be expected to interfere with the pending investigation. Accordingly, the FBI withheld that information pursuant to Exemption (b)(7)(A).

### (U) *Exemption (b)(7)(C) – Unwarranted Invasions of Personal Privacy*

(92)    (U) Exemption (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

(93)    (U) As previously noted in the section of this declaration concerning Exemption (b)(6), the practice of the FBI is to conjunctively assert Exemptions (b)(6) and (b)(7)(C) as they provide overlapping protections for personal privacy. Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard, and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by

SECRET//NOFORN

SECRET//NOFORN

both exemptions is sufficiently similar to warrant a consolidated discussion.  Each exemption

balances individuals' privacy interests against the public's interest in disclosure.

(94)　　(U)  For purposes of both exemptions, a public interest exists only when

information would significantly increase the public's understanding of the FBI's performance of

its mission to protect and defend the United States against terrorist and foreign intelligence

threats; uphold and enforce the criminal laws of the United States; and provide leadership and

criminal justice services to federal, state, municipal, and international agencies and partners.

(95)　　(U)  The FBI has relied on Exemptions (b)(6) and (b)(7)(C) here to protect the

names of or information about FBI Special Agents and FISC and NSD employees; information

sufficient to identify a third party who was the source of some information relied upon in the

four Page FISA applications; and certain personally-identifying and other non-public private

information about Carter Page.

(U)  **(b)(6)/(b)(7)(C)-1**　　　**FBI Special Agents**

(96)　　(U)  The FBI withheld the names of the FBI Special Agents who signed the Page

FISA applications processed in response to plaintiff's request.  These Special Agents were

assigned to the pending Russia investigation during the period covered by the four Page FISA

applications and are experienced counterintelligence agents.

(97)　　(U)  The FBI regularly protects the identities of its Special Agents.  FBI agents

have access to information regarding official law enforcement investigations, and therefore may

become targets of harassing inquiries for unauthorized access to information regarding such

investigations if their identities were released.  This is particularly true of agents who work

national security cases, including counterintelligence cases, who have access to some of the most

sensitive and highly classified information possessed by the FBI.  Assignments of agents to any

SECRET//NOFORN

SECRET//NOFORN

particular investigation or matter are not by choice. Publicity (adverse or otherwise) regarding a specific investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. FBI agents also have privacy interests in being free from unnecessary, unofficial questioning regarding their conduct in particular investigations, whether or not they are currently employed by the FBI. For example, an individual investigated by the FBI may carry a grudge and may seek revenge on the agents involved in that investigation.

(98)    (U) Many of these concerns are heightened when the agents whose identities are protected work counterintelligence cases. The FBI's counterintelligence mission involves protecting the secrets of the U.S. Intelligence Community from risks of espionage and insider threats; protecting the nation's critical assets; and countering the activities of foreign spies. FBI counterintelligence investigations involve significant threats to the national security of the United States by foreign intelligence services and other hostile government actors. FBI agents responsible for conducting these investigations can be exposed to real and substantial threats to their lives and safety, and the FBI's concerns about targets of such investigations holding grudges against such agents are more acute when those targets are foreign intelligence officers from hostile governments.

(99)    (U) Here, the above-described reasons led the FBI to conclude that the Special Agents whose names are protected here have substantial privacy interests. That determination is further bolstered by the fact that the investigation and specific investigative activity at issue here are very high-profile and have been the subject of substantial media attention and speculation.

(100)    (U) In contrast, there is no public interest to be served by disclosing these employees' identities because they would not, by themselves, significantly increase the public's

SECRET//NOFORN

understanding of the FBI's operations and activities with respect to obtaining the four FISA warrants on Page, the conduct of the Russia investigation *writ large,* or any other FBI operations or activities.

(101)   (U)  In the absence of a public interest, the Special Agents' substantial privacy interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C). Accordingly, the FBI properly protected the names of its Special Agents.[16]

(U)  **(b)(6)/(b)(7)(C)-2**        **Carter Page**

(102)   (U)  While the declassification of the Nunes Memo and the release of it and the Schiff Memo revealed to the public that Carter Page had been the subject of FISC-authorized surveillance under the FISA, there nevertheless remains information about him contained in the FISA applications and FISC orders that was not made public and in which he retains a privacy interest.  The FBI cannot publicly describe the nature of the information it has protected without revealing information that is exempt under these or other cited exemptions.

(103)   (S//NF)  ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

(104)   (S//NF)  ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

---

[16] (U)  These Special Agents are non-executive employees.



(105)   (U)  After concluding that Page retains substantial privacy interests in the

redacted information, the FBI considered whether there is any public interest that overrides these

privacy interests.  While there is certainly a demonstrated public interest in these FISA

applications, the particular information about Carter Page that has been protected here would not

so significantly increase the public's understanding of the FBI's operations and activities in

relation to obtaining authority from the FISC on four occasions to surveil Page pursuant to the

FISA.  Thus, on balance, the FBI concluded that Page's privacy interests outweighed any public

interest in the redacted information.

(U)  **(b)(6)/(b)(7)(C)-3**      **FISC and NSD Employees**

(106)   (U)  The information falling within this category consists of the names and titles

of a FISC deputy clerk and the NSD attorney who signed and submitted the four Page FISA

applications to the FISC.  Neither of these employees is an executive-level employee.  The FBI

regularly protects the names and identities of employees of other Government agencies or offices

who are identified in FBI law enforcement records.  The reasons for doing so are similar to the

FBI's reasons for protecting the identities of its Special Agents as detailed above.

(107)   (U)  Here, the FISC and NSD employees whose identities the FBI protected are in positions to access highly-sensitive and classified information concerning counterintelligence and counterterrorism matters.  If their identities were disclosed, they could become targets of harassing inquiries for unauthorized access to non-public information about the four Page FISAs specifically, or more generally, non-public information about other FISC matters, FBI investigations, or IC intelligence activities to which they may have access.  Disclosure of their identities would also risk hostile action by adverse foreign powers, either by way of revenge or of actively targeting them in intelligence-gathering operations.

(108)   (U)  In contrast, there is no public interest to be served by disclosing these employees' identities because they would not, by themselves, significantly increase the public's understanding of the FBI's operations and activities with respect to obtaining the four FISA warrants on Page, the conduct of the Russia investigation *writ large*, or other FBI operations or activities.

(109)   (U)  In the absence of a public interest, these employees' substantial privacy interests necessarily must prevail under the balancing tests for Exemptions (b)(6) and (b)(7)(C).  Accordingly, the FBI properly protected the names and titles of these FISC and NSD employees.[17]

(U)  __(b)(6)/(b)(7)(C)-4__          __Third Party Who Was a Source of Information Relied Upon in the Carter Page FISA Applications__

(110)   (U)  The FBI protected information that would identify an individual who was a source of information that came into the FBI's possession during a particular phase of the

---

[17] (U) Information about the NSD employee was also redacted pursuant to Exemptions (b)(6) and (b)(7)(C) at NSD's request.

SECRET//NOFORN

investigation. This identifying information appears on one page in the third FISA application and one page in the fourth FISA application.[18]

(111)   (U)   Individuals identified in FBI investigative materials have substantial privacy interests in not being publicly linked with a sensitive national security investigation. Such public exposure could subject the individuals to harassment, intimidation, or threats of legal or economic reprisal; possible physical harm; or even death. These considerations led the FBI to conclude that this individual has substantial privacy interests here, particularly considering that the investigation is a sensitive investigation involving the activities of a foreign government and has received such wide-spread attention. In contrast, the identity of this individual who is mentioned in a single footnote in two of the applications would not, without more, significantly increase the public's understanding of FBI operations or activities. Accordingly, the FBI concluded that this individual's privacy interests outweighed any public interest in his/her identity, and protected the information under Exemptions (b)(6) and (b)(7)(C).

(U) ***Exemption (b)(7)(D) – Confidential Source Information***

(112)   (U)   Exemption (b)(7)(D) protects records or information compiled for law enforcement purposes when disclosure:

> could reasonably be expected to disclose the identity of a
> confidential source, including a State, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement authority in the course of
> a criminal investigation or by an agency conducting a lawful
> national security intelligence investigation, information furnished
> by the confidential source.

---

[18] (U) The particular identifying information about this third party is not classified and the individual did not provide information directly to the FBI as part of its investigation. Accordingly, the FBI has not cited Exemptions (b)(1) or (b)(7)(D) to protect this particular individual.

SECRET//NOFORN

SECRET//NOFORN

5 U.S.C. § 552(b)(7)(D). Exemption (b)(7)(D) provides categorical protection for the identities of confidential sources, as well as information provided by such a source in a criminal or national security investigation. No balancing of interests is required and the public's interest in the information is not a factor. Rather, once the FBI establishes that the source provided information under express or implied assurances of confidentiality, the identity of the source and all information the source provided in a criminal or national security investigation are exempt under Exemption (b)(7)(D).

(113)  (U) The FBI regularly relies on confidential sources. Confidential sources may provide information under express assurances of confidentiality, and are "informants" within the common meaning of the term, although the FBI refers to them as "Confidential Human Sources" or "CHSs." Alternatively, confidential sources may provide information under circumstances from which assurances of confidentiality may be inferred. In either situation, these sources are considered to be confidential because they furnish information only with the understanding that their identities and the information they provided will not be divulged outside the FBI. Information provided by these sources is singular in nature, and if released, could reveal their identities. Sources must feel free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public and that they may, as a result, face reprisals. Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

(114)  (U) The release of a source's identity could forever eliminate that source as a future means of obtaining information, and also has a chilling effect on the cooperation of other sources. Revealing the identities of confidential sources risks one of the FBI's most important

SECRET//NOFORN

SECRET//NOFORN

means of collecting information and intelligence, and severely hampers law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal and national security laws.

(115) (U) As a result of the declassification of the Nunes Memo, and the release of both of the HSPCI memoranda, it was publicly revealed that the FBI relied on a confidential and classified intelligence source, referred to throughout the Page FISA applications as "Source #1." The FBI has not protected information about this source's identity, nor has it protected information he provided that matches information revealed in the HPSCI memoranda or the Grassley/Graham letter. The FBI has protected information that would identify the identities of other confidential sources who provided information or intelligence to the FBI; information provided by those sources; and information provided by Source #1 that does not match information revealed in the HPSCI memoranda or the Grassley/Graham letter.

(116) (U) Source #1 was a code-named CHS for the FBI. By definition, such sources are confidential. That is, as part of the FBI's protocols for CHSs, they are provided express assurances of confidentiality. Moreover, Source #1 provided information in furtherance of a sensitive national security investigation being conducted by the FBI. Accordingly, under the second clause of Exemption (b)(7)(D), any information he provided is categorically exempt. Thus, except as to information that matches information revealed in the HPSCI memoranda or the Grassley/Graham letter, the FBI redacted all information provided by Source #1. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-303, 309-310, and 312-317.

(117) (U) The FISA applications also contain information about and from other sources who cooperated with and provided information to the FBI under express assurances of

SECRET//NOFORN

SECRET//NOFORN

confidentiality. CHSs are provided express assurances of confidentiality by the FBI. Accordingly, the FBI concluded that the requirements for express assurances of confidentiality had been satisfied here. Further description of the bases for this conclusion as to the FISA applications cannot be discussed publicly without disclosing information that is exempt under this or one of the other exemptions cited in relation to this information. However, because these sources cooperated with and provided information to the FBI in furtherance of a national security (intelligence) investigation under express assurances of confidentiality, the requirements of Exemption (b)(7)(D) are satisfied and the FBI properly protected information that would reveal the identities of the sources, as well as the information that they provided to the FBI. Using the fourth application and resulting orders as an example, this information was protected on Bates pages 17-cv-597(FBI)-301-302, 308-311, and 317-318.

(118)   (S//NF)

## (U) *Exemption (b)(7)(E) – Investigative Techniques and Procedures*

(119)   (U) Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when release] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). This exemption affords categorical protection to techniques and procedures used in law enforcement investigations. It protects techniques and procedures that are not well-known to the public as well as non-public details

SECRET//NOFORN

SECRET//NOFORN

about the use of publicly-known techniques and procedures.

(U) **(b)(7)(E)-1**        **Investigative Focus**

(120)   (U)  Many investigative steps preceded the FBI's FISA applications; the four

Page FISA applications and orders reveal how the FBI conducted certain aspects of the

investigation to that date and a road-map of certain contemplated investigative steps (*i.e.*, the

requested surveillance).  Although the general techniques authorized by the FISA are publicly

known, this detailed information about how, when, where, and why such authorities are

employed in a particular investigation is not publicly known.  This type of detailed information

would be valuable to criminals and adversaries as a guide to adjusting their behaviors, taking

evasive actions, and developing countermeasures to thwart FBI investigations.  Accordingly, the

FBI protected this information in the four Page applications and resulting orders, including in the

minimization procedures, under Exemption (b)(7)(E) in order to the risk of circumvention posed

by disclosure of this information.

(U) **(b)(7)(E)-2**        **Collection and/or Analysis of Information**

(121)   (U)  Category (b)(7)(E)-2 includes information that reveals the methods used by

the FBI to collect and analyze information it obtains for investigative purposes.[19]

(122)   (S//NF)  ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[19] (U) This information overlaps with the information protected in category (b)(7)(E)-3, which protects
specific investigative techniques authorized and utilized in national security investigations inasmuch as the FBI's
methods for collecting information and the types of techniques it is authorized to use in national security
investigations will, in the context of these records, generally be the same thing.  The FBI cited category (b)(7)(E)-3
in every instance that it cited category (b)(7)(E)-2.

SECRET//NOFORN

████████████████████████████████████████████

███████████████████████████████

(123)   (U)  The release of this information would disclose the methods used in the collection and analysis of information, including how and from where the FBI collects particular types of information and the methodologies employed to analyze it once collected.  Such disclosures would enable subjects of FBI investigations to identify when these or similar currently used techniques are being used and then take evasive actions or countermeasures to circumvent them.  This would diminish the relative utility of these techniques and facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained.  Accordingly, to protect the viability of these techniques, the FBI protected this information in the four Page applications and resulting orders, including in the minimization procedures, under Exemption (b)(7)(E).

(U)  **(b)(7)(E)-3**      **Specific Techniques Authorized for and Used in National Security Investigations**

(124)   (U)  The FBI protected information that would reveal the specific techniques that the FBI is authorized to and in fact uses in national security investigations.  In this context, the techniques were referenced because they were used in the context of *this* national security investigation but their disclosure here would also have ramifications for the use of these techniques in other national security cases.  The FBI has a toolbox of investigative techniques that it uses in national security (counterintelligence and counterterrorism) cases, which overlap in many respects with its criminal investigative toolbox, although the FBI obviously has one significant and different tool in the national security toolbox – FISA.  This category covers non-

44

SECRET//NOFORN

public information about all of the techniques referenced in the Page FISA applications and

orders including those that have not been publicly disclosed in relation to investigative actions

taken in this investigation; those that have been publicly disclosed in relation to this

investigation, such as CHSs; and those under the FISA that the FISC authorized the FBI to use

here.  Although techniques authorized by the FISA are publicly known, this detailed information

about how, when, where, and why such authorities are employed in a particular investigation is

not publicly known.

(125)  (S//NF)



(126)  (U)  Here, the context in which these techniques are discussed reveals details

about when in an investigation a particular technique might be utilized, the types of information

that might be sought via the technique, and the limitations on its use and/or utility; what

techniques might be used in combination; and non-public information about how the techniques

are implemented.  When aggregated, as it is here, this information can paint a road-map of how a

SECRET//NOFORN

SECRET//NOFORN

national security, and in particular a counterintelligence, investigation is conducted.[20]  Disclosure

of such a road-map here and over time would give sophisticated criminals and adversaries the

information necessary to adjust their activities and take effective countermeasures to circumvent

the FBI's investigative and intelligence-gathering efforts.  Accordingly, the FBI protected this

information under Exemption (b)(7)(E) here.

(U)  **(b)(7)(E)-4**        **Specific Databases Used by the FBI for Investigative and Law**
**Enforcement Purposes**

(127)   (U)  The FBI protected its use of several non-public databases that it relied on to

obtain/confirm information and intelligence gathered in the course of its investigation.  These

databases are accessible to law enforcement personnel to conduct queries of or for particular

types of information for law enforcement and intelligence gathering purposes.  The databases

protected include those exclusive to the FBI as well as others that are available to other federal

government law enforcement personnel.  These databases are essentially "one-stop" shops where

the FBI can query already-gathered information in order to corroborate or refute it, and/or obtain

new or additional information in order to develop investigative leads.   It is not publicly known

when and under what circumstances the FBI utilizes these particular databases, particularly in the

context of a national security/counterintelligence investigation.  Armed with such information,

spies, criminals, and others intent on avoiding FBI attention could develop countermeasures to

avoid detection, which would impede the FBI's ability to effectively conduct national security

and criminal investigations.

---

[20]  (U)  The FISA applications explain the investigative steps taken prior to seeking FISA coverage, as well
as the information that the FBI was able to obtain using them, which formed the probable cause necessary to obtain
a FISA warrant.

SECRET//NOFORN

(U)  **(b)(7)(E)-5**      **Monetary Payments in Relation to Utilization of Investigative Techniques**

(128)   (U)  The FBI protected specific information about payments to CHSs on two pages of each FISA application.  While it is publicly known that the FBI pays CHSs under some circumstances, the details of when, for what, and how much CHSs are paid are aspects of this technique that are not made public, in order to protect the viability of the technique.  Without adequate context, the particular amount paid to a CHS could be viewed to suggest the relative volume of information provided by a particular CHS, which could cause individuals who believe they are the subjects of such source reporting to assess the likelihood that their activities have come to the FBI's attention and then take countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's activities.

(129)   (U)  Finally, disclosing the amounts paid to CHSs in a particular investigation or for particular types of information would reveal non-public information about the level of resources devoted to particular investigations or subject matters.  The FBI has limited resources that it must allocate strategically in order to effectively pursue its law enforcement and intelligence gathering missions.  Revealing the amount of money the FBI has paid to particular CHSs in particular investigations and over particular periods of time would reveal the FBI's emphasis on certain investigations or intelligence gathering efforts.  Revealing this emphasis would reveal how the FBI has allocated and is allocating its limited resources.  If aggregated over time, this information would paint a high-level picture of the resources devoted to particular types of investigations or particular FBI threat areas, and reveal where the FBI's strengths and weaknesses lie within the spectrum of its intelligence gathering and criminal investigative activities.  This would give sophisticated criminals and adversaries the information necessary to

adjust their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI strength areas and exploit the weak ones. Accordingly, the FBI protected payment information under Exemption (b)(7)(E) in this case.

(U) **(b)(7)(E)-6** **Targets, Dates, and Scope of Surveillance**

(130)   (U)   While it is known that the FBI conducts surveillance authorized under the FISA, as well as other types of authorized surveillance, and while it is known that there was surveillance conducted here, the details about how the surveillance was implemented (investigatively and/or technically), the locations targeted by the surveillance, and the specific time period(s) during which the surveillance was conducted are not public and were not disclosed in the HPSCI memoranda.[21]   These non-public details about the conduct of surveillance, particularly surveillance authorized under the FISA, are utilized by the FBI in other current investigations.   Disclosure of non-public details about when and how the FBI conducts surveillance and the circumstances under which the FBI will seek authority to do so would, over time, create a mosaic that criminals and other adversaries could use to predict when and where surveillance may occur, detect it when it is occurring, and develop and utilize countermeasures to defeat or avoid different types of surveillances.   Accordingly, the FBI protected this information under Exemption (b)(7)(E) in the four Page FISA applications and resulting orders, including in the minimization procedures, in order to preserve the usefulness and utility of this technique.

(U) **(b)(7)(E)-7** **Dates and Types of Investigations**

(131)   (U)   On one page in each of the FISA applications, the FBI protected information

---

[21] (U)  This includes, for example, the FISC docket numbers, the specific dates that the FISA applications were filed and orders issued, and the declassification dates in the classification stamps (which can be used to pinpoint the dates of the applications and orders).  All of this information reveals the specific time period(s) under which the surveillance was conducted.

SECRET//NOFORN

that, when referenced in connection with an actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation, and the time period of the particular investigation. Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation and the particular dates that the investigation covers, which would allow targets to identify what activities might be under investigation and to adjust their behavior accordingly. Moreover, the knowledge that a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid detection. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

(U) **(b)(7)(E)-8**         **Investigative Strategies for Utilizing Particular Evidence**

(132)  (U) The FBI protected information, which was repeated in each of the four FISA applications, that describes a particular purpose for which it might use information gathered as a result of its FISA authorized surveillance on Page. This information reflects non-public information about how the FBI investigatively uses information that it gathers during an investigation. While the particular context here concerns information gathered as a result of its utilization of FISA, the same potential uses of investigative information could be present in many other contexts. Publicly disclosing this information would permit targets of FBI investigative activities to anticipate FBI investigative activities, and this in turn would permit them to take countermeasures against such activities. This would abrogate the usefulness of FISA as a technique, at least in this particular and important regard, as well as the investigative activities that may flow as a result of information obtained under FISA. No further information

SECRET//NOFORN

about this category of information or how it falls within Exemption (b)(7)(E) can be made on the
public record without undermining the FBI's assertion of this exemption, as well as Exemptions
(b)(1), (b)(3), and (b)(7)(A), which were also asserted to protect this information.

(133)   (S)



### (U) SEGREGABILITY DETERMINATIONS FOR RELEASED IN PART PAGES

(134)   (U)   Each page of the four Page FISA applications and accompanying orders was
carefully reviewed by a team of DOJ employees to determine what portions of the pages
contained exempt information requiring redaction pursuant to the FOIA, what portions could be
segregated and released, and what pages did not contain any segregable information and had to
be withheld in full.  As part of this review, the employees carefully analyzed all information in
the four Page FISA applications and resulting orders to determine what information has been
revealed through the HPSCI memoranda and/or officially, publicly disclosed, and to ensure that
no information for which FOIA exemptions were or likely have been waived was redacted.  A
total of 598 pages of responsive records were carefully reviewed and analyzed, and it was
determined that 412 pages could be released in part and that 186 pages had to be withheld in full,
in order to protect the classified and otherwise exempt information contained therein.

### (U) PAGES WITHHELD IN FULL – PAGE FISAs

(135)   (U)   The FBI withheld in full 186 pages associated with the FISA applications and
resulting orders pursuant to Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E) (categories 1-3

and 6).[22]  Disclosure of these pages would reveal classified intelligence methods and law

enforcement techniques; however, the FBI cannot publicly describe these pages and the bases for

withholding them any further without revealing information that is itself exempt.



(136)   (S//NF)

(137)   (S//NF)

(138)   (S//NF)

---

[22] (U)  Discrete information in the records would be subject to redaction pursuant Exemptions (b)(6) and
(b)(7)(C), as described in the category (b)(6)/(b)(7)(C)-2 discussion above.

SECRET//NOFORN



(139)   (S//NF)

(140)   (S//NF)

SECRET//NOFORN

SECRET//NOFORN



(141)  (S//NF)

(U) **PARTIAL GLOMAR RESPONSE**

(142)  (U)  The FBI relies on a Glomar response in instances in which, assuming that responsive records existed, even acknowledging their existence would result in harm protected against by one or more FOIA exemptions.  To be credible and effective, the FBI must use a Glomar response in all similar cases regardless of whether responsive records actually exist, including instances in which the FBI does not possess records responsive to a particular request. If the FBI were to invoke a Glomar response only when it actually possessed responsive records, the Glomar response would be interpreted as an admission that responsive records exist.

(143)  (U)  Here, the FBI has determined that merely acknowledging the existence or

53

non-existence of any records responsive to plaintiff's request, beyond the four Carter Page FISA

applications and resulting FISC orders, and former Director Comey's March 20, 2017 statement

that neither the FBI nor DOJ have any information about the alleged wiretapping referred to in

President Trump's March 4, 2017 tweets, could trigger harm under FOIA exemptions.  With

limited exceptions, such as the unique circumstances giving rise to the FBI's processing and

release of the four Page FISA packages, the FBI does not and cannot publicly confirm or deny

FISA coverage on particular individuals or entities, or that FISC orders have been sought or

obtained in the conduct of any particular investigation.  As no authorized Executive Branch

official has acknowledged the existence or non-existence of FISA warrants, applications and

orders beyond the four on Carter Page, the FBI's partial Glomar response as to any other

responsive records remains proper.[23]

(144)   (U)   As an original classification authority, I have determined that the FBI can

neither confirm nor deny whether the FBI maintains responsive records because to do so could

reasonably be expected to compromise national security and/or reveal intelligence activities,

sources, or methods.  *See* 5 U.S.C. §§ 552(b)(1), (b)(3).

---

[23] (U)  On March 20, 2017, then FBI Director James B. Comey specifically addressed President Trump's four-part post on Twitter on March 4, 2017 that President Obama had had President Trump's " 'wires tapped' in Trump Tower just before the victory," stating:

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI.  The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components.  The Department has no information that supports those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017.  https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9fl9a0cf9cf (last accessed 6/12/2017).  Aside from this statement and the acknowledgment of the four Page FISA applications and accompanying FISC orders, neither the FBI not DOJ have publicly commented on or acknowledged the existence or non-existence of any other FISA records within the scope of plaintiff's FOIA request.

(145)   (U)   Moreover, acknowledging or denying the existence or non-existence of records could result in harms protected against by FOIA Exemption (b)(7)(A), 5 U.S.C. § 552(b)(7)(A).

A.      (U)   As previously described, on March 20, 2017, then-FBI Director Comey publicly confirmed the existence of an investigation into Russia's interference in the 2016 Presidential election. *See* Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation). On May 17, 2017, the Acting Attorney General appointed Special Counsel Mueller and authorized him to conduct the investigation confirmed by then-FBI Director Comey on March 20, 2017.   DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)).

B.      (U)   As plaintiff specifically requested FISA/FISC records related to Russian interference in the 2016 election, the FBI cannot confirm or deny the existence or non-existence of responsive records, beyond those already acknowledged and processed, because that could reasonably be expected to adversely affect the pending investigation.

(146)   (U)   Finally, acknowledging the existence or non-existence of any other responsive records could reasonably be expected to risk circumvention of the law. *See* 5 U.S.C. § 552(b)(7)(E).

(U)   **FOIA EXEMPTION (b)(1) AS A BASIS FOR THE PARTIAL GLOMAR RESPONSE**

(147)   (U)   FOIA Exemption (b)(1) protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national

SECRET//NOFORN

defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

(148)   (U)  E.O. 13526 § 1.1(a) provides that information may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in § 1.4 of E.O. 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

(149)   (U)  E.O. 13526 explicitly authorizes precisely the type of response that the FBI has provided to plaintiff in this case.  Specifically, § 3.6(a) provides that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."

(150)   (U)  Consistent with E.O. 13526 and as described below, I have determined that acknowledging the existence or nonexistence of the records requested by plaintiff, beyond the four Carter Page FISA applications and orders discussed in detail above, would require the FBI to disclose properly classified facts that concern § 1.4(c) ("intelligence activities, sources, and methods") and § 1.4(d) ("foreign relations and foreign activities of the United States").  Moreover, responsive records, if they exist, would be owned by and under the control of the U.S. Government.  Finally, I have determined that acknowledging the existence or non-existence of the requested records reasonably could be expected to result in damage to national security.

SECRET//NOFORN

SECRET//NOFORN

(151)   (U) My determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.[24]

## (U) *Intelligence Activities, Sources, and Methods*

(152)   (U) The records requested by plaintiffs, if they exist, implicate classified intelligence activities and methods, and acknowledging the existence or non-existence of any such records reasonably can be expected to cause damage to national security.  An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization.  An intelligence activity or method has two characteristics.  First, the intelligence activity or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the use or non-use of the activity or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, method, and source are to be preserved.

(153)   (U) Intelligence activities and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific

---

[24] (U) To the extent possible on the public record, I have explained the harm to national security that would result from confirming or denying the existence or non-existence responsive records here.  If the Court finds that explanation inadequate, Defendants could offer further explanation *ex parte* and *in camera*.

SECRET//NOFORN

use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(154)  (U) The U.S. Government must do more than prevent explicit references to an intelligence activity or method; it must also prevent indirect references to them. One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information. We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(155)  (U) Here, acknowledging the existence or non-existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and resulting FISC orders, and former Director Comey's March 20, 2017 statement that neither the FBI nor DOJ have any information about the alleged wiretapping referred to in President Trump's March 4, 2017 tweets, would be tantamount to confirming whether or not the FBI has relied on a particular intelligence activity or method targeted at particular individuals or organizations. The FBI has not confirmed or denied the existence of any other FISA surveillance records responsive to plaintiff's request. Confirming or denying whether any or not other responsive records exist would reveal otherwise non-public information regarding the nature of the FBI's intelligence

interests, priorities, activities, and methods—information that is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission. Accordingly, to confirm or deny that the FBI possesses or does not possess records responsive to plaintiff's request could risk compromising intelligence activities or methods, and thus would pose at least a serious risk to the national security.[25]

### (U) *Foreign Relations and Foreign Activities of the United States*

(156)  (U)  Responding to plaintiff's request with anything other than a Glomar response would also reveal information concerning U.S. foreign relations and foreign activities, the disclosure of which reasonably can be expected to cause damage to national security. Plaintiff's request necessarily implicates U.S. foreign relations and foreign activities in relation to foreign governments or government officials/employees.

(157)  (U)  FISA prescribes procedures for the physical and electronic surveillance and collection of "foreign intelligence information" between "foreign powers" and "agents of foreign powers" suspected of espionage or terrorism. Thus, on its face, a request for information about FISA materials implicates foreign relations and foreign activities because those are at the heart of the FBI's use of FISA as an intelligence and investigative tool.

(158)  (U)  The FBI's confirmation or denial of the existence of responsive records could reasonably be expected to cause damage to the national security interests of the United States by negatively impacting U.S. foreign relations with these and other countries. Given the sensitivity of the United States' present and future relationships with foreign countries and the importance of such relationships to our national security, requests like plaintiff's—which, directly or

---

[25] (U) FISC orders, applications, and minimization procedures are classified, at a minimum, at the SECRET level.

SECRET//NOFORN

indirectly, call for records that would relate to sensitive and appropriately classified details of the United States' relationship with foreign government(s)—reflect precisely the situation in which the FBI finds it necessary to assert a partial Glomar response to plaintiff's request.

(159)  (S//NF) 

(160)  (U) Accordingly, confirming or denying the existence or non-existence of particular FISA records can reasonably be expected to cause serious damage to the national security by undermining our relationships with foreign partners.

SECRET//NOFORN

### (U) FOIA Exemption (b)(3) as a Basis for the Partial Glomar Response

(161)   (U)  Exemption (b)(3) protects information that is specifically exempted from public disclosure by a statute that requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, establishes particular criteria for withholding, or refers to particular types of matters to be withheld.  5 U.S.C. § 552(b)(3)(A).  If the non-disclosure statute was enacted after the date of enactment of the OPEN FOIA Act of 2009, it must specifically cite this paragraph in order for Exemption (b)(3) to apply.  *Id.* at § 552(b)(3)(B).

(162)   (U)  Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1 (i)(1) (the "National Security Act"), provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure."  Accordingly, the National Security Act constitutes a federal statute which "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" under 5 U.S.C. § 552(b)(3).  Under the direction of the DNI, other components within the U.S. Government are authorized to protect intelligence sources and methods from unauthorized disclosure.

(163)   (U)  As previously described in relation to the Exemption (b)(1) Glomar explanation, acknowledging the existence or non-existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and orders discussed in detail above, would tend to reveal whether an intelligence method[26] is being deployed against a particular

---

[26] (U) An intelligence method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization determined to be of national security interest; any procedure (human or non-human) or intelligence source, used to obtain information concerning the individual or organization; and foreign liaison relationships.

SECRET//NOFORN

target or organization, thus compromising the national security interests of the United States. Accordingly, the National Security Act, in conjunction with Exemption (b)(3), provides an additional and independent basis for the FBI's partial Glomar response to plaintiff's request.

### (U) FOIA EXEMPTIONS (b)(7)(A) AND (b)(7)(E) AS BASES FOR THE GLOMAR RESPONSE

#### (U) *Exemption (b)(7) Threshold*

(164)   (U) As discussed above, before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(165)   (U) The only circumstance under which the FBI can request a FISA order is when the FBI is conducting an authorized, predicated national security investigation within the scope of its law enforcement and foreign intelligence responsibilities.  Accordingly, FISA applications and FISC orders – when they exist – are records compiled for law enforcement purposes.

#### (U) *Exemption (b)(7)(A)*

(166)   (U) FOIA Exemption 7(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(167)   (U) In addition to satisfying Exemption (b)(7)'s threshold, an agency must establish that (a) there is a pending or prospective law enforcement proceeding and (b) disclosure of responsive records could reasonably be expected to adversely affect it.

SECRET//NOFORN

SECRET//NOFORN

(168)   (U)  As previously noted, in July 2016, the FBI opened an investigation of Russian election interference.  The FBI sought and obtained a FISA warrant in October 2016 to conduct surveillance of Carter Page in the course of that investigation.  The FBI thereafter sought and obtained three renewals from the FISC to continue surveilling Page.  The FISA applications were compiled as part of the investigation into Russian election interference.  In May 2017, the Acting Attorney General appointed Special Counsel Mueller and authorized him to conduct the Russian election interference investigation confirmed by then-FBI Director James Comey on March 20, 2017.  That investigation is on-going.  Plaintiff's request specifically seeks FISA applications and FISC orders related to the Russian election interference investigation.  Thus, the requirement of a pending enforcement proceeding in Exemption (b)(7)(A) is satisfied.

(169)   (U)  The final element -- interference with that investigation -- is readily established.  Confirming or denying the existence or non-existence of responsive records would reveal non-public information about the focus, scope, and conduct of that investigation.  Specifically, it would reveal whether or not specific investigative techniques have been used; when and to what extent they were used, if they were; their relative value or benefit if they were used; and the targets they were used against, if any.  Prematurely disclosing non-public information about the Russia investigation could give targets and others intent on interfering with the FBI's investigative efforts the information necessary to:  take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats.  Accordingly, confirming or denying the existence or non-existence of responsive records, beyond the four Carter Page FISA applications and orders discussed in detail above, could reasonably be expected to adversely

63

SECRET//NOFORN

affect the pending investigation.  Therefore, the FBI's partial Glomar response is justified under Exemption (b)(7)(A) as well.

### (U) *Exemption (b)(7)(E)*

(170)  (U)  Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552 (b)(7)(E).  This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures.

(171)  (U)  How the FBI applies its investigative resources (or not) against a particular allegation, report of criminal activity, or perceived threat is itself a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E).

(172)  (U)  As previously demonstrated, acknowledging or denying the existence or non-existence of the law enforcement records that plaintiff seeks, beyond the four Carter Page FISA applications and orders discussed in detail above, would be tantamount to confirming or denying whether or not the FBI is employing specific investigative techniques authorized under the FISA against specific targets as part of the pending Russian interference investigation.  Even in acknowledged investigations, the FBI does not routinely disclose whether or not it has employed this particular classified investigative technique against a particular target.  Such an acknowledgment would reveal when and under what circumstances the FBI relies upon FISA-authorized techniques in an investigation.  Confirming whether or not FBI has responsive

SECRET//NOFORN

SECRET//NOFORN

records would provide pieces of information that adversaries could use to ascertain at what point, and against whom we might use particular techniques. Armed with this information, adversaries could glean significant insight into the activities likely to attract – or not attract – the FBI's law enforcement attention. These individuals would then be able alter their behavior to avoid attention by law enforcement, making it more difficult for the FBI to be proactive in assessing threats and investigating crimes. Therefore, the FBI can neither confirm nor deny the existence of records responsive to plaintiff's request, beyond the four Carter Page FISA applications and orders discussed in detail above, without causing harms protected against by FOIA Exemption (b)(7)(E), and Exemption (b)(7)(E) provides independent justification for the FBI's partial Glomar response here.

## (U) **CONCLUSION**

(173)   (U)  For the reasons described above, the FBI's Glomar response to plaintiff's request, except as to records that have been officially publicly revealed, was proper; the FBI's search for records responsive to the portion of plaintiff's request for which the Glomar response has been pierced – *i.e.*, the four FISA applications and orders on Carter Page revealed in the HPSCI memoranda – was reasonably calculated to, and in fact did, locate the responsive records; the FBI properly protected information in the four Page FISA applications and orders pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), and (b)(7)(A) and (C)-(E); and the FBI reasonably segregated and released non-exempt information on the pages released in part and properly concluded that it could not do so on the pages withheld in full.

SECRET//NOFORN

SECRET//NOFORN

(U)  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A and B attached hereto are true and correct copies.

(U)  Executed this 19 day of October, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

66

SECRET//NOFORN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAMES MADISON PROJECT, et al.

      Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE,

      Defendant.

Civil Action No. 1:17-cv-0597-APM

# EXHIBIT A



**U.S. Department of Justice**

---

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

July 20, 2018

Mr. Bradley P. Moss, Esquire
5208 Whisper Willow Drive
Fairfax, VA 22030

> Civil Litigation No.: 17-cv-00597
> Subject: Foreign Intelligence Surveillance
> Court Orders and Applications Regarding
> Trump et al
> (June 1, 2016 - Present)

Dear Mr. Moss:

The enclosed documents were reviewed under the Freedom of Information Act (FOIA), Title 5, United States Code, Section 552. As a result of President Trump's declassification of the House Permanent Select Committee (HPSCI) Majority Staff's January 18, 2018 memorandum entitled "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation," which revealed DOJ and the FBI had sought and obtained authority under the Foreign Intelligence Surveillance Act (FISA) to conduct surveillance of Carter Page, and the subsequent release of the HPSCI Minority's January 29, 2018, memorandum entitled "Correcting the Record – The Russia Investigation," which provided additional information about the Page FISAs, the government was required to review these records for potential release of segregable information in response to FOIA requests for these materials.

Below you will find check boxes under the appropriate statute headings which indicate the types of exemptions asserted to protect information which is exempt from disclosure. The appropriate exemptions are noted on the enclosed pages next to redacted information. The checked exemption boxes used to withhold information are further explained in the enclosed Explanation of Exemptions.

| **Section 552** | | **Section 552a** |
|---|---|---|
| ☑ (b)(1) | ☑ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| 50 USC Section 3024(i)(1) | ☑ (b)(7)(D) | ☐ (k)(2) |
| | ☑ (b)(7)(E) | ☐ (k)(3) |
| | ☐ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) | | ☐ (k)(7) |

589 pages were reviewed and 412 pages are being released.

Below you will also find additional informational paragraphs about your request. Where applicable, check boxes are used to provide you with more information about the processing of your request. Please read each item carefully.

☐    Documents were located which originated with, or contained information concerning, another Government Agency [OGA].

     ☐    This information has been referred to the OGA for review and direct response to you.

⌐  We are consulting with another agency.   The FBI will correspond with you regarding this information
     when the consultation is completed.

⌐
     In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) and Privacy Act
     exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the
     existence of your subject's name on any watch lists.

     For your information, Congress excluded three discrete categories of law enforcement and national security
records from the requirements of the Freedom of Information Act (FOIA).   See 5 U.S. C. § 552(c) (2006 & Supp. IV
(2010).   This response is limited to those records subject to the requirements of the FOIA.   This is a standard
notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do
not, exist. Enclosed for your information is a copy of the Explanation of Exemptions.

     Although your request is in litigation, we are required by 5 USC § 552 (a)(6)(A) to provide you the following
information concerning your right to appeal.   You may file an appeal by writing to the Director, Office of Information
Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C.
20530-0001, or you may submit an appeal through OIP's FOIA online portal by creating an account on the following
web site:   https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or
electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.   If you
submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act
Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

⌐  The enclosed material is from the main investigative file(s) in which the subject(s) of your request was
     the focus of the investigation.   Our search located additional references, in files relating to other
     individuals, or matters, which may or may not be about your subject(s).   Our experience has shown
     such additional references, if identified to the same subject of the main investigative file, usually contain
     information similar to the information processed in the main file(s).   As such, we have given priority to
     processing only the main investigative file(s) given our significant backlog.   If you would like to receive
     any references to the subject(s) of your request, please submit a separate request for the reference
     material in writing.   The references will be reviewed at a later date, as time and resources permit.

☑
     See additional information which follows.

                                                        Sincerely,

                                                        David M. Hardy
                                                        Section Chief
                                                        Record/Information
                                                          Dissemination Section
                                                        Information Management Division

Enclosures

     The enclosed documents represent a release of information responsive to your FOIA request.   The
attached documents are Bates stamped 17-cv-597(FBI)-1-412.   An additional 177 responsive pages were
categorically withheld pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).

     Beyond what is released herein, the FBI neither confirms nor denies the existence of additional records
responsive to this request because merely acknowledging whether or not responsive records exist would itself cause
harms protected against by FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E).

     Please note this response also constitutes Department of Justice, National Security Division's final response
to your FOIA request to their agency for this same material.

     This material is being provided to you at no charge.

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)  (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)  related solely to the internal personnel rules and practices of an agency;

(b)(3)  specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)  trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)  inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)  personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)  records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)  contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)  geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)  information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)  material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)  information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)  investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)  material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)  required by statute to be maintained and used solely as statistical records;

(k)(5)  investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)  testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)  material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES MADISON PROJECT, et al. | |
| Plaintiffs, | Civil Action No. 1:17-cv-0597-APM |
| v. | |
| U.S. DEPARTMENT OF JUSTICE, | |
| Defendant. | |

# EXHIBIT B

**James Madison Project et al. v. DOJ, 17-cv-0597 (D.D.C.)**
**FOIA Exemption Code Index**

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | X | X | X | X | | | | | X | X | X | | | X | | | | X | | | |
| 2 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 3 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 4 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 5 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 6 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 7 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 8 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 9 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 10 | | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 11 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 12 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | |
| 13 | X | X | X | | X | | | | X | X | | | | X | | | | X | | | |
| 14 | X | X | X | | X | | | | X | X | | | | | | | | X | | | |
| 15 | X | X | X | | X | | | X | X | X | | X | X | | | | | X | | | |
| 16 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 17 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 18 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 19 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 20 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 21 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 22 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 23 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 24 | | | | | | | | | | | | | | | | | X | | | | |
| 25 | | X | | | | | | | X | X | | | | | | | | X | | | |
| 26 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 27 | X | X | X | | | | | X | X | X | | | X | X | | | | X | | | |
| 28 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 29 | X | X | X | | X | | | X | X | X | X | X | | X | | | | X | | | |
| 30 | X | X | X | | X | | | X | X | X | X | | | X | | | | X | | | |
| 31 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 32 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 33 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 34 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 35 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 36 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 37 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 38 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 40 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 41 | X | X | X | | X | | | | X | X | X | | | X | X | | | X | | | |
| 42 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 43 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 44 | X | X | X | | | | | | X | X | | | | X | | | | X | | | |
| 45 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 46 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 47 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 48 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 49 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 50 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 51 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 52 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 53 | | | | | | | | | | | | | | | | | X | | | | |
| 54 | X | X | X | X | | | | | | | | | | | | | | X | | | |
| 55 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 56 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 57 | X | X | X | | | | | | X | X | | | | | | X | | X | | | |
| 58 | X | X | X | | X | | | | X | X | | | | | | X | | X | | | |
| 59 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | |
| 60 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 61 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 62 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 63 | X | X | X | | | | | | | | | | | | | | | X | | | |
| 64 | X | X | X | | | | | | X | X | | | | X | | | | X | | | |
| 65 | X | X | X | | | | | | X | | | | | | | | | X | | | |
| 66 | | | X | | | X | | | | | | | | | | | | X | | | |
| 67 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 68 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 69 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 70 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 71 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 72 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 73 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 74 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 75 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 76 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 77 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 78 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 79 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 80 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 81 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 82 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 83 | X | X | X | | | | | | | | | | | | | | | X | | | |
| 84 | X | X | X | X | | | | | X | X | X | | | X | | | | X | | | |
| 85 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 86 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 87 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 88 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 89 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 90 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 91 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 92 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 93 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 94 | X | X | X | | | | | X | X | X | X | | | | | | | X | | | |
| 95 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 96 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | |
| 97 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 98 | X | X | X | | X | | | | X | X | | | | X | | | | X | | | |
| 99 | X | X | X | | X | | | | X | X | | | | | | | | X | | | |
| 100 | X | X | X | | | | | X | X | X | | X | X | | | | | X | | | |
| 101 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 102 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 103 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 104 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 105 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 106 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 107 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 108 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 109 | | | | | | | | | | | | | | | | | X | | | | |
| 110 | | | X | | | | | | X | X | | | | | | | | X | | | |
| 111 | X | X | X | | X | | | X | X | X | | | | | | | | X | | | |
| 112 | X | X | X | | | | | X | X | X | | | X | X | | | | X | | | |
| 113 | X | X | X | | | | | X | X | X | X | | | | | | | X | | | |
| 114 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 115 | X | X | X |  | X |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 116 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 117 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 118 | X | X | X |  |  |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 119 | X | X | X |  |  |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 120 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 121 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 122 | X | X | X |  | X |  |  | X | X | X | X | X |  | X |  |  |  | X |  |  |  |
| 123 | X | X | X |  | X |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 124 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 125 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 126 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 127 |  |  | X |  |  |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 128 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 129 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 130 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 131 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 132 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 133 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 134 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 135 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 136 | X | X | X |  | X |  |  |  | X | X | X |  |  | X | X |  |  | X |  |  |  |
| 137 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 138 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 139 | X | X | X |  |  |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 140 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 141 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 142 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 143 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 144 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 145 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 146 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 147 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 148 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 149 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 150 | X | X | X | X |  |  |  |  |  |  |  |  |  |  |  |  |  | X |  |  |  |
| 151 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 152 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 153 | X | X | X | | | | | | X | X | | | | | | X | | X | | | |
| 154 | X | X | X | | X | | | | X | X | | | | | | X | | X | | | |
| 155 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | |
| 156 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 157 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 158 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 159 | X | X | X | | | | | | | | | | | | | | | X | | | |
| 160 | X | X | X | | | | | | X | X | | | | X | | | | X | | | |
| 161 | X | X | X | | | | | | X | | | | | | | | | X | | | |
| 162 | | | X | | | X | | | | | | | | | | | | X | | | |
| 163 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 164 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 165 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 166 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 167 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 168 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 169 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 170 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 171 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 172 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 173 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 174 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 175 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 176 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 177 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 178 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 179 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 180 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 181 | X | X | X | | | X | | | | | | | | | | | | X | | | |
| 182 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 183 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 184 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 185 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 186 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 187 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 188 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 189 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 190 | X | X | X | | | | | | X | X | | | | | | | | X | | | |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 191 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 192 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 193 | X | X | X | | | | | X | X | X | X | | | | | | | X | | | |
| 194 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 195 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | |
| 196 | X | X | X | | X | | | | X | X | | | | X | | | | X | | | |
| 197 | X | X | X | | X | | | | X | X | | | | | | | | X | | | |
| 198 | X | X | X | | X | | | X | X | X | | X | X | | | | | X | | | |
| 199 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 200 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 201 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 202 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 203 | X | X | X | | | | X | X | X | X | | | | | | | | X | | | |
| 204 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 205 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 206 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 207 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 208 | | | | | | | | | | | | | | | | | X | | | | |
| 209 | | | X | | | | | | X | X | | | | | | | | X | | | |
| 210 | X | X | X | | X | | | X | X | X | | | | | | | | X | | | |
| 211 | X | X | X | | | | | X | X | X | | | X | X | | | | X | | | |
| 212 | X | X | X | | | | | X | X | X | X | | | | | | | X | | | |
| 213 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 214 | X | X | X | | X | | | X | X | X | X | | | X | | | | X | | | |
| 215 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 216 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 217 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 218 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 219 | X | X | X | | X | | | X | X | X | | | | | | | | X | | | |
| 220 | X | X | X | | X | | | X | X | X | X | | | X | | | | X | | | |
| 221 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 222 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 223 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 224 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 225 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 226 | X | X | X | | X | | | | X | X | | | | | | | | X | | | |
| 227 | X | X | X | | X | | | | X | X | | | | | | | | X | | | |
| 228 | X | X | X | | X | | | | X | X | | | | | | | | X | | | |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 229 | X | X | X | | X | | | X | X | X | | | | | | | | X | | | |
| 230 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 231 | X | X | X | | X | | X | | X | X | X | X | | X | | | | X | | | |
| 232 | X | X | X | | X | | X | | X | X | X | | | X | | | | X | | | |
| 233 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 234 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 235 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 236 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 237 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 238 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 239 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 240 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 241 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 242 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 243 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 244 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 245 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 246 | X | X | X | | X | | | | X | X | X | | | X | X | | | X | | | |
| 247 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 248 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 249 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 250 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 251 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 252 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 253 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 254 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 255 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 256 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 257 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 258 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 259 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 260 | X | X | X | X | | | | | | | | | | | | | | X | | | |
| 261 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 262 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 263 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 264 | X | X | X | | X | | | | X | X | | | | | | X | | X | | | |
| 265 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | |
| 266 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 267 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 268 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 269 | X | X | X | | | | | | | | | | | | | | | X | | | |
| 270 | X | X | X | | | | | | X | X | | | | X | | | | X | | | |
| 271 | X | X | X | | | | | | X | | | | | | | | | X | | | |
| 272 | | | X | | | X | | | | | | | | | | | | X | | | |
| 273 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 274 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 275 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 276 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 277 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 278 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 279 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 280 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 281 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 282 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 283 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 284 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 285 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 286 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 287 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 288 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 289 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 290 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 291 | X | X | X | | | X | | | | | | | | | | | | X | | | |
| 292 | X | X | X | X | | | | | X | X | X | | | X | | | | X | | | |
| 293 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 294 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 295 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 296 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 297 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 298 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 299 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 300 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 301 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 302 | X | X | X | | | | | X | X | X | | | | | | | | X | | | |
| 303 | X | X | X | | | | | X | X | X | X | | | | | | | X | | | |
| 304 | X | X | X | | | | | | X | X | | | | | | | | X | | | |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 305 | X | X | X |  | X |  |  |  | X | X | X |  |  |  |  |  |  | X |  |  |  |
| 306 | X | X | X |  | X |  |  |  | X | X |  |  |  | X |  |  |  | X |  |  |  |
| 307 | X | X | X |  | X |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 308 | X | X | X |  | X |  |  | X | X | X |  | X | X |  |  |  |  | X |  |  |  |
| 309 | X | X | X |  |  |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 310 | X | X | X |  |  |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 311 | X | X | X |  | X |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 312 | X | X | X |  | X |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 313 | X | X | X |  |  |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 314 | X | X | X |  |  |  | X | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 315 | X | X | X |  |  |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 316 | X | X | X |  |  |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 317 | X | X | X |  | X |  |  | X | X | X | X |  | X | X |  |  |  | X |  |  |  |
| 318 | X | X | X |  | X |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 319 | X | X | X |  | X |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 320 | X | X | X |  |  |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 321 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | X |  |  |  |  |
| 322 |  | X |  |  |  |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 323 | X | X | X |  | X |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 324 | X | X | X |  |  |  |  | X | X | X |  |  |  | X |  |  |  | X |  |  |  |
| 325 | X | X | X |  |  |  |  | X | X | X | X |  |  |  |  |  |  | X |  |  |  |
| 326 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 327 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 328 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 329 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 330 | X | X | X |  | X |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 331 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 332 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 333 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 334 | X | X | X |  | X |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 335 | X | X | X |  |  |  |  | X | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 336 | X | X | X |  | X |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 337 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 338 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 339 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 340 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 341 | X | X | X |  | X |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 342 | X | X | X |  | X |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 343 | X | X | X |  | X |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 344 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 345 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 346 | X | X | X |  | X |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 347 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 348 | X | X | X |  | X |  |  | X | X | X | X | X |  | X |  |  |  | X |  |  |  |
| 349 | X | X | X |  | X |  |  | X | X | X | X | X |  | X |  |  |  | X |  |  |  |
| 350 | X | X | X |  | X |  |  | X | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 351 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 352 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 353 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 354 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 355 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 356 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 357 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 358 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 359 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 360 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 361 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 362 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 363 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 364 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 365 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 366 | X | X | X |  | X |  |  |  | X | X | X |  |  | X | X |  |  | X |  |  |  |
| 367 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 368 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 369 | X | X | X |  |  |  |  |  | X | X |  |  |  |  |  |  |  | X |  |  |  |
| 370 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 371 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 372 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 373 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 374 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 375 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 376 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 377 | X | X | X |  | X |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 378 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 379 | X | X | X |  |  |  |  |  | X | X | X |  |  | X |  |  |  | X |  |  |  |
| 380 | X | X | X | X |  |  |  |  |  |  |  |  |  |  |  |  |  | X |  |  |  |

| Bates | b1 | b3 1 | 7A-1 | 6/7C 1 | 6/7C 2 | 6/7C 3 | 6/7C 4 | 7D 1 | 7E 1 | 7E 2 | 7E 3 | 7E 4 | 7E 5 | 7E 6 | 7E 7 | 7E 8 | RIF | RIP | FOIA WIF | Seal WIF | RD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 381 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 382 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 383 | X | X | X | | | | | | X | X | | | | | | | | X | | | |
| 384 | X | X | X | | X | | | | X | X | | | | | | X | | X | | | |
| 385 | X | X | X | | X | | | | X | X | X | | | | | | | X | | | |
| 386 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 387 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 388 | X | X | X | | | | | | X | X | X | | | | | | | X | | | |
| 389 | X | X | X | | | | | | | | | | | | | | | X | | | |
| 390 | X | X | X | | | | | | X | X | | | | X | | | | X | | | |
| 391 | X | X | X | | | | | | X | | | | | | | | | X | | | |
| 392 | | | X | | | X | | | | | | | | | | | | X | | | |
| 393 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 394 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 395 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 396 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 397 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 398 | X | X | X | | X | | | | X | X | X | | | X | | | | X | | | |
| 399 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 400 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 401 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 402 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 403 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 404 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 405 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 406 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 407 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 408 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 409 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 410 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 411 | X | X | X | | | | | | X | X | X | | | X | | | | X | | | |
| 412 | X | X | X | | | X | | | | | | | | | | | | X | | | |
| 413 | | | | | | | | | | | | | | | | | | | | | |
| 414 | | | | | | | | | | | | | | | | | | | | | |
| 415 | | | | | | | | | | | | | | | | | | | | | |
| 416 | | | | | | | | | | | | | | | | | | | | | |
| 417 | | | | | | | | | | | | | | | | | | | | | |
| 418 | | | | | | | | | | | | | | | | | | | | | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE JAMES MADISON PROJECT, *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF JUSTICE,

*Defendant*.

No. 17-cv-00597-APM

**DECLARATION OF PATRICK N. FINDLAY**

I, Patrick N. Findlay, do hereby state and declare as follows:

1.      I am the Acting Chief and Special Counsel of the Office of Strategy Management and Development ("OSMD") of the National Security Division ("NSD") of the United States Department of Justice ("DOJ" or the "Department").  NSD is a component of the Department. *See* 72 Fed. Reg. 10064 (Mar. 7, 2007).  I have served as the Acting Chief of OSMD since July 2018 and as a Special Counsel in OSMD since June 2016.  Prior to my positions with NSD, I served as an Associate General Counsel for the Federal Bureau of Investigation ("FBI") from July 2012 until June 2016.

2.      Among other responsibilities, in my capacity as the Acting Chief of OSMD, I serve as the Acting Director of the Freedom of Information Act and Declassification Unit ("NSD FOIA"), which is responsible for responding to requests for access to NSD records and information pursuant to the Freedom of Information Act ("FOIA"), *codified at* 5 U.S.C. § 552, and the Privacy Act of 1974, as well as processing the NSD records which are responsive to FOIA requests received by other Executive Branch agencies.  As Acting Director of NSD FOIA, I have been delegated authority from the Attorney General of the United States as an Original

Classification Authority ("OCA").   Through the exercise of my official duties, I have become

familiar with this action and the underlying FOIA request at issue.   I base the statements

contained herein upon my personal knowledge of the subject of this FOIA request, as well as

information provided to me in the course of my official duties.   In particular, I have consulted

with NSD's Office of Intelligence ("OI") regarding this FOIA request.

3.   I am submitting this declaration in support of the Department's Motion for

Summary Judgment.

### Plaintiffs' FOIA Request and Procedural History

4.   In an emailed letter dated March 6, 2017, plaintiffs stated "[O]n March 4, 2017,

President Donald J. Trump sent out a four-part post on Twitter accusing former President Barack

Obama's Administration of a 'Nixon/Watergate' effort to 'tap' the phones of President Trump

and/or his associates during the 2016 presidential campaign.   President Trump suggested the

surveillance was unlawful." Ex. A (Plaintiffs' March 6, 2017, FOIA request) at 1. Plaintiffs then

requested the following:

> (1) A copy of any order(s) by the Foreign Intelligence Surveillance Court
> ("FISC") authorizing surveillance of and/or collection of information
> concerning the Trump Organization, President Trump, President Trump's
> campaign for the presidency, or people associated with President Trump;
>
> (2) A complete copy of any application(s) to the FISC seeking authorization
> for surveillance of and/or collection of information concerning the Trump
> Organization, President Trump, President Trump's campaign for the
> presidency, or people associated with President Trump; and
>
> (3) A copy of any minimization procedures issued by the FISC and that
> applied to any order(s) issued that fall within the scope of categories 1 or 2.

Ex. A at 2.

5.   In an email to plaintiffs' counsel dated March 17, 2017, NSD FOIA issued a

"Glomar response," stating that NSD FOIA does not search for records in response to requests

regarding the use or non-use of certain foreign intelligence gathering techniques in which the confirmation or denial of the existence of responsive records would, in and of itself, reveal information properly classified under Executive Order 13526. *See* Ex. B (March 17, 2017 email).

6.      Plaintiffs appealed NSD's determination to the Department's Office of Information Policy ("OIP") on March 17, 2017. OIP affirmed NSD's determination by letter dated April 12, 2017. *See* Ex. C. (OIP's April 12, 2017, letter).

7.      On July 14, 2017, as part of this litigation, the Government filed a declaration authored by G. Bradley Weinsheimer describing facts supporting the Department's assertion of a Glomar response. *See* Ex. D (Declaration of G. Bradley Weinsheimer, dated July 13, 2017 (filed July 14, 2017 as Dkt. No. 13) ("Weinsheimer Declaration")). Through the Weinsheimer Declaration, NSD articulated the original basis for NSD's Glomar response pursuant to FOIA Exemption 1, and explained that NSD does not "confirm or deny the existence of records regarding any particular individual alleged to be pertinent to operational FISA work." Ex. D at ¶7. I submit this declaration to support the amendment of the Glomar response and the motion for summary judgment in the current matter. The two exceptions to the otherwise categorical Glomar response discussed below arise out of 1) the confirmation of no responsive records related to March 4, 2017, tweets and 2) the partial declassification of four applications and orders under the Foreign Intelligence Surveillance Act and related disclosures by ("FISA").

### The March 4, 2017, Tweets Referenced in Plaintiffs' FOIA Request

8.      On March 4, 2017, President Trump made a four-part post on Twitter, stating, among other things, that President Obama "had my 'wires tapped' in Trump Tower just before

the victory."[1]  During sworn testimony before the House Permanent Selection Committee on

Intelligence ("HPSCI") on March 20, 2017, then FBI Director James Comey was asked about

this by Congressman Schiff and responded:

> With respect to the President's tweets about alleged wiretapping directed at
> him by the prior administration, I have no information that supports those
> tweets and we have looked carefully inside the FBI. The Department of
> Justice has asked me to share with you that the answer is the same for the
> Department of Justice and all its components. The Department has no
> information that supports those tweets.

*See* Transcript of the HPSCI Hearing on Russian Interference in the 2016 U.S. Election, March

20, 2017 (*available at* <https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-

transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/> (last

visited Oct. 19, 2018)).  Accordingly, DOJ has subsequently confirmed that the Department—

including NSD—has no records regarding wiretapping of then-candidate Trump in Trump Tower

prior to the election.[2]

### Page FISA Applications and Orders

9.       The United States House of Representatives Permanent Select Committee on

Intelligence ("HPSCI") Majority Staff's memorandum entitled "Foreign Intelligence

Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,"

dated January 18, 2018, ("Majority Memo")[3] included information classified at the time it was

---

[1] *Available at* <https://twitter.com/realDonaldTrump/status/837989835818287106>,
<https://twitter.com/realDonaldTrump/status/837993273679560704>,
<https://twitter.com/realDonaldTrump/status/837994257566863360> and
<https://twitter.com/realDonaldTrump/status/837996746236182529> (all visited Oct. 19, 2018).

[2] For more on the particulars of the search within NSD that allowed NSD to confirm this fact for
NSD, see Supplemental Declaration of G. Bradley Weinsheimer, *Gizmodo Media Group* v.
*Department of Justice*, Civil Action No. 17-cv-03566, dated Dec. 14, 2017 (filed Dec. 15, 2017,
at Dkt. No. 32), attached hereto as Ex. E.

written, including that DOJ and the FBI had sought and obtained authority pursuant to FISA to

conduct surveillance of Carter Page. In a letter dated February 2, 2018, the Counsel to the

President noted that President Trump declassified the Majority Memo.[4]  Because the

declassification of the Majority Memo and the subsequent release of the HPSCI Minority's

January 29, 2018, memorandum entitled "Correcting the Record – The Russia Investigation,"[5]

revealed the existence of FISA applications and orders to conduct surveillance of Carter Page,

the Department reviewed these records for potential release of segregable information in

response to FOIA requests seeking these materials.

      10.     Due to the high-profile and sensitive nature of the subject of plaintiffs' request,

attorneys in OI – subject-matter experts who were already familiar with the relevant records –

identified and provided records responsive to plaintiffs' FOIA request concerning Carter Page.

OI attorneys determined, based on their familiarity with the types of records at issue in this

matter, that the records responsive to plaintiffs' request would be located in OI's files.

      11.     NSD provided the Page FISA applications and orders to the FBI, which

coordinated the FOIA review of these records.  NSD has concluded that no other office or

---

[3] *Available at* <https://intelligence.house.gov/uploadedfiles/memo_and_white_house_letter.pdf>, 3-6 (visited Oct. 19, 2018).

[4] *See* Letter from Donald F. McGahn II, Counsel to the President, to the Honorable Devin Nunes, Chairman of the House Permanent Select Committee on Intelligence (Feb. 2, 2018), *available at* <https://intelligence.house.gov/uploadedfiles/memo_and_white_house_letter.pdf> (visited Oct. 19, 2018).

[5] *See* Correcting the Record – The Russia Investigation from the House Permanent Select Committee on Intelligence Minority, to All Members of the House of Representatives (Jan. 29, 2018), *available at* <https://intelligence.house.gov/uploadedfiles/hpsci_redacted_minority_memo.pdf> (visited Oct. 19, 2018).

records repositories within NSD would likely maintain non-duplicative records responsive to plaintiffs' request.

12.      On July 20, 2018, in response to several FOIA requests, including plaintiffs' instant FOIA request, the Department released in part, pursuant to the FOIA, 412 pages of FISA applications and orders to conduct surveillance of Carter Page.  The Government asserted FOIA Exemptions 1, 3, 6, 7(A), 7(C), 7(D), and 7(E), over certain material in the records and redacted that material accordingly; 186 pages were withheld in full.[6]  The Department's review and corresponding partial release was limited to the FISA applications and orders.  This FOIA release was unprecedented; prior to this release, there had never been any official public disclosure of an application to the FISC or an order from the FISC pertaining to a specific individual surveillance target.

13.      Because of these disclosures, NSD no longer asserts a Glomar response with respect to the fact that Carter Page was the subject of the FISA applications and orders released in July 2018.

### NSD's Remaining Glomar Response

14.      Other than (a) the Department's 2017 acknowledgement that it has no records responsive to plaintiffs' request inasmuch as it seeks records of alleged wiretapping of then-

---

[6] Though OI represented the Government before the Foreign Intelligence Surveillance Court, in each of these applications a Supervisory Special Agent of the FBI is identified as the Federal Officer making the application and verified each application. *See* the public release of these applications and orders at 1, 54, 84, 150, 182, 260, 292, 380, *available at* <https://vault.fbi.gov/d1-release/d1-release/at_download/file > (visited Oct. 19, 2018). Accordingly, FBI coordinated the review of these documents, and NSD participated in the process.  Because I understand that an FBI official will address the withholdings of information from the applications pursuant to various FOIA exemptions, and confirm that no further non-exempt information exists that can be reasonably segregated and released to plaintiffs, I do not address those issues here.

candidate Trump in Trump Tower by the Obama Administration prior to the election, as referenced in the President's March 4, 2017, tweets, and (b) the extraordinary public acknowledgements and FOIA releases concerning the FISC applications and orders to conduct surveillance of Carter Page, I am not aware of the Executive Branch having publicly confirmed or denied the existence of any FISC applications or orders "authorizing surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for the presidency, or people associated with President Trump." *See* Ex. A at 2.

15.     Accordingly, as to whether any other records exist that are responsive to plaintiffs' FOIA request that do not pertain to the President's March 4, 2017 tweets or the acknowledged FISA applications and orders relating to Carter Page, NSD neither confirms nor denies the existence or non-existence of such records.  NSD does so pursuant to FOIA Exemption 1.  I have determined that additional harm to national security would result from any additional disclosures of the existence or non-existence of such records, taking into account the information made public on this matter.

FOIA Exemption 1

16.     Pursuant to FOIA Exemption 1 and Executive Order 13526, absent highly unusual circumstances, NSD generally does not confirm or deny the existence of records regarding any particular individual alleged to be a target of FISC-authorized surveillance.  Under the Department of Justice, National Security Information, Security Classification Guide (July 2012) ("DOJ NSISCG"), the fact that a FISA application was submitted or used in a particular case is classified national security information, as is the identification of specific individuals or organizations who are subjects of a national security investigation making use of a FISA warrant.

7

*See* United States Department of Justice, *National Security Information, Security Classification Guide*, July 2012, at 34.

17.    To disclose the existence or non-existence of responsive documents in NSD files would disclose whether or not particular individuals or organizations were targets of FISC-authorized surveillance, thus disclosing information pertaining to intelligence sources and methods under Executive Order 13526 § 1.4(c).  And merely acknowledging the existence or non-existence of records responsive to plaintiffs' FOIA request, even in light of the above-discussed extraordinary disclosures, would reasonably be expected to trigger harm to national security.

18.    On its face, plaintiffs' FOIA request seeks disclosure of information pertaining to intelligence sources and methods.  And assuming for purposes of explanation that other surveillance applications existed, they would fall within the purview of FISA operational files, the existence of which is classified in the interests of national security pursuant to Executive Order 13526 § 1.4(c)-(d).  Similarly, disclosing whether or not NSD sought authority for intelligence collection concerning particular topics would, by itself, risk the revelation of intelligence sources and methods.

19.    As noted above, the DOJ NSISCG confirms the classified nature of any statement merely acknowledging the existence or non-existence of records responsive to plaintiffs' FOIA request.  As an OCA, I have determined that the existence or non-existence of records responsive to the portions of plaintiffs' FOIA request that remain subject to NSD's Glomar response remains a classified fact because any such acknowledgment would tend to confirm or disprove that the Department sought or is seeking authority for intelligence operations for particular targets or activities.

20.     Moreover, disclosure of the existence or nonexistence of other responsive records would cause harm to national security because it would permit hostile intelligence services to use FOIA to acquire information about United States intelligence investigations.  Once a particular source or method, or the fact of its use in a particular situation, is discovered, its continued usefulness may be degraded.  If NSD were to indicate that it maintains responsive information, such confirmation would provide trained intelligence analysts of foreign intelligence services with individual pieces of information that could be compiled into a catalogue of FISA activities. Intelligence services and other adversaries could use these disclosures to gain insight into which intelligence agents operating in this country were known to the U.S. Government and which were not.  Further, this information could be used to deploy counterintelligence assets against the U.S. Government and significantly impair U.S. intelligence collection.

21.     Conversely, revealing the absence of responsive records pertaining to particular individuals would tend to indicate that persons within the scope of the request were not pertinent to the approval of FISA applications.  That fact could be extremely valuable to foreign powers and hostile intelligence services who could use it to carry out intelligence activities with the knowledge that the U.S. Government is not monitoring certain people and may not even suspect them.  As a result, the best way for NSD to protect critical intelligence information and minimize the harm to national security for the Government is to assert a Glomar response to requests for information pertaining to operational FISA work.

22.     The determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to

prevent or delay the release of information that does not require protection in the interests of national security. *See* Executive Order 13526 § 1.7(a).

### Conclusion

23.     To my knowledge, no authorized Executive Branch official has officially disclosed whether there are records responsive to plaintiffs' FOIA request other than those disclosures discussed above related to President Trump's March 4, 2017 tweets and the Page-related applications and orders. NSD otherwise adheres to its Glomar response pursuant to FOIA Exemption 1 as to the existence or non-existence of any documents responsive to plaintiffs' FOIA request with respect to other FISA applications or orders, if any.

I certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

Executed this 19th day of October 2018, at Washington, D.C.


_____
PATRICK N. FINDLAY

# EXHIBIT A

# The James Madison Project
## 1250 Connecticut Avenue, N.W.
### Suite 200
### Washington, D.C. 20036

(202) 498-0011
(202) 330-5610 fax

E-Mail: FOIA@JamesMadisonProject.org
http://www.JamesMadisonProject.org

March 6, 2017

VIA E-MAIL

Arnetta Mallory
FOIA Initiatives Coordinator
Department of Justice
National Security Division
Room 10702
600 E Street, NW
Washington, D.C. 20530-0001

Re:   FOIA Request – Trump FISA Warrant

Dear Ms. Mallory:

This is a request on behalf of The James Madison Project ("JMP") and Brad Heath ("Mr. Heath")(hereinafter referred to jointly as "the Requesters") under the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*

On March 4, 2017, President Donald J. Trump sent out a four-part post on Twitter accusing former President Barack Obama's Administration of a "Nixon/Watergate" effort to "tap" the phones of President Trump and/or his associates during the 2016 presidential campaign. President Trump suggested the surveillance was unlawful. *https://www.washingtonpost.com /politics/trump-accuses-obama-of-nixonwatergate-wiretap--but-offers-no-evidence/2017 /03/04/1ddc35e6-0114-11e7-8ebe-6e0dbe4f2bca_story.html?hpid=hp_hp-top-table-main_ trumpwiretap-8pm%3Ahomepage%2Fstory&tid=a_inl&utm_term=.23f02d72f083* (last accessed March 6, 2017).

This FOIA request seeks copies of Department of Justice National Security Division ("DOJ NSD") records, including cross-references. Specifically, the Requesters seek the following:

---

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

1) A copy of any order(s) by the Foreign Intelligence Surveillance Court ("FISC") authorizing surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for the presidency, or people associated with President Trump;

2) A complete copy of any application(s) to the FISC seeking authorization for surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for the presidency, or people associated with President Trump; and

3) A copy of any minimization procedures issued by the FISC and that applied to any order(s) issued that fall within the scope of categories #1 or 2.

The scope of the search should be construed to include all types of applications for "orders" or "warrants" regarding which the FISC is authorized to issue, including but not limited to, an order authorizing surveillance of an "agent of a foreign power" or an order authorizing the collection of "business records" through Section 215 of the USA Patriot Act.

DOJ NSD can limit the timeframe of its search from June 1, 2016, up until the date of acceptance of this request. The scope of the search should not be limited to DOJ NSD-originated records and should be construed to include records that are currently in the possession of a U.S. Government contractor for purposes of records management.

The Requesters are pre-emptively asserting that President Trump's public comments constitute prior official disclosure of the existence of at least one, if not more, FISA warrants. Accordingly, the Requesters will dispute any legal claim justifying a refusal to confirm or deny the existence or non-existence of responsive records. The Requesters will similarly dispute any legal claim justifying withholding responsive records in their entirety based exclusively upon Exemption 1, as implicating classified information.

The Requesters are pre-emptively waiving any objection to the redaction of the names of any U.S. Government officials below a GS-14 position or whom otherwise were not acting in a supervisory position. The Requesters similarly waive any objection to redactions of the names of any U.S. Government contractors in a position of authority similar to that of a GS-13 series civilian employee or below.

In terms of all other third parties who work or worked for the U.S. Government and whose names appear in records responsive to this request, the Requesters submit that the privacy interests of those individuals have been diminished by virtue of their involvement in one or more of the U.S. Government functions described above as falling within the scope of this request. There is a recognized inverse relationship between the position of authority that a government

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

employee holds and the strength of that employee's privacy interests. See Stern v. FBI, 737 F.2d 84, 92 (D.C. Cir. 1984); Jefferson v. Dep't of Justice, 2003 U.S. Dist. LEXIS 26782, *11 (D.D.C. Nov. 14, 2003); see also Perlman v. Dep't of Justice, 312 F.3d 100, 107-109 (2d. Cir. 2002)(setting forth five factors to consider in weighing government employee's privacy interests against public interest in disclosure, including employee's rank and whether information sheds light on a government activity).

The work performed by these third parties (whether they be Government officials or contractors) was part of their official responsibilities on behalf of the U.S. Government and was not of a personal nature. They served in a position of trust and authority to, among other things, formulate arguments supporting and ultimately draft applications to be submitted to the FISC authorizing surveillance of and/or information concerning requested targets of investigation. Given that responsive records memorializing the work they performed will shed light on government activity, it would be reasonable to conclude that the relevant third parties' respective (and diminished) privacy interests are outweighed by the public interest in disclosure of the information indexed to their name.[1]

We are also requesting a waiver of or, at a minimum, a reduction in fees. First, for similar reasons as those described above, there is an overriding public interest in disclosure of responsive records. Second, both JMP and Mr. Heath qualify – in their own respective right – for designation as representatives of the news media.

JMP is a non-partisan organization dedicating to promoting government accountability and the reduction of secrecy. *http://jamesmadisonproject.org/* (last accessed August 7, 2015). Mr. Heath is an Investigative Report for USA TODAY, writing primarily about law and criminal justice. *http://www.usatoday.com/staff/679/brad-heath/* (last accessed March 6, 2017).

The Requesters have the ability to disseminate information on a wide scale and intend to use information obtained through this FOIA request in an original work, particularly through news articles written by Mr. Heath.  According to 5 U.S.C. § 552(a)(4)(A)(ii),

> the term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.

---

[1] We acknowledge, of course, that some redactions or narrowly focused withholdings might ultimately be appropriate as DOJ NSD processes the responsive records.

---

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

The Requesters can demonstrate their intent and ability to publish or otherwise disseminate information to the public. See Nat'l Security Archive v. Dep't of Defense, 880 F.2d 1381, 1386 (D.C. Cir. 1989). Mr. Heath in particular maintains the ability to publish articles explaining the content of any responsive records received as part of this request. In the event that fees are ultimately assessed, do not incur expenses beyond $25 without first contacting our office for authorization.

Relying upon those same arguments outlining a public interest in disclosure of requested records, the Requesters are also seeking expedited processing of their FOIA request. FOIA permits expedited processing when a "compelling need" exists. 5 U.S.C. § 552(a)(6)(E)(v). Specifically, "compelling need" means "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity." Id. at § 552(a)(6)(E)(v)(II).

If you deny all or part of this request, please cite the specific exemptions you believe justify your refusal to release the information or permit the review and notify us of your appeal procedures available under the law. We request that any documents or records produced in response to this request be provided in electronic (soft-copy) form wherever possible. Acceptable formats are .pdf, .jpg, .gif, .tif. Please provide soft-copy records by email or on a CD if email is not feasible. However, the Requesters do not agree to pay an additional fee to receive records on a CD, and in the instance that such a fee is required, they will accept a paper copy of responsive records.

Your cooperation in this matter would be appreciated. If you wish to discuss this request, please do not hesitate to contact me at (202) 907-7945 or via e-mail at brad@jamesmadisonproject.org.

Sincerely,

/s/

Bradley P. Moss
Deputy Executive Director

*"Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives."*

*James Madison, 1822*

# EXHIBIT B

**Mallory, Arnetta (NSD)**

| | |
|---|---|
| **From:** | NSDFOIA (NSD) |
| **Sent:** | Friday, March 17, 2017 10:17 AM |
| **To:** | Bradley P. Moss, Esq. |
| **Subject:** | RE: NSD FOIA request #17-094 |

Bradley Moss
The James Madison Project
1250 Connecticut Ave, NW
Suite 200
Washington, DC 20036

FOIA/PA #17-094

Dear: Mr. Moss:

This is in reference to your email dated March 5, 2017, pertaining 1) A copy of any order(s) by the Foreign Intelligence Surveillance Court ("FISC") authorizing surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for the presidency, or people associated with President Trump; 2) A complete copy of any application(s) to the FISC seeking authorization for surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for the presidency, or people associated with President Trump; and 3) A copy of any minimization procedures issued by the FISC and that applied to any order(s) issued that fall within the scope of categories #1 or 2. Our FOIA office received your Freedom of Information request on March 5, 2017.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c) (2006 & Supp. IV (2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

The National Security Division (NSD) maintains operational files which document requests for and approvals of authority for the U.S. Intelligence Community to conduct certain foreign intelligence activities.

We do not search these records in response to requests regarding the use or non-use of such techniques in cases where the confirmation or denial of the existence of responsive records would, in and of itself, reveal information properly classified under Executive Order 13526. To confirm or deny the existence of such materials in each case would tend to reveal properly classified information regarding whether particular surveillance techniques have or have not been used by the U.S. Intelligence Community. Accordingly, we can neither confirm nor deny the existence of records in these files responsive to your request pursuant to 5 U.S.C. 552(b)(1).

If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site: https://foiaonline.regulations.gov/foia/action/public/home. Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,
Arnetta Mallory
Government Information Specialist

# EXHIBIT C



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Brad Moss, Esq.
Mark S. Zaid, P.C.
Suite 200
1250 Connecticut Avenue, NW
Washington, DC 20036
brad@markzaid.com

Re:   Appeal No. DOJ-AP-2017-003002
      Request No. 17-094
      CDT:TAZ

**VIA: FOIAonline**

Dear Mr. Moss:

You appealed on behalf of your clients, The James Madison Project and Brad Heath of USA TODAY, from the action of the National Security Division of the United States Department of Justice on their Freedom of Information Act request for access to records concerning:

1) "A copy of any order(s) by the Foreign Intelligence Surveillance Court ('FISC') authorizing surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for the presidency, or people associated with President Trump;

2) A complete copy of any application(s) to the FISC seeking authorization for surveillance of and/or collection of information concerning the Trump Organization, President Trump, President Trump's campaign for the presidency, or people associated with President Trump; and

3) A copy of any minimization procedures issued by the FISC and that applied to any order(s) issued that fall within the scope of categories #1 or 2."

After carefully considering your appeal, I am affirming the National Security Division's action on your clients' request. The FOIA provides for disclosure of many agency records. At the same time, Congress included in the FOIA nine exemptions from disclosure that provide protection for important interests such as personal privacy, privileged communications, and certain law enforcement activities.

I have determined that the National Security Division properly refused to confirm or deny the existence of any records responsive to your clients' request because the existence or nonexistence of any responsive records is currently and properly classified. See 5 U.S.C. § 552(b)(1). However, I am referring this matter to the Department of Justice's Department Review Committee so that it may determine if the existence or nonexistence of any responsive

- 2 -

records should remain classified under Executive Order No. 13,526.  You will be informed of the Department's final decision on this matter.  This referral does not affect your clients' right to pursue litigation.

Please be advised that this Office's decision was made only after a full review of this matter.  Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeal, your clients' underlying request, and the action of the National Security Division in response to your clients' request.  If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office's FOIA Public Liaison for your appeal.  Specifically, you may speak with the undersigned agency official by calling (202) 514-3642.

If your clients are dissatisfied with my action on your appeal, the FOIA permits them to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  Using OGIS services does not affect your clients' right to pursue litigation.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; email at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

4/12/2017

X  _Sean O'Neill_

Sean R. O'Neill
Chief, Administrative Appeals Staff
Signed by: OIP

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

JAMES MADISON PROJECT, *et al.*,

Plaintiffs,

v.

DEPARTMENT OF JUSTICE,

Defendant.

Civil Action No. 16-CV-597 (CKK)

## DECLARATION OF G. BRADLEY WEINSHEIMER

I, G. BRADLEY WEINSHEIMER, declare as follows:

1.   I am the Acting Chief of Staff and the Director of Risk Management and Strategy for the National Security Division ("NSD") of the United States Department of Justice ("DOJ" or "Department"). NSD is a component of the Department which formally began operations on October 2, 2006, by consolidating the resources of the Office of Intelligence Policy and Review ("OIPR")[1] and the Criminal Division's Counterterrorism Section ("CTS") and Counterespionage Section ("CES"). I have served as Director of Risk Management and Strategy since March 2016, prior to which time I served as the Deputy Counsel in the DOJ's Office of Professional Responsibility from June 2011 until March 2016, and as an Assistant U.S. Attorney in the District of Columbia from June 1991 until June 2011.

2.   Among other responsibilities, in my capacity as the Director of Risk Management and Strategy, I supervise and am the acting Director for the Freedom of Information ("FOIA")

---

[1] OIPR is now known as the Office of Intelligence ("OI").

and Declassification Unit ("NSD FOIA"), which is responsible for responding to requests for
access to NSD records and information pursuant to the FOIA, 5 U.S.C. § 552 and the Privacy
Act of 1974.  Through the exercise of my official duties, I have become familiar with this action
and the underlying FOIA requests.  The statements contained in this declaration are based upon
my personal knowledge and information provided to me in the course of my official duties.

     3.     In addition, I have TOP SECRET original classification authority delegated to me
by the Attorney General of the United States pursuant to Section 1.3(c) of Executive Order
13526.  Therefore, I am authorized to conduct classification reviews and to make original
classification and declassification decisions up to the TOP SECRET level.  Through the exercise
of my official duties, I have become familiar with this civil action and the underlying FOIA
request. I make the following statements based upon my personal knowledge and information
made available to me in the course of performing my official duties.

     4.     In an email dated March 6, 2017, plaintiffs, the James Madison Project ("JMP"),
stated, "On March 4, 2017, President Donald J. Trump sent out a four-part post on Twitter
accusing former President Barack Obama's Administration of a 'Nixon/Watergate' effort to 'tap'
the phones of President Trump and/or his associates during the 2016 presidential campaign.
President Trump suggested the surveillance was unlawful."  Plaintiffs then requested the
following:

    (1)    A copy of any order(s) by the Foreign Intelligence Surveillance Court
("FISC") authorizing surveillance of and/or collection of information
concerning the Trump Organization, President Trump, President Trump's
campaign for the presidency, or people associated with President Trump;

    (2)    A complete copy of any application(s) to the FISC seeking authorization
for surveillance of and/or collection of information concerning the Trump
Organization, President Trump, President Trump's campaign for the
presidency, or people associated with President Trump; and

     (3)    A copy of any minimization procedures issued by the FISC and that
applied to any order(s) issued that fall within the scope of categories #1 or
2.

JMP added that they "are pre-emptively asserting that President Trump's public comments
constitute prior official disclosure of the existence of at least one, if not more, FISA warrants."
And they would "dispute any legal claim justifying a refusal to confirm or deny the existence or
non-existence of responsive records." This request was assigned NSD FOI/PA #17-094. A copy
of this request is attached as Exhibit A.

     5.    In an email dated, March 17, 2017, NSD FOIA issued a "Glomar response" by
stating that it does not search for records in response to requests regarding the use or non-use of
certain foreign intelligence gathering techniques in which the confirmation or denial of the
existence of responsive records would, in and of itself, reveal information properly classified
under Executive Order 13526. A copy of this March 17, 2017 email is attached as Exhibit B.
Plaintiffs appealed NSD's determination to the Department of Justice's Office of Information
Policy ("OIP") on March 17, 2017. A copy of this letter is attached as Exhibit C. OIP affirmed
NSD's determination in a letter dated, April 12, 2017. Plaintiffs filed this lawsuit on April 4,
2017.

     6.    FOIA Exemption (b)(1) protects records that are: "(A) specifically authorized
under criteria established by an Executive order to be kept secret in the interest of national
defense or foreign policy and (B) are in fact properly classified pursuant to such Executive
order." 5 U.S.C. § 552(b)(1). Executive Order 13526 § 1.1(a) provides that information may be
classified under the terms of this order only if all of the following conditions are met: (1) an
original classification authority is classifying the information; (2) the information is owned by,
produced by or for, or is under the control of the U.S. Government; (3) the information falls

3

within one or more of the categories of information listed in § 1.4 of Executive Order 13526; and

(4) the original classification authority determines that the unauthorized disclosure of the

information reasonably could be expected to result in some level of damage to the national

security, and the original classification authority is able to identify or describe the damage.

Executive Order 13526 further states that, in response to a FOIA request, "[a]n agency may

refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of

their existence or nonexistence is itself classified under this order or its predecessors." Exec.

Order 13526, § 3.6(a).

7.      Pursuant to Exemption 1 of FOIA and Executive Order 13526, NSD does not

confirm or deny the existence of records regarding any particular individual alleged to be

pertinent to operational FISA work.  Pursuant to the Department of Justice, National Security

Information, Security Classification Guide (July 2012), the fact that a FISA application was

applied for or used in a particular case is classified national security information, as is

identification of specific individuals or organizations who are subjects of a national security

investigation making use of a FISA warrant.

8.      Here, to disclose the existence or nonexistence of responsive documents in NSD

files would disclose whether or not particular individuals were pertinent to FISA applications

and warrants, thus disclosing information pertaining to intelligence sources and methods under

E.O. 13526 § 1.4(c)[2].

9.      Such disclosure would cause harm to national security because it permits hostile

intelligence services to use FOIA to acquire information about U.S. intelligence investigations.

---

[2] Pursuant to Executive Order § 1.7(a), this information is not classified to (1) conceal violations of law, inefficiency, or administrative error, (2) prevent embarrassment to a person, organization, or agency (3) restrain competition, or (4) prevent or delay the release of information that does not require protection in the interest of the national security.

Once a particular source or method or the fact of its use in a particular situation is discovered, its continued usefulness may be degraded or impossible.

10. Furthermore, information disclosed in response to a FOIA request becomes public information. Intelligence organizations and other adversaries are expert at acquiring and analyzing information in the public domain. Thus, information given to one FOIA requester will be available to subsequent requesters and to foreign powers and their intelligence services. If NSD were to indicate that it maintains responsive information, these responses would provide trained intelligence analysts with individual pieces of information that could be compiled into a catalogue of FISA activities. Intelligence services and other adversaries could use these disclosures to discover which intelligence agents operating in this country were known to the U.S. Government and which were not. This information could be used to deploy counterintelligence assets against the U.S. Government and impair U.S. intelligence collection.

11. Conversely, revealing the absence of responsive records pertaining to particular individuals would tend to indicate that persons within the scope of the request were not pertinent to the approval of FISA applications. That fact could be extremely valuable to foreign powers and hostile intelligence services who could use it to carry out intelligence activities with the knowledge that the United States Government is not monitoring certain people and may not even suspect them.

12. As a result, the best way for NSD to protect critical intelligence information and minimize the harm to national security for the Government is to assert a Glomar response to requests for information pertaining to operational FISA work. To be credible and effective, the NSD must use the Glomar response consistently in all cases where the existence or nonexistence of records responsive to a FOIA request is a classified fact, as it is here, including instances in

5

which NSD does not possess records responsive to a particular request. If NSD were to invoke a
Glomar response only when it actually possessed responsive records, the Glomar response would
be interpreted as an admission that responsive records exist. This practice would reveal the very
information that NSD must protect in the interest of national security. If NSD were to possess
responsive records and acknowledged that, such an admission would provide hostile foreign
powers with access to additional, operationally valuable information about hypothetical U.S.
intelligence investigations and allow those powers to subvert those same hypothetical
investigations. Further, if NSD does not possess responsive records and informed the public of
that fact, hostile foreign powers could use that fact to carry out activities against the United
States with the knowledge the Government is not surveilling certain people.

13.     I have reviewed the Complaint, which quotes public statements made by President
Donald J. Trump and FBI Director James Comey. These statements do not alter NSD's decision
to neither confirm nor deny whether there are responsive records. To my knowledge, no
authorized Executive Branch official has officially disclosed the precise information at issue
here, and its disclosure is reasonably expected to harm national security.

## CONCLUSION

I certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of July 2017, Washington, DC

G. BRADLEY WEINSHEIMER

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

GIZMODO MEDIA GROUP, LLC,                    :

                  Plaintiff,            :       17 Civ. 3566 (DLC)

  -against-                                   :

DEPARTMENT OF JUSTICE,                        :

                Defendant.           :

------------------------------------------------------------------------x

## SUPPLEMENTAL DECLARATION OF G. BRADLEY WEINSHEIMER

I, G. BRADLEY WEINSHEIMER, declare as follows:

1.      I am the Acting Chief of Staff and the Director of Risk Management and Strategy for the National Security Division ("NSD") of the United States Department of Justice ("DOJ" or "Department"). NSD is a component of the Department which formally began operations on October 2, 2006, by consolidating the resources of the Office of Intelligence Policy and Review ("OIPR")[1] and the Criminal Division's Counterterrorism Section and Counterespionage Section (now known as the Counterintelligence and Export Control Section). I have served as Director of Risk Management and Strategy since March 2016, prior to which time I served as the Deputy Counsel in DOJ's Office of Professional Responsibility from June 2011 until March 2016, and as an Assistant U.S. Attorney in the District of Columbia from June 1991 until June 2011.

2.      Among other responsibilities, in my capacity as the Director of Risk Management and Strategy, I supervise the Freedom of Information ("FOIA") and Declassification Unit ("NSD FOIA"), which is responsible for responding to requests for access to NSD records and

---

[1] OIPR is now known as the Office of Intelligence ("OI").

information pursuant to the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974. I currently serve as the acting Director of NSD FOIA. Through the exercise of my official duties, I have become familiar with this action and the underlying FOIA request, and I submitted a declaration as part of DOJ's September 27, 2017, motion for summary judgment. *See* Dkt. No. 22.

3.      I am submitting this supplemental declaration to provide additional information about the search for records that enabled DOJ to represent that it has no records responsive to Plaintiff's April 6, 2017, FOIA request inasmuch as it seeks records of alleged wiretapping of then-candidate Trump in Trump Tower by President Obama prior to the 2016 election. *See id.* ¶ 8. The statements contained in this supplemental declaration are based upon my personal knowledge and information provided to me in the course of performing my official duties.

4.      On March 4, 2017, President Trump made a four-part post on Twitter, alleging that President Obama "had my 'wires tapped' in Trump Tower just before the victory." *See id.* ¶ 6; Dkt. No. 31 (Def. Mem. of Law) at 3.

5.      In March 2017, after President Trump made this four-part Twitter post, and before then-FBI Director Comey testified before the House Permanent Select Committee on Intelligence on March 20, 2017, NSD undertook a search to determine if it was in possession of any records of alleged wiretapping of then-candidate Trump in Trump Tower prior to the 2016 election as claimed in the March 4 tweets. The search was limited to determining whether or not any records specifically referenced in the March 4 tweets existed; the following explanation makes no representations about and does not confirm or deny the existence or non-existence of any other wiretap records.

6.      Subject matter experts from NSD's Office of the Assistant Attorney General ("OAAG") and the Operations Section of OI, who, based on their positions, responsibilities, and

2

length of service, would be expected to know of the existence of any such information, were consulted. The Operations Section of OI is the Department of Justice component responsible for preparing and filing all applications for orders from the Foreign Intelligence Surveillance Court pursuant to the Foreign Intelligence Surveillance Act ("FISA"). Based on these discussions, NSD determined that no FISA applications or other NSD records existed concerning the alleged wiretapping of then-candidate Trump in Trump Tower prior to the 2016 election, and thus NSD possessed no such records.

7.      Because of the responsibilities, particular experience, and expertise of the subject matter experts who were consulted, NSD is confident that information gathered from these individuals constituted a complete and definitive search for these records. Nevertheless, in March 2017 in an effort to be as thorough as possible, NSD also conducted an electronic search in the relevant OI case management system, which search was designed to identify any records of wiretapping of then-candidate Trump in Trump Tower prior to the 2016 election as referenced in the March 4 tweets. This search similarly yielded no responsive records.

8.      No additional searches are reasonably likely to yield records in the possession of NSD of wiretapping of then-candidate Trump in Trump Tower prior to the 2016 election.

I certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed this /4ᵗʰ day of December 2017, Washington, D.C.

G. BRADLEY WEINSHEIMER